UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

ROBERT H. BURCH, Individually and on :    Civil Action No. 08-cv-01029
Behalf of All Others Similarly Situated, :
                             :
            Plaintiff, :    <u>CLASS ACTION</u>
                             :
       vs. :    COMPLAINT FOR VIOLATION OF THE
SLM CORPORATION, ALBERT L. LORD, :    FEDERAL SECURITIES LAWS
CHARLES ELLIOTT (C.E.) ANDREWS and :
ROBERT S. AUTOR, :
                             :
          Defendants. :
                             :

———————————————————— x    <u>DEMAND FOR JURY TRIAL</u>

## INTRODUCTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of SLM Corporation ("Sallie Mae" or the "Company") between January 18, 2007 and January 3, 2008, inclusive (the "Class Period"), against Sallie Mae and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").

2.      Sallie Mae, through its subsidiaries, provides education finance in the United States. The Company was founded in 1972 and its primary business is to originate and hold student loans by providing funding, delivery and servicing support for education loans.  The Company provides its loans through participating in the Federal Family Education Loan Program ("FFELP") and through offering non-federal guaranteed Private Education Loans.

3.      During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial results.  As a result of defendants' false statements, Sallie Mae's stock traded at artificially inflated prices during the Class Period, reaching its Class Period high of $57.98 per share in July 2007.

4.      Sallie Mae offers its loans to students attending both traditional schools and non-traditional schools.  Traditional schools are typically institutions of higher education that are not-for-profit and offer bachelors and graduate degrees.  Non-traditional schools are typically educational institutions that are for-profit and offer associate degrees and/or vocational, career or technical programs.  For-profit schools are institutions that are run by private profit-seeking companies or organizations.  They make up a small segment of students attending colleges and universities.

5.      The graduation rate at the non-traditional schools is much lower than the graduation rate at the typical schools.  Graduation is critical to student loan lenders as graduates tend to earn more and experience lower rates of unemployment than non-graduates, both of which are key factors for borrowers being able to pay back their student loans.  Additionally, the students attending non-

traditional schools tend to have a lower tier credit quality and many of them fall into the category of subprime borrowers.

6.    Despite evidence that Sallie Mae's loan loss provisions for its subprime borrowers attending non-traditional schools were inadequate both prior to and at the start of the Class Period, Sallie Mae failed to adequately reserve for losses in its non-traditional portfolio.

7.    Thereafter, as the subprime market began to rapidly deteriorate in early 2007, Sallie Mae experienced a high level of defaults in its non-traditional portfolio. Nonetheless, Sallie Mae's loan loss provisions for its non-traditional portfolio remained at inadequate levels during the Class Period.

8.    Then, in an SEC filing on January 3, 2008, the Company disclosed that it would be cutting back on its core business of lending to students by being "more selective" in making students loans due to turmoil in the credit markets and a new federal law that slashed subsidies to the private companies that make government-backed student loans.

9.    On this news, Salle Mae's stock dropped $2.49 per share, to close at $16.67 per share, a one-day decline of 15% on volume four-times the average three-month volume. This was the lowest Sallie Mae's stock had traded since October 2000.

10.    Several weeks later, Sallie Mae disclosed that it had suffered a tremendous loss in the fourth quarter of 2007 as well as for the year due in large part to a charge to increase its loan loss provision by $575 million to cover actual and expected loan losses. In total, Sallie Mae's loan provision for 2007 was $1.4 billion compared to $303 million for 2006. The majority of the large increase in the loan loss provision was related to subprime loans made prior to 2007 that were a part of the Company's non-traditional portfolio. While the loans in the non-traditional segment only

represented 15% of the Company's managed private credit portfolio, they resulted in 60% of the total charge-offs for 2007.

11.    Sallie Mae further disclosed that it would be exiting the non-traditional segment and would stop making loans to students who attended schools with very low graduation rates.  Three major for-profit secondary-education companies announced that Sallie Mae had notified them that it would discontinue making loans to students at the schools who were classified as subprime borrowers.

12.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    The Company failed to engage in proper due diligence in originating student loans to subprime borrowers, particularly those attending non-traditional institutions;

(b)    The Company was not adequately reserving for uncollectible loans in its non-traditional portfolio in violation of GAAP, causing its financial results to be materially misstated;

(c)    The Company failed to disclose known trends and uncertainties as required by SEC regulations concerning collection issues with its non-traditional loan portfolio;

(d)    The Company had far greater exposure to anticipated losses and defaults related to its non-traditional loan portfolio than it had previously disclosed;

(e)    The Company's business model was unprepared for legislative changes that would result in a reduction in federal student lender rate subsidies and an increase in lender risk to a much greater extent than represented by defendants;

(f)    Given the deterioration and the increased volatility in the subprime market and reductions in federal subsidies, the Company would be forced to tighten its lending standards on

- 3 -

both its federal loans and private education loans which would have a direct material negative impact on its loan originations going forward; and

(g)    Given the increased volatility in the subprime market and reductions in federal subsidies, the Company had no reasonable basis to make projections about its ability to maintain its current student loan production levels or its ability to manage its costs. As a result, the Company's projections issued during the Class Period about its earnings for 2007 were at a minimum reckless.

13.    As a result of defendants' false statements, Sallie Mae's stock price traded at inflated levels during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down more than 71% from their Class Period and near all time high of $57.98 per share in July 2007.

## JURISDICTION AND VENUE

14.    The claims asserted arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5. Jurisdiction is conferred by §27 of the 1934 Act. Venue is proper pursuant to §27 of the 1934 Act. Sallie Mae has operations in this District, false statements were made in this District and acts giving rise to the violations complained of occurred in this District.

## PARTIES

15.    Plaintiff Robert H. Burch purchased Sallie Mae common stock as described in the attached certification and was damaged thereby.

16.    Defendant Sallie Mae, through its subsidiaries, provides education finance in the United States. It originates and holds student loans by providing funding, delivery, and servicing support for education loans through its participation in FFELP and through offering non-federally

guaranteed private education loans.  Sallie Mae stock trades under the symbol SLM on the New York Stock Exchange.

17.    Defendant Albert L. Lord ("Lord") is Vice Chairman and Chief Executive Officer ("CEO") of Sallie Mae and served as Chairman of Sallie Mae from March 2005 to January 2008. During the Class Period, Lord sold 1.665 million shares of Sallie Mae stock, reaping $52.9 million in insider trading proceeds.

18.    Defendant Charles Elliott (C.E.) Andrews ("Andrews") served as Chief Financial Officer ("CFO") of the Company from February 2006 to January 2008.  From May 2007 until December 2007, Andrews additionally served as CEO.  He was named President in December 2007.

19.    Defendant Robert S. Autor ("Autor") was, at relevant times, Executive Vice President, Operations of Sallie Mae.

20.    Defendants Lord, Andrews and Autor (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Sallie Mae's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein at ¶¶28, 32, 34, 36, 38, 40, 42, 44, 46 and 49.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

21.    Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Sallie Mae.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Sallie Mae common stock was a success, as it: (i) deceived the investing public regarding Sallie Mae's prospects and business; (ii) artificially inflated the price of Sallie Mae common stock; (iii) allowed defendant Lord to reap over $52.9 million in compensation while Sallie Mae stock traded at artificially inflated prices; and (iv) caused plaintiff and other members of the Class to purchase Sallie Mae common stock at inflated prices.

## BACKGROUND

22.    Sallie Mae, through its subsidiaries, provides education finance in the United States. It originates and holds student loans by providing funding, delivery, and servicing support for education loans through its participation in FFELP and through offering non-federally guaranteed private education loans. The Company primarily markets its FFELP Stafford and private education loans through on-campus financial aid offices.  It also engages in a debt management operations business, which provides a range of accounts receivable and collections services, including student loan default aversion services, defaulted student loan portfolio management services, contingency collections services for student loans and other asset classes, and accounts receivable management and collection for purchased portfolios of receivables.  In addition, the Company purchases and manages sub-performing and non-performing mortgage loans.  Further, it provides a range of other financial services, processing capabilities, and information technology to educational institutions, lenders, students and their families, and guarantee agencies.

23.    In recent years, Sallie Mae has engaged in equity forward contracts related to the Company's securities as a way to raise money without borrowing.  In an equity forward contract an issuer sells its securities to a buyer and agrees to repurchase the shares for a greater amount in the

future.  The issuer is essentially placing a bet that the price of its shares will rise.  If the market value of the underlying securities falls below certain predetermined "trigger" levels, the buyer of the contract has the right to terminate the contract and settle all or a portion of the original contract price.

24.    As of December 31, 2006, the Company had outstanding equity forward contracts to purchase 48.2 million shares of its common stock at prices ranging from $46.30 to $54.74 per share with trigger prices ranging from $20.84 to $35.58 per share.  In February 2007, the Company amended its equity forward contracts whereby the trigger prices were reduced with the highest trigger price being $30.11 per share.  As of February 28, 2007, the Company had outstanding equity forward contracts to purchase 48.2 million shares of its common stock at prices ranging from $43.50 to $54.74 per share with trigger prices ranging from $23.93 per share to $30.11 per share.  Given the nature of equity forward contracts, it was imperative that the Company maintain its share price above the predetermined trigger levels throughout the Class Period.

25.    Furthermore, it was essential for Sallie Mae to maintain its share price in order to promote a merger agreement with another company.  In October 2006, defendant Lord initiated negotiations with a private equity firm concerning the possibility of an acquisition of the Company.  Thereafter the negotiations continued throughout the end of 2006 and into the beginning of 2007 with the Company entering into a merger agreement in April 2007.

26.    In a move to consummate the merger agreement, Sallie Mae misrepresented the Company's business and prospects.  These false statements about Sallie Mae's business were extremely important to the market and made the Company an attractive acquisition target.

27.    In order to consummate the merger, it was vital that Sallie Mae maintain its stock price at the start of the Class Period.

- 7 -

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

28.    On January 18, 2007, the Company issued a press release entitled "Sallie Mae's fee-based businesses exceed $1 billion; managed loans grow 16 percent to $142 billion."  The release stated in part:

- Loan Purchases Top a Record $34 Billion

- Fee Income Increases 20 Percent

- Internal Lending Brands' Growth Rate Exceeds 40 Percent

. . . SLM Corporation, commonly known as Sallie Mae, today reported fourth-quarter and full-year 2006 earnings and performance results that include a total managed student loan portfolio of $142 billion, a 16-percent increase from the year-ago quarter.

**"Core earnings" net income was $326 million, or $.74 per diluted share, for the 2006 fourth quarter, compared to $284 million, or $.63 per diluted share, in the year-ago quarter. For the full-year 2006, "core earnings" net income was $1.3 billion, or $2.83 per diluted share, up from $1.1 billion, or $2.51 per diluted share, for 2005. Recognizing stock-based compensation in both the current and year-ago periods and adjusting for one-time items, "core earnings" diluted earnings per share were $.74 in the fourth quarter 2006, a 16-percent increase from $.64 in the year-ago quarter, and $2.79 in 2006, a 17-percent increase from $2.39 in 2005.**

"We delivered a record amount of loans to help students access higher education," said Tim Fitzpatrick, CEO. "The private sector, led by Sallie Mae, continues to provide product, pricing and service innovations that deliver results to 80 percent of colleges and universities in the U.S. and help nearly 6 million students access college every year."

\*        \*        \*

**Fourth-quarter 2006 GAAP net income was $18 million, or $.02 per diluted share, compared to $431 million, or $.96 per diluted share, in the year-ago quarter. GAAP net income for 2006 totaled $1.2 billion, compared to $1.4 billion in 2005.**

Included in these GAAP results are pre-tax net losses on derivative and hedging activities of $(245) million in the fourth-quarter 2006 and $(339) million year-to-date 2006, compared to pre-tax net gains of $70 million and $247 million in the respective year-ago periods.

- 8 -

29.    On February 1 and 2, 2007, defendant Lord sold 400,000 shares of stock for an average price of $45.80 per share reaping $18.3 million in insider trading proceeds.

30.    This stock sale by defendant Lord was especially fortuitous as it came days before the public release of President Bush's budget proposal on February 5, 2007.  In the President's budget, he proposed cutting student lender rate subsidies and increasing lender risk.  The news sent Sallie Mae's shares down 9% in a day.  The timing of defendant Lord's sale prompted separate investigations by the Securities and Exchange Commission ("SEC"), the U.S. House of Representatives' Committee on Education and Labor and the U.S. Senate Committee on Health, Education, Labor and Pensions.

31.    On April 13, 2007, news surfaced that Sallie Mae was in talks to be bought out by a private equity firm.

32.    On April 16, 2007, the Company issued a press release entitled "Investor group to buy Sallie Mae for $25 billion."  The release stated in part:

> An investor group led by J.C. Flowers & Co. has signed a definitive agreement to purchase SLM Corporation, commonly known as Sallie Mae, for approximately $25 billon or $60.00 per share of common stock, the companies announced today.
>
> When the transaction is complete, J.C. Flowers along with private-equity firm Friedman Fleischer & Lowe will invest $4.4 billion and own 50.2 percent, and Bank of America and JPMorgan Chase each will invest $2.2 billion and each will own 24.9 percent. Sallie Mae's independent board members have unanimously approved the agreement and recommended that its shareholders approve the agreement.
>
> "We are pleased to invest in Sallie Mae and help provide increased liquidity, stability and financial strength," said J. Christopher Flowers, Managing Director at J.C. Flowers. "Both Bank of America and JPMorgan Chase have fully committed to support the company with short- and long-term financing."
>
> The new owners are committed to supporting Sallie Mae's focus on transparency among lenders, schools and students and on corporate governance. Sallie Mae will be subject to oversight by Congress and the Department of Education, and will continue to be subject to all applicable federal and state laws, including the Higher Education Act.

Upon closing, Sallie Mae's current management will continue to lead the company, ensuring that it will continue to adhere to the New York Attorney General's Student Loan Code of Conduct, which Sallie Mae adopted April 11. Sallie Mae will continue to originate student loans under its internal brands and will remain headquartered in Reston, Va.

In 2006, Sallie Mae, the nation's leading saving- and paying-for-college company, originated $23.4 billion of student loans.

"This is an exciting, new chapter in Sallie Mae's history," said Sallie Mae CEO Tim Fitzpatrick, who will continue in that role. "Over the years we have worked with Congress and other policymakers to offer innovative products to students, and to address the challenges of college affordability and rising student debt. We have helped meet this challenge by offering industry-leading student loan discounts, introducing innovative technology, and investing in Upromise, which administers college savings plans."

33.    On this news, Sallie Mae's stock increased from the low $40s to the mid-$50s on unusually high volume.

34.    On April 24, 2007, the Company issued a press release entitled "SLM Corporation's portfolio of managed loans grows 18 percent in first-quarter 2007."  The release stated in part:

- Loan Purchases Up 45 Percent

- Internal Lending Brand Originations Increase 35 Percent

- Direct-to-Consumer Private Education Loans Increase 64 Percent

. . . SLM Corporation, commonly known as Sallie Mae, today reported first-quarter 2007 earnings and performance results that include an 18-percent increase in the managed student loan portfolio to $150 billion from the year-ago quarter's $127 billion. Also during the quarter, the company originated $4.8 billion through its internal lending brands, a 35-percent increase over the year-ago period.

"Our recent acquisition announcement reaffirms and strengthens our commitment to invest in the next generation of America's students," said Tim Fitzpatrick, chief executive officer. "We remain focused on doing what we do best: providing access to education savings and low-cost financing together with the best information resources to help students pay for college."

The company purchased $11.6 billion in education loans during the first-quarter 2007, a 45-percent increase from the year-ago period. Also during the 2007 first quarter, the company originated $8.0 billion in preferred-channel loans. Approximately 60 percent of all preferred-channel loans originated in the first

quarter 2007 were originated by the company's internal lending brands, compared to 47 percent in the year ago period. Preferred-channel loan originations include loans originated by the company's internal lending brands and external lending partners.

Private education loan originations, a segment of preferred-channel originations, were $2.4 billion, and included more than $241 million of direct-to-consumer loans, a 64-percent increase from $147 million of private education loans originated through this channel in the year-ago quarter.

\*        \*        \*

**Sallie Mae reported first-quarter 2007 GAAP net income of $116 million, or $.26 per diluted share, compared to $152 million, or $.34 per diluted share, in the year-ago period. Included in these GAAP results are pre-tax losses on derivative and hedging activities of $(357) million, compared to $(87) million in the year-ago quarter, servicing and securitization revenue of $252 million, compared to $99 million in the year-ago period, and a provision for losses of $150 million, compared to $60 million in the year-ago period.**

**"Core earnings" net income for the quarter was $251 million, or $.57 per diluted share, compared to $287 million, or $.65 per diluted share in the year-ago quarter. These results include a provision for losses of $199 million in the first-quarter 2007, compared to $75 million in the first-quarter 2006. Annualized net charge-offs as a percentage of average private education loans in repayment were 3.4 percent in the first quarter of 2007, compared to 1.3 percent in the year-ago period**.

35.      On May 25, 2007, Sallie Mae filed its Preliminary Proxy Statement relating to the merger.  Pursuant to the Proxy Statement, the Company disclosed that its officers and directors had certain interests in the merger that were different from the interests of the Company's shareholders, including the potential to receive large cash payments upon consummation of the merger and indemnity agreements which would protect the executives from past misconduct.  The cash payments were to be based upon the conversion of the officers' and directors' equity interests in the Company at the effective time of the merger which included the automatic vesting of all outstanding stock options.  At the time of the merger, defendant Lord was to receive a cash payment of approximately $225 million, defendant Andrews was to receive $16.1 million and defendant Autor was to receive $16 million.

- 11 -

36.     On July 11, 2007, the Company issued a press release entitled "SLM Corporation provides update on transaction," which stated in part:

> SLM Corporation, commonly known as Sallie Mae, today announced that, in connection with the April 15, 2007 agreement providing for the acquisition of Sallie Mae, the acquiring entity, owned by affiliates of J.C. Flowers & Co., Bank of America and JPMorgan Chase, has informed Sallie Mae that it believes that current legislative proposals pending before the U.S. House of Representatives and U.S. Senate "could result in a failure of the conditions to the closing of the merger to be satisfied." Sallie Mae strongly disagrees with this assertion, intends to proceed towards the closing of the merger transaction as rapidly as possible and will take all steps to protect shareholders' interests.

37.     However, after this news, Sallie Mae's stock price retreated to the low $50s. Nonetheless, Sallie Mae maintained that the new legislation would not have a meaningful impact on its business.

38.     On July 17, 2007, the Company issued a press release entitled "Sallie Mae's managed loan portfolio grows 18 percent from prior year to $153 billion in second-quarter; Originations through Company's lending brands grow 39 percent." The release stated in part:

> SLM Corporation, commonly known as Sallie Mae, today reported second-quarter 2007 earnings and performance results that include an 18-percent increase in managed student loans from the year-ago quarter, with the company's portfolio topping $153 billion. Second-quarter 2007 preferred-channel loan originations were $3.6 billion, and loans originated through the company's internal brands, a segment of total preferred-channel loan originations, grew 39 percent from the year-ago period to $2.4 billion.
>
> Preferred-channel loan originations include loans originated by the company's internal lending brands and external lending partners. Preferred-channel originations in the first half of 2007 were $11.6 billion, and internal brands originated $7.2 billion, or 62 percent, of the total.
>
> "Our loan portfolio continues to register strong growth, and our internal brands are outpacing the market," said C.E. Andrews, chief executive officer. "We are delivering best-in-class products and services to schools, students and families to help them access higher education."
>
> The company purchased $20.9 billion in education loans in the first half of 2007, a 27-percent increase from the same period last year. In the second-quarter 2007, loan purchases were $8.4 billion.

\*       \*       \*

*Sallie Mae reported second-quarter 2007 GAAP net income of $966 million, or $1.03 per diluted share, compared to $724 million, or $1.52 per diluted share, in the year-ago period. Included in these GAAP results are pre-tax gains on derivative and hedging activities of $822 million in the second-quarter 2007, compared to $123 million in the year-ago quarter, and a decrease of $671 million in gains on student loan securitizations. Second-quarter 2007 GAAP diluted earnings per share were reduced by $1.21 due to the reversal of unrealized gains on dilutive outstanding equity-forward contracts as required by the GAAP diluted earnings per share calculation.*

*"Core earnings" net income for the second-quarter 2007 was $189 million, or $.43 per diluted share, down from $320 million, or $.72 per diluted share, in the year-ago quarter. These second-quarter 2007 results include a provision for losses of $247 million and $51 million in expenses related to the company's previously announced acquisition. Annualized net charge-offs as a percentage of average private education loans in repayment were 3.5 percent in the second-quarter 2007, compared to 3.4 percent in the prior quarter. For the first half of 2007, "core earnings" net income was $440 million, compared to $607 million in the first half of 2006*.

39.    Thereafter, throughout the Fall of 2007, the deal began to collapse as the buyer group refused to consummate the merger per the original terms of the merger agreement due to the recent change in legislation and the turmoil in the credit market.

40.    On October 11, 2007, the Company issued a press release entitled "Sallie Mae student loan originations increase 13-percent from year-ago quarter; Managed student loan portfolio reaches $160 billion." The release stated in part:

> SLM Corporation, commonly known as Sallie Mae, today reported third-quarter 2007 earnings and performance results that include a 13-percent rise in its student loan originations to $8.9 billion, from the 2006 third quarter's $7.8 billion. Year-to-date 2007, student loan originations were $20.5 billion, compared to $18.6 billion in the same period last year. The company's managed student loan portfolio totaled $160 billion at the end of the third-quarter 2007.
>
> "Thanks to our industry-leading brand, our scale and efficiencies, and our focus on students and families, we successfully faced a number of challenges this quarter," said C.E. Andrews, chief executive officer. "We have a solid track record of growing our 'core earnings' through various political, interest rate and economic environments, and the fundamentals of our business point to a bright future for our company."

                                    *       *       *

    *Sallie Mae reported a third-quarter 2007 GAAP net loss of $344 million, or $.85 diluted loss per share, compared to net income of $263 million, or $.60 per diluted share, in the year-ago period. Included in these GAAP results are pre-tax losses on derivative and hedging activities of $487 million in the third-quarter 2007, principally related to the decline in share price during the quarter on the company's equity forward positions.*

    Third-quarter 2007 "core earnings" net income was $305 million, or $.70 per diluted share, before $46 million, or $.11 per diluted share, in after-tax reductions to net income from the following non-recurring items: $28 million related to the recent legislative changes in the FFELP risk-sharing percentage and $18 million related to the company's previously announced merger agreement. Including these non-recurring items, reported "core earnings" net income was $259 million, or $.59 per diluted share.

    For the first nine months of 2007, "core earnings" net income was $699 million, compared to $927 million in the same period last year.

41.    Throughout November 2007, Sallie Mae's stock continued to drift downward from the mid-$40s range at the beginning of the month to mid to upper $30s by the end of the month as the market began to learn the extent to which the deterioriation in the credit market and the extent to which the new legislation would negatively affect Sallie Mae's business.

42.    On December 12, 2007, the Company issued a press release entitled "SLM Corporation provides update of transaction and financial outlook."  The release stated in part:

    SLM Corporation, commonly known as Sallie Mae, today announced the following:

    To address recent reports in the marketplace regarding the proposed buyout of Sallie Mae by a group led by J.C. Flowers, Bank of America and JP Morgan Chase, the company's Board of Directors states the following:

    Over the past eight weeks, in a series of discussions between the company and senior representatives of the Flowers group, Sallie Mae has indicated that, to resolve the dispute between the parties, the company offered to consider an alternative transaction with the Flowers group, and to give them the opportunity to update their due diligence and submit a new proposal to acquire the company with no pre-conditions.

    The buyer's group has indicated to Sallie Mae that it does not wish to pursue these opportunities.

- 14 -

The Board remains committed to protecting the rights of our shareholders, and will pursue all available recourse, including the company's existing lawsuit against the buyer's group.

The company has indications of interest, subject to customary terms and conditions, from 10 financial institutions for new secured warehouse funding significantly in excess of $30 billion.

The company also made the following announcements:

*Financial Outlook*

*The company expects fourth-quarter core earnings per diluted share to be in the range of $.52 to $.57, excluding non-recurring items such as merger-related costs. The fourth quarter core earnings per share are being impacted by funding costs and increased reserves for the FFELP loan portfolio.*

*The company will release its private credit trust data on Friday, Dec. 14, which will show an improvement in charge-offs, 90-day and over delinquencies, and forbearances.*

*The company is lowering its 2008 core earnings EPS guidance from $3.25 to a range of $2.60 to $2.80 due primarily to increased costs from replacing the company's interim funding facility.*

*The underlying business drivers for the company are strong and executive management is strategically repositioning certain aspects of the business to allow for maximum growth and earnings opportunities.*

Equity Forward Contracts

Separately, the company has reduced the strike and trigger prices with its counterparties on equity forward contracts. As a result of these transactions, the company's aggregate position on equity forward contracts is 48.2 million shares at an average strike price of $43.93, with trigger prices ranging from $26.00 to $19.58.

Executive Reorganization

Barry Feierstein has been promoted to lead sales and marketing. Feierstein, who joined Sallie Mae in 2004, has been responsible for the company's private loan strategy and development. Robert Autor has been appointed to lead the company's originations, servicing and call center operations, in addition to its information technology group. Autor joined the company in 1999 as part of the Nellie Mae acquisition.

Kevin Moehn, executive vice president, sales and originations, and June McCormack, executive vice president, servicing, technology and sales marketing, will be leaving the company.

The Board will continue to work with Sallie Mae's management to generate shareholder value, and to grow the company's industry leadership position.

Additionally, the company will be permitting its directors and executive officers to trade company stock, subject to the company's normal trading clearance procedures. Due to the proposed Flowers transaction, the company had restricted its directors and executives from trading company stock since March 2007.

43.     This was part of a series of partial disclosures and revelations concerning the truth about Sallie Mae's business operations, finances, business metrics, and future business and financial prospects. Nonetheless, Sallie Mae's stock continued to trade at artificially inflated levels as this revelation, along with the ones made during the remainder of the Class Period, was accompanied by denials and continued misrepresentations by defendants. Upon this partial disclosure, Sallie Mae's stock dropped $3.45 per share on December 12, 2007, to close at $28.49 per share, a one-day decline of 12% on extremely high volume.

44.     On December 13, 2007, the Company issued a press release entitled "SLM Corporation provides update on equity forward contracts," which stated in part:

SLM Corporation, commonly known as Sallie Mae, today announced that the company has amended or closed out certain equity forward contracts. As a result of these transactions, the company's aggregate position on equity forward contracts is 44.0 million shares at an average strike price of $44.30, with trigger prices ranging from $24.75 to $19.58.

45.     On December 14, 2007, defendant Lord sold 1,265,401 shares of stock for an average price of $27.36 per share reaping $34.6 million in insider trading proceeds. Additionally, director Charles Daley sold 80,023 shares of stock on this day reaping $2.2 million in insider trading proceeds.

46.     In its press release dated December 14, 2007, the Company made the following representations concerning defendant Lord's stock sale:

In addition, Sallie Mae announced that Mr. Lord today sold 1.2 million shares of SLM common stock, approximately 10 percent of his equity units, on the open market. This action was required under Mr. Lord's borrowing arrangements. Sallie

Mae opened its trading window for directors and executive officers today for the first time since discussions with the J.C. Flowers group in March 2007. After the sale, Mr. Lord owns approximately 340,000 SLM shares and share units, and holds stock options and appreciation rights, at various exercise prices, covering approximately 10 million SLM shares.

47.    The stock sale by defendant Lord was again fortuitous, as it came days before Sallie Mae would host a conference call in which it would disclose that the Company might be facing higher financing costs and that the Company would need to add capital. This news sent Sallie Mae's shares tumbling – closing down 21% in a day. The timing of these stock sales prompted another investigation by the SEC into the Company's disclosures in December 2007, both before and after its executives and directors traded their stock.

48.    On December 19, 2007, *The Wall Street Journal* published an article entitled "Sallie Mae Understated Stock Sale by CEO Lord," which stated in part:

> Albert L. Lord, chief executive of student-loan titan SLM Corp., or Sallie Mae, sold slightly more SLM stock than the company announced last week.

> On Friday, Mr. Lord sold 1,265,401 shares of SLM, or 97% of his company stock, according to filings the company made yesterday with the Securities and Exchange Commission. The sales were at an average price of $27.36 a share.

> That was more than Sallie Mae had disclosed, when it announced Friday evening that "Mr. Lord today sold 1.2 million shares of SLM common stock." The company's release also overstated Mr. Lord's remaining holdings.

> A Sallie Mae spokesman acknowledged the errors but didn't comment further.

> Sallie Mae shares have fallen 40% since the beginning of the year, closing yesterday at $28.87, up 97 cents, in 4 p.m. New York Stock Exchange composite trading.

> The company's business has come under pressure since Congress agreed to cut subsidies for student-loan providers. In September, a group led by private-equity firm J.C. Flowers & Co. backed out of an agreement to buy Sallie Mae for $60 a share.

> Sallie Mae had also described Mr. Lord's sale as "approximately 10% of his equity units" – meaning if one adds up the total number of Mr. Lord's shares, stock

options and other derivatives on a one-to-one basis, the stock sale was of 10% of his total number of Sallie Mae equity instruments.

For almost all of Mr. Lord's stock options, the exercise price is higher than the current share price, making them worthless unless Sallie Mae's share price rises.

Accounting for his various derivatives at their fair values, Mr. Lord's transaction represents the sale of roughly three-quarters of his SLM holdings, said someone familiar with the matter.

49.     On December 19, 2007, on the Company's shareholder conference call, defendants made the following statements:

[Lord:]  Let me first talk about the deal. I'm not going to talk very much about it. As you are well aware, it's not a deal any longer, it's litigation. I'm going to attempt to engage in a little self-defense, hopefully not defensively. I and the Company and the Board have gotten some bad press for not doing a transaction. I know there are many disappointed recent shareholders. Again, the irony is that my objective over a 30-year career of representing public companies has been to reward investors, particularly in this Company which I hold very dear.

*      *      *

I'm going to mention a few words about my stock sale. My bank sold me out on Friday of 1.2 million shares. I will mention that it's embarrassing and troublesome to me personally. It is not a sign of my disillusionment with the Company; in fact, the exact reverse is the case. It is a short-term cost in my view of my own belief in my company. I suppose you might say, one more victim of an unfinished deal. I can assure you that I'm properly incented to create the earnings growth that is Company has been known for and I have no more margin stock – no more margin.

*      *      *

The other immediate goal, and it has already been started by the Company, is to focus directly on the highest quality private credit asset channels. Intermediate goals – intermediate for me means the – I guess we call it the '08 lending season. It begins in the summer of '08, so we're really talking about maybe July. It is at that point I hope we begin to restore a viable long-term earnings growth rate for the Company. We will continue to capitalize on our on-campus strength and build that credit channel. There are numerous opportunities to consolidate the industry. We have to be very discriminating in that effort, but I see massive opportunity for us to increase share. Again, to acquire that capacity, we will likely use stock. We will not do dilutive transactions. We will not increase our goodwill, and these opportunities will be taken also to build capital.

When people think about this Company in terms of its earnings growth rate, and we have had a pretty impressive growth rate for 25 years, it comes down to very

simple, simple basics. It's the growth in the number of students, the growth in the cost of schools and our ability to grow market share. Our focus, particularly now in light of events including legislation, will be to focus our growth targets even more directly on the four-year schools where we want to build market share. Sallie Mae has had a strong double-digit growth rate for 25 years. When we first listed this Company in 1983, I was CFO. The success we have earned over that period has been as a consequence of what I just mentioned – the growth in higher ed, our market share growth. We've achieved those double-digit growth rates in the face of 25 years of margin cuts. This recent round of margin cuts was significant, but is not net. It changes the landscape for us, but if anybody's prepared to deal with that, we are. These macroeconomic facts did not change just because of a failed deal.

                    *        *        *

Recently, we restruck or reforecast or reguided or whatever is the language we need to use our fourth quarter earnings and our 2008 outlook. I am being asked why. I'm not going to get precise, but the issue is predominantly funding costs. Our securitization market costs are out over 25 basis points. Access there is not as free and is not infinite as it once was. We have discovered an index mismatch between commercial paper on which the student loans earn their interest and LIBOR. This credit crunch has exposed that mismatch, which had never opened in the roughly 10 years we've had this commercial paper index, but it has widened out into double-digits. The interim financing facility provided by the buyer has high financing costs. Replacing it will probably involve higher financing costs. This is not a great time to be financing.

We made a decision on the basis of trying to increase market share to – not to knock out our borrower benefits in response to the recent legislation. Original forecast had us knocking borrower benefits out. There are – and we have moved our private credit provision up a little bit since we have talked to you in October. Since we talked to you in October, this credit crunch reemerged, and – well, so be it.

As I said, I don't want to get into FICO scores and basis points. Steve can help you guys with your models with respect to these issues, and he will. Of course, I hear a lot of questions about private credit quality. I would direct you to our securitization data, which is actually showing mild improvement. At least on a delinquency data versus prior quarters, it seems to be moving in the right direction. I am not the least bit Pollyanna-ish because of those numbers. This is a delicate economic environment; at least it seems to be, so we're watching them very closely. I'm pleased they're going in the right direction, but I also would tell you, we are comparing them to first-half statistics which bear the cost of some operational issues and make it a little bit difficult to fully analyze that data.

We have analyzed our defaults and we have a highly sophisticated and professional group of collectors in our collection function and they've analyzed these defaults and we are on them. We have moved quickly to cut off those loans – the

most difficult loans – at their source, and I believe we have a very good understanding of that. This is a very high priority of mine in my new seat.

The very good news is that demand for this product is as strong as ever, and it grows. Almost all marginal funding student borrowing is in the private credit area. Almost every student has used up whatever guaranteed loans are available. So whatever growth and whatever demand increase there is, is typically in the private area. I say that is good news. It gives us the luxury of applying a little more care in the selection of these assets.

I hear noise from a variety of places, some of which make me less than happy about our refinancing our interim facility. That facility comes due in May, although in February it becomes much more expensive. As I said, there seems to be a lot of interest in this facility. We need to remember that this is a fully secured facility. And while it is a bad time to be negotiating interest rates, we are very much in the process. We have a great deal of interest in this, and in my view, it's a matter of cost.

The long-term – I think it's worth noting that the Company has never had an interim facility in its 30-year history. This is a byproduct of a deal. The goal will be of course to have backup facilities in sufficient amount long-term, but obviously the long-term goal is, as we've built capital, is to reduce the size of it, and certainly the cost of it.

I have been CEO and CFO of this Company for 24 years. We – I think the largest that that underlying facility had ever been was $6 billion. That would clearly be insufficient today, but this is a unique situation. Our goal, as I said earlier I think, is to build other avenues to move our assets off-balance sheet.

I'm going to wrap up. As I said, this Company has been around for 35 years. It has led the financing of higher education for 35 years. The macroeconomics of this industry remain the same. There have been a variety of changes, particularly in the legislative area and in the credit markets underlying all of this, but we're doing about a company that seeks to lead and does lead the higher education finance industry and has been in effect wandering off on a different path for the last nine months now. We need to get off that patch and get back on the right path and get back to the double-digit earnings growth that we've had in the past. I have had a 26-year – out of the Company's 35 years, I have been associated with it for 26 years. I am extraordinarily proud of it.

This is just one more major challenge for this Company. We will exceed that challenge. There are lots of worriers in this environment. Just remember, those of you who are worrying, that this business is one of the very few that is not totally recession-proof, but it is virtually recession proof.

50.     Following the Company's conference call, Sallie Mae's stock dropped $5.98 per share, to close at $22.89 per share on December 19, 2007, a one-day decline of 21% on extremely high volume.

51.     On December 20, 2007, *The Wall Street Journal* published an article entitled "Sallie Offers Little on Strategy – CEO, in Investor Call, Fails to Assuage Worry As Shares Slide by 21%," which stated in part:

> Sallie Mae's chief executive rattled investors, declining to answer many questions about the student-loan company's finances and strategy amid concern about its prospects in the credit crunch.

> After a rambling conference call, which Chief Executive Albert L. Lord ended with an expletive, shares of Sallie Mae, officially SLM Corp., fell $5.98, or 21%, to $22.89 in 4 p.m. New York Stock Exchange composite trading. Mr. Lord said the company is considering raising money to shore up its balance sheet through an offering of common stock, and that Sallie wouldn't consider reinstating its dividend – suspended this year – until mid-2008.

> Yesterday's conference call caps a tough autumn for Sallie Mae. Last week, a $25 billion takeover bid by a group of investors, led by private-equity firm J.C. Flowers & Co., came to an end. The two sides are now locked in litigation about whether the buyout group will have to pay Sallie a $900 million breakup fee. The collapse of the deal, which would have given investors $60 a share, follows the decision by Congress to slash billions of dollars of subsidies to student-loan companies, hurting Sallie's business.

> Mr. Lord, after dodging many questions, pledged to answer them at a meeting in January. ***In an apparent reference to investors' anger, he said: "I can assure you, you will be going through a metal detector." He ended the conference call by saying "Let's go. There's no questions. Let's get the [expletive] out of here***."

> Sallie Mae spokesman Tom Joyce called the metal-detector remark "an attempt at humor" and the expletive "an unfortunate slip of the tongue." Mr. Joyce said the call had been intended for Mr. Lord, in his new role, to give investors a "broad overview" of the company's situation.

> Mr. Lord, who has been with the company for 26 years, served as chief executive from 1997 to 2005. The company named him CEO again last week, though he had taken over the principal-executive role in November.

> Mr. Lord also addressed his recent sale of 1,265,401 shares of SLM, or 97% of his company stock. The company's disclosures suggested he had borrowed against

his stockholdings and faced a margin call as the value of his holdings declined. Yesterday, Mr. Lord, who still holds millions of options, said "my bank sold me out" of the shares and called it "embarrassing and troublesome to me personally" and "not a sign of disillusionment with the company."

Mr. Lord, a hard-charging executive known for his brusque manner, is often credited with transforming the company in recent years from a government-sponsored entity into a private firm with fast-growing profits. (Critics said the company was taking advantage of students' ever-higher debts.) "Al's always been a shoot-from-the-hip kind of guy," said Matt Snowling, an analyst at Friedman, Billings, Ramsey & Co., referring to yesterday's conference call. "He shot himself in the foot on this one."

Sallie's travails yesterday show the extreme nervousness of investors about securities backed by financial instruments, such as mortgages and credit cards. Sallie has long prospered because of the robust market for securities backed by student loans, which are guaranteed by the U.S. government.

Yet, Mr. Lord indicated that its costs are rising because investors are nervous even about those securities. Sallie Mae also makes and resells private student loans – which aren't backed by the government. Investors have largely lost interest in those deals, fearing they could be subject to rising defaults.

Sameer Gokhale, an analyst with Keefe, Bruyette & Woods, says he didn't expect students to have trouble getting access to government-backed student loans. But he and other analysts said private loans – often necessary for students amid spiraling tuitions – may end up being less available and more costly. "One has to wonder who is going to be around to lend money to students on the private-loan side," he said.

52.    Furthermore, due to the utter collapse of the Company's stock price by December 19, 2007, most of the trigger prices as set by the Company's equity forward contracts had been reached – meaning that the Company had lost its bet on its own share value and was required to settle its equity contracts.

53.    As a result, on December 26, 2007, the Company announced a proposed $2.5 billion public offering of common stock and mandatory convertible preferred stock in order to raise the capital required to physically settle its outstanding equity forward purchase contracts. The offering closed on December 31, 2007, resulting in total net proceeds of $2.9 billion.

54.    Then, on January 3, 2008, the Company filed an 8-K with the SEC which stated in part:

**Business trends**

On December 12, 2007, we announced that our business has recently been negatively affected as a result of higher funding costs (including the costs of utilizing, and the expected costs of refinancing, the Interim ABCP Facility, defined below), and increased reserves for our Federal Family Education Loan Program ("FFELP") loan portfolio. In addition, our business has been negatively affected by an index mismatch between the commercial paper rate, the index for determining the interest rate we earn on the vast majority of our FFELP student loan assets, and LIBOR, the index for determining the interest rates on a substantial portion of our debt used to fund these assets.

Our management team is evaluating certain aspects of our business as a response to the impact on our business of The College Cost Reduction and Access Act of 2007 (the "Act"), and current challenges in the capital markets. The Act has a number of important implications for the profitability of our FFELP business, including a reduction in special allowance payments, the elimination of the "Exceptional Performer" designation and the corresponding reduction in default payments to 97% through 2012 and 95% thereafter, an increase in the lender paid origination fees for certain loan types and reduction in default collections retention fees, and account maintenance fees related to guaranty agency activities. As a result, we expect that the Act will significantly reduce and, combined with higher financing costs, could possibly eliminate the profitability of new FFELP loan originations, while increasing our risk sharing from our FFELP loan portfolio.

*In response to the Act and market conditions, we plan to be more selective in pursuing origination activity, in both FFELP loans and private education loans. In addition, we plan to curtail less profitable student loan acquisition activities such as spot purchases and wholesale consolidation loan purchases, which will reduce our funding needs*. We expect to see many participants exit the student loan industry in response to the Act as well as current market conditions and we therefore expect to partially offset declining loan volumes caused by our more selective lending policies with increased market share taken from participants exiting the industry. We expect to continue to focus on generally higher-margin Private Education Loans, both through our school channel and our direct to consumer channel, although in the case of the latter, with particular attention to continuing the more stringent underwriting standards that are necessary in this market. We also expect to adjust our private education loan pricing to reflect the current financing and market conditions. We also plan to eliminate certain borrower benefits offered in connection with both our FFELP loans and our private education loans. We will further de-emphasize pursuing incremental consolidation loans, in particular FFELP consolidation loans, as a result of significant margin erosion for FFELP consolidation loans created by the combined effect of the Act and the increased cost of borrowing

in the current capital markets. Nevertheless we will continue our efforts to protect selected FFELP assets existing in our portfolio. We expect to continue to aggressively pursue other FFELP-related fee income opportunities such as FFELP loan servicing, guarantor servicing and collections.

*      *      *

**Forward agreements**

The Company intends to use approximately $2.0 billion of the net proceeds from the concurrent offerings described above to settle its outstanding equity forward contract with Citibank, N.A. and repurchase the 44,039,890 shares of common stock deliverable to the Company under the contract. The Company and Citibank, N.A. have agreed to physically settle the contract, and the Company has paid Citibank, N.A. approximately $1.1 billion, the difference between the contract purchase price and the market closing price on December 28, 2007 on the approximate 44 million shares. Consequently, the common shares outstanding on the Company's year-end balance sheet will reflect the shares issued in the public offerings and the physical settlement of the equity forward contract. The Company will pay Citibank, N.A. the remaining balance due under the contract in early January 2008.

**Dividends**

We have not paid any dividends on our common stock since the execution of the merger agreement with the Buyer Group in April 2007. While the restriction on the payment of dividends under the merger agreement has been terminated, we expect to continue not paying dividends in the near term in order to focus on balance sheet improvement and expect to re-examine our dividend policy in the second half of 2008.

**Management changes and sales of securities**

On December 14, 2007, we announced that our Board of Directors added the Chief Executive Officer title and responsibilities to our Executive Chairman Albert L. Lord. C.E. Andrews, our previous CEO, assumed the role of President.

*On the same date, we announced we had opened our trading window for directors and executive officers for the first time since we commenced discussions with the Buyer Group in March 2007. Mr. Lord sold approximately 1.3 million shares of our common stock, or approximately 97% of the common stock that he owned before the sale, on the open market on December 14, 2007. Also on December 14, 2007, Mr. Charles Daley, a director, sold approximately 80,023 shares of our common stock or approximately 68% of the common stock that he owned before the sale*. Messrs. Lord and Daley have advised us that these actions were required under their respective borrowing arrangements.

55.    On this news, Salle Mae's stock dropped $2.49 per share, to close at $16.67 per share on January 4, 2008, a one-day decline of 15% on volume four-times the average three-month volume. This was the lowest Sallie Mae's stock has traded since October 2000.

56.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    The Company failed to engage in proper due diligence in originating student loans to subprime borrowers, particularly those attending non-traditional institutions;

(b)    The Company was not adequately reserving for uncollectible loans in its non-traditional portfolio in violation of GAAP, causing its financial results to be materially misstated;

(c)    The Company failed to disclose known trends and uncertainties as required by SEC regulations concerning collection issues with its non-traditional loan portfolio;

(d)    The Company had far greater exposure to anticipated losses and defaults related to its nontraditional loan portfolio than it had previously disclosed;

(e)    The Company's business model was unprepared for legislative changes that would result in a reduction in federal student lender rate subsidies and an increase in lender risk to a much greater extent than represented by defendants;

(f)    Given the deterioration and the increased volatility in the subprime market and reductions in federal subsidies, the Company would be forced to tighten its lending standards on both its federal loans and private education loans which would have a direct material negative impact on its loan originations going forward; and

(g)    Given the increased volatility in the subprime market and reductions in federal subsidies, the Company had no reasonable basis to make projections about its ability to maintain its current student loan production levels or its ability to manage its costs. As a result, the

Company's projections issued during the Class Period about its earnings for 2007 were at a minimum reckless.

57.    As a result of defendants' false statements, Sallie Mae's stock price traded at inflated levels during the Class Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down more than 71% from their Class Period and near all time high of $57.98 per share in July 2007.

## POST CLASS PERIOD REVELATIONS

58.    On January 22, 2008, Corinthian Colleges, Inc., a for-profit post-secondary education company, filed an 8-K with the SEC which stated in part:

> Corinthian Colleges, Inc. ("Corinthian," the "Company," "we" or "us") has been informed by Sallie Mae and two other lenders that they will no longer make private loans available for students who present higher credit risks (i.e. subprime borrowers). We understand this change in policy applies to subprime borrowers at post-secondary institutions in general.

> Effective October 1, 2007, Congress reduced subsidies for all federal Title IV student financial aid lenders. Those subsidy reductions, coupled with the challenging subprime credit market, have caused lenders to re-evaluate their contractual arrangements with post-secondary institutions, including Corinthian.

> The largest of these lenders, Sallie Mae, provided 90% of private loans for Corinthian's students in the United States. Private loans constituted approximately 13% of our U.S. revenue (on a cash basis) in fiscal 2007. On January 18, 2008, we received a letter from Sallie Mae indicating that it was exiting the subprime lending business for private student loans. Thus, effective March 1, 2008, Sallie Mae will no longer provide private loans for Corinthian students in the subprime credit category. In fiscal 2007, approximately 75% of our private loan portfolio was subprime. We understand that Sallie Mae's intention is to honor its loan obligations to current students; continue providing private loans to students with prime credit scores; and continue providing federal Title IV loans.

59.    Thereafter, other institutions in the for-profit sector, including Career Education Corp. and Lincoln Educational Services Corp., made similar disclosures regarding Sallie Mae's change in policy.

60.    On January 23, 2008, the Company issued a press release entitled "Sallie Mae announces fourth-quarter and full-year 2007 results."  The release stated in part:

- Loan Loss Provision Creates Net Loss in Fourth Quarter

- Originations Top $25 Billion

. . . SLM Corporation, commonly known as Sallie Mae, today reported "core earnings" results that include a fourth-quarter 2007 net loss of $139 million, or $.36 diluted loss per share, and full-year 2007 net income of $560 million, or $1.23 diluted earnings per share.

Student loan originations totaled $5.0 billion in the 2007 fourth quarter and $25.5 billion during the full-year 2007. Student loans originated through Sallie Mae's internal brands, the most profitable segment of total student loan originations, grew 27 percent year over year to $16.6 billion.

*The company recorded a loan loss provision of $575 million on a GAAP basis, or $750 million on a "core earnings" basis, in the 2007 fourth quarter that contributed to a net loss for the quarter and reduced earnings for the year. The increase in the provision relates primarily to the actual and expected performance of the non-traditional, higher-risk portion of the company's managed student loan portfolio.*

*"While there were some bright spots, we are obviously disappointed by our fourth-quarter results overall. Our cost of funds and loan loss expectations were impacted by weakening credit markets," said Albert Lord, chief executive officer. "We faced significant distractions in 2007, but we have taken several of the necessary steps to position the company for a return to strong, quality asset and earnings growth. Our business trends point in the right direction. In 2007, a challenging year for our industry, we helped students with a record amount of financing to pay for college. In 2008 and beyond, our market leadership position will continue to grow together with the demand for higher education."*

\*        \*        \*

Sallie Mae reported a fourth-quarter 2007 GAAP net loss of $1.6 billion, or $3.98 diluted loss per share, including a $1.5 billion mark-to-market loss on the company's equity forward contract, which was physically settled in full in January 2008. This compares to net income of $18 million, or $.02 diluted earnings per share, in the year-ago period.

The GAAP net loss for 2007 totaled $896 million, compared to GAAP net income of $1.2 billion in 2006. The 2007 GAAP results include principally the forward contract mark-to-market loss and private loan loss provision of $884 million.

Fourth-quarter 2007 "core earnings" net loss was $139 million, or $.36 diluted loss per share, compared to net income of $326 million, or $.74 diluted earnings per share, in the year-ago period. Driving the 2007 fourth-quarter's loss were provisions for loan losses of $750 million. This compares to $88 million in the year-ago quarter.

For the full-year 2007, "core earnings" net income was $560 million, compared to $1.3 billion in 2006.

61.    Additionally, in the Company's conference call held on January 23, 2008, the Company made the following admissions concerning its loan loss provisions:

[Lord]:  I am sure there are a lot of people in this room that remember that, their credit worthiness, although they may not have been told that at the time, changed dramatically when they got out of college especially if you went into college – never mind. Graduation is critical. ***Sallie Mae may have lent too much money to students who have gone to schools without very good graduation records***. Such students at such schools are virtually singly responsible for 60% of the '07 credit losses. Our methodology in creating loan loss provisions tended to look backwards. Because that's the information that we had. But we have specifically identified the borrowers who are not likely to graduate and provided for them this quarter, its a – frankly a different reserving methodology, ***but we know those assets are going to default***. And so we have reserved for them. Jack will get into far more detail and lay this out in a way that's comprehensible shortly. I believe our long-term charge off numbers will be less than 3% and in fact the relevant numbers for '07 for the assets that we would say are traditional school assets are something less than 2%.

*        *        *

Quality assets grew in 2007. They will grow in 2008 and they will grow in 2009 and in 2008 and 2009 they will be far higher quality. The top line is not our issue. The issue is getting the top line to the bottom line and as I have said repeatedly, the issue we are dealing with right now, forget all of '07 events, are cost to funds related and bad debt are related. Cost to funds will improve. The timing of that is not in our hands. Loan losses will also improve. In fact despite the fact that we are staring into the face of what looks to be a deteriorating economy, we believe and I am sure you have heard this a thousand times, we have our arms around this major issue. We expect provision – loan loss provision reductions. We are going to be very careful about that obviously because this economy is – maybe hasn't quite found its way yet but I would hope that as early as mid year 2008 you are seeing that. The company has stopped making loans that were predictably not collectible. You may have seen the announcements. I think three of our major customers and unfortunately what was bad news for us in this quarter has turned out to be very bad news for them as well. You may have seen the announcements that we have notified them that we are just not making those loans anymore.

- 28 -

Jack Remondi – SLM Corporation – CFO

\*      \*      \*

Our core earnings for the year totalled $560 million, a 57% decrease on earnings per share to $1.23. This was – the decrease here was primarily driven by the large increase in our loan loss reserve, our provision per loan losses on our private portfolio. Our provision increased by 1.1 billion over 2006.

\*      \*      \*

The bulk of the reserve though, was driven by the private credit portfolio with a 961 million increase in the private loan provision. This increase was driven by worst than expected default trends in a very limited segment of our overall portfolio, its the portfolio that we will refer to as our nontraditional loans. These are loans that are made to lower tier credit borrowers and are attending, for the most part, schools that have a different profile than other institutions. And mostly due to types of degrees that they offer, more associate versus bachelors and as well as the type of students that attend those institutions. I want to be clear here that it's not a – it's not as easy to say, as I think some people have said, for profit, non-profit, those are not distinctions that adequately describe the areas of concern here. This is really a segment of the schools that for one reason or another are bringing in students but not producing graduates. Or if they are producing graduates their graduates are not earning sufficient – they haven't gained a sufficient economic benefit to generate the earnings to pay off and meet the debt obligations associated with their loan. And that's the business that we will be exiting. Given the deteriorating economic environment and the loss of events for the segment of the portfolio, the fact that the loss segment – the loss events for this segment of the portfolio become more evident earlier in the life cycle of the loan, we took this opportunity to take a look at our reserving methodology and really in effect what's happening is we are recognizing that certain segments of our loan portfolio have loss characteristics more visible to us today. This is really driven by the change in the economic environment as it tends to hit people at the lower tier credit qualities hardest and earliest. We did increase our loss expectations on these types of loans earlier this year but the fourth quarter charge is principally reflective of the earlier loss recognition rather than a significant change in expectations as to gross defaults going forward.

\*      \*      \*

Moving on to the private credit portfolio, as we've kind of hinted here, our defaults are highly concentrated, amongst a small set of our borrower population. And in 2007, we experienced a significant decline in the credit quality associated with that segment of the portfolio. These loans today equal about 15% of our managed private credit portfolio, but they generate 60% – or contributed 60% of our total charge offs in 2007. Obviously, a business model that does not make sense. We've taken steps to cease lending activity in these segments of the population and we expect, as Al said in 2008, we will see better loan-loss provisions although

because we are looking forward here, higher charge off rates until these loans fully enter the repayment cycle. From our long history, with we know that graduation is the key to credit quality in the student loan space. People who generate, who get a degree, improve their economic and employment prospects materially and thereby generate the means to repay their loans. Our default experience in 2007 supports this, over 65% of our charge offs in 2007 were from borrowers who withdrew early from their program of study or dropped below less than half time status. And that's important because it's the less than half time is the trigger that throws the loan into repayment. This chart shows you how divergent the experience is amongst the different segments of our portfolio. You can see how much higher not only our delinquency rates associated with these loans which run more than six times higher the delinquency rates of our traditional loan portfolios, and these are delinquencies over 90 days. But that they also experience even higher defaults or charge off rates. These loans default at almost eight times the rate that we see in the traditional portfolio.

As a result of the increased provision for loan losses in our nontraditional portfolio, our allowance at year end is a very healthy 37% of the remaining balance of our nontraditional loans in repayment. Combined our allowance for this segment of the portfolio covers more than three times our charge off rates in 2007 which we think was accelerated also due to some operational issues but primarily due to credit and economic factors. And just to be clear, once again with these changes, we would expect the provision in 2008 to decline. We'll see how much that actually improves given the economic environment and how that drives portfolio performance particularly in the remaining portion of this nontraditional loan portfolio. But we do expect charge off rates to continue to rise in the nontraditional segment as this portfolio transitions from the in school status, where charge offs are obviously zero, to the repayment status. And once that portfolio moves into those segments, then we will begin to see the charge off rate decline for that area. We did – before I leave that, we did make some changes in 2007 regarding the underwriting aspects associated with these loans. We implemented programs that delayed the dispersement of loans between 60 and 90 days after enrollment in order to capture early withdrawal events at these institutions and we also implemented, in 2007, some significant risk sharing agreements with students attending certain schools in this category that had those institutions pick up a material portion of what we would expect to be the default exposure on those loans. That would lead one to believe that our 2007 vintage portfolio, as it enters are repayment, will see better default trends than earlier segments of the portfolio but we still believe they represent an unacceptable level of default losses and will – was a factor in why we are exiting this business.

This chart is something that people who follow Sallie Mae would have seen before, but it really is the story associated with education lending. And it bears repeating multiple times, in education, a degree, and the higher that agree, generates higher levels of income and lower levels of unemployment. Those two factors mean our borrowers, by lending to them – the type of lending that we do is to help people generate an improvement in their economic capabilities. And it's that improvement that in turn allows them to meet the debt obligations associated with their loans. If

kids don't graduate, it's very difficult. ***As we saw earlier, 65% of our charge offs came from students who withdrew. It's very difficult to collect on that loan over time***. What this chart also shows is that – it helps to prove here, is that our – with our traditional loan portfolio where graduation rates are high, our performance has been exceptional in the past and we expect that to continue going forward. Our charge off rates for this portfolio – the segment of the portfolio which again is 85% of our total managed book is well under 2% in 2007. And we expect those kinds of numbers to continue in that low two's kind of range over the life of the portfolio. Our repayment tools on these loans also help tremendously and help us work with students who are very difficulty making repayment. This is where the forbearance tool is such a critical component to managing the ultimate loan performance on our private credit assets. Students generate this higher earnings capability and lower unemployment levels but there are bumps in the road for them. And that's where forbearance comes into place, if they've graduated, they've generated the means they might just have a temporary experience that requires some relief but once they get beyond that, once they get beyond that, once again we can expect repayment on their loans. Clearly for students who is withdrawal, forbearance is really only an option – a viable option to the extent that we think it's a bridge to getting them back into an – in enrollment status. Without that life becomes very difficult for both of us.

62.    On January 28, 2008, *Reuters* published an article entitled "Sallie Mae, Buyout Group Settle Lawsuit Over Deal."  The article stated in part:

Student-lending company Sallie Mae said on Monday it settled a lawsuit over its failed buyout by a group led by private equity firm JC Flowers and had received $31 billion in new financing.

Sallie Mae, formally known as SLM Corp, dropped its lawsuit and its efforts to seek a $900 million breakup fee from the buyout group in order to gain the funding to replace $30 billion in interim financing that was due Feb. 15.

Bank of America Corp, JPMorgan Chase and five other banks were providing the new funding. JC Flowers said it would not be obligated to make any payment to Sallie Mae.

"We believe this announcement is a considerable positive given reduced liquidity risk and would expect investors to again focus on SLM's profitability and growth potential," said Lehman Brothers analyst Bruce Harting.

The interim financing had been put in place by Bank of America and JPMorgan, which were part of the buyout group that also included private equity firm Friedman Fleischer & Lowe.

Sallie Mae's buyout crumbled after the Flowers group walked away and claimed that Sallie Mae had suffered a "material adverse change" to its business due

- 31 -

to the credit market squeeze and recent legislation that slashes subsidies to student lenders.

Sallie Mae had filed a lawsuit seeking the breakup fee of $900 million, but the buyout group balked at paying any termination fee.

As part of the new financing pact, the lawsuit filed by Sallie Mae over the proposed merger as well as all counterclaims were dismissed and the merger pact was terminated, Sallie Mae said.

*"THE RIGHT THING"*

*"With little chance of recovering any of the $900 million termination fee and the legal expenses involved, we believe the company did the right thing and secured funding – presumably at better terms – as a trade-off," said Matthew Snowling, an analyst at investment group Friedman Billings Ramsey.*

*"Sallie Mae has long since lost any legal standing on arguing that a material adverse condition had occurred because the company has continued to lower its earnings forecast over time, citing the government's subsidy cut as a reason," Snowling said.*

*Last week, Sallie Mae posted a fourth-quarter loss due in part to higher provisions for loan losses due to the weakening credit markets.*

Securing the new financing also marks a first crucial win for the company's new chairman, Anthony Terracciano, a veteran banking executive, analysts said. Terracciano, who joined Sallie Mae earlier this month, has worked to stabilize Sallie Mae and restore credibility after the failed merger.

Sallie Mae is expected to pay an interest rate of about 4.5 percent on the 364-day financing package, according to The New York Times.

"While there will certainly be a sigh of relief that the credit line has been refinanced, we would echo management's recent comments that it appears costly," said Credit Suisse analyst Moshe Orenbuch.

### SALLIE MAE'S FALSE FINANCIAL
### REPORTING DURING THE CLASS PERIOD

63.    In order to inflate the price of Sallie Mae's stock, defendants caused the Company to falsely report its results for year-end 2006 and for the first three quarters of 2007 by failing to adequately accrue its loan loss provisions, which overstated the Company's net income, and by concealing known trends and uncertainties with respect to its non-traditional loan portfolio.

64.    The results for year-end 2006 and for the first three quarters of 2007 were included in a Form 10-K and Forms 10-Qs filed with the SEC. The results were also included in press releases disseminated to the public.

65.    These representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of Sallie Mae's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

66.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

67.    With respect to accounting for contingencies, GAAP, as set forth in FASB Statement of Financial Accounting Standard (SFAS) No. 5, *Accounting for Contingencies*, ¶8, states:

> An estimated loss from a loss contingency . . . shall be accrued by a charge to income if *both* of the following conditions are met:
>
> a.    Information available prior to issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b.    The amount of loss can be reasonably estimated.

(Footnote omitted, emphasis in original.)

68.    In violation of GAAP, Sallie Mae failed to provide an adequate reserve for its loan loss provision related to its non-traditional loan portfolio.  Despite evidence that the Company was experiencing a high level of delinquency and charge-offs in its non-traditional loan portfolio, the Company failed to provide an adequate reserve for its subprime borrowers attending non-traditional schools.

69.    Ultimately, Salle Mae was forced to take a charge to increase its loan loss provision by $575 million in the fourth quarter 2007 in order to cover actual and expected loan losses.  In total, Sallie Mae's loan provision for 2007 was $1.4 billion compared to $303 million for 2006.  A large portion of the charge was related to loans made by the Company prior to 2007 to subprime borrowers attending non-traditional schools.

70.    Furthermore, during the Class Period, Sallie Mae failed to disclose known trends and uncertainties concerning its non-traditional loan portfolio in violation of SEC regulations.

71.    Under SEC Regulations, Item 7 of Form 10-K and Item 2 of Form 10-Q, Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), require the issuer to furnish information required by Item 303 of Regulation S-K [17 C.F.R. §229.303] ("Item 303").  In discussing results of operations, Item 303 requires the registrant to:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

72.    The instructions to paragraph 303(a) further state:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results . . . .

73.     In addition, the SEC, in its May 18, 1989 Interpretive Release No. 34-26831, has indicated that registrants should employ the following two-step analysis in determining when a known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have a material effect on the registrant's financial condition or results of operation.

74.     The MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future.  As Securities Act Release No. 33-6711 states:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance.  MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company.

75.     Item 303 states:

> To the extent that the financial statements disclose material increases in net sales or revenues, provide a narrative discussion of the extent to which such increases are attributable to increases in prices or to increases in the volume or amount of goods or services being sold or to the introduction of new products or services.

76.     And further states:

> Where the consolidated financial statements reveal material changes from year to year in one or more line items, the causes for the changes shall be described to the extent necessary to an understanding of the registrant's businesses as a whole . . . .

77.     According to Securities Act Release No. 33-6349:

> It is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company.

78.     Nonetheless, in violation of both GAAP and SEC rules, Sallie Mae's Class Period Forms 10-K and 10-Q failed to disclose known trends and uncertainties related to Sallie Mae's operations.  Specifically it failed to disclose the following: that the Company was experiencing higher default and charge-off rates at non-traditional schools than at traditional schools, that the Company had failed to engage in proper due diligence in making subprime loans to students attending non-traditional schools and that the Company had failed to provide an adequate loan loss provision for its non-traditional loan portfolio.

79.     Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers

securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)    The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

80.    Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities

analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

<strong>LOSS CAUSATION/ECONOMIC LOSS</strong>

81.    By misrepresenting its financial outlook, the defendants presented a misleading picture of Sallie Mae's business and prospects.  Thus, instead of truthfully disclosing during the Class Period that Sallie Mae's business was not as healthy as represented, defendants falsely reported Sallie Mae's financial outlook and its actual business prospects going forward.

82.    These claims of profitability caused and maintained the artificial inflation in Sallie Mae's stock price throughout the Class Period and until the truth was revealed to the market.

83.    Defendants' false and misleading statements had the intended effect and caused Sallie Mae's stock to trade at artificially inflated levels throughout the Class Period, reaching its Class Period high of $57.98 per share on July 9, 2007.

84.    The truth about Sallie Mae's business operations, finances, business metrics, and future business and financial prospects began to enter the market with a series of partial disclosures and revelations beginning in July 2007 which were accompanied by denials and continuing misrepresentations by defendants.  As a result, the artificial inflation in Sallie Mae's stock price did not come out of the stock all at once, rather the artificial price inflation came out over time, in bits, pieces, and spurts as the stock continued to trade at artificially inflated, albeit lower, prices through January 2008.

85.    As a direct result of defendants' admissions and the public revelations regarding the truth about Sallie Mae's overstatement of its financial outlook and its actual business prospects going forward, Sallie Mae's stock price plummeted 71%, falling from $57.98 per share on July 9, 2007 to $16.67 per share on January 4, 2008 – a drop of $41.31 per share.  This drop removed the

inflation from Sallie Mae's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

86.     Plaintiff incorporates ¶¶1-85 by reference.

87.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

88.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

    (a)     employed devices, schemes and artifices to defraud;

    (b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Sallie Mae common stock during the Class Period.

89.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Sallie Mae common stock.  Plaintiff and the Class would not have purchased Sallie Mae common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

- 39 -

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

90.     Plaintiff incorporates ¶¶1-89 by reference.

91.     The Individual Defendants acted as controlling persons of Sallie Mae within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Sallie Mae stock, the Individual Defendants had the power and authority to cause Sallie Mae to engage in the wrongful conduct complained of herein.  Sallie Mae controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

92.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Sallie Mae common stock during the Class Period (the "Class").  Excluded from the Class are defendants.

93.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Sallie Mae has over 466 million shares of stock outstanding, owned by hundreds if not thousands of persons.

94.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether the 1934 Act was violated by defendants;

(b)     whether defendants omitted and/or misrepresented material facts;

(c)     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     whether the price of Sallie Mae's common stock was artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

95.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

96.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

97.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding plaintiff and the members of the Class damages, including interest;

C.     Awarding plaintiff reasonable costs and attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  January 31, 2008

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD


                    /s/ Samuel H. Rudman
_____
               SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
DAVID C. WALTON
CATHERINE J. KOWALEWSKI
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

LAW OFFICES OF ALFRED G.
  YATES, JR., P.C.
ALFRED G. YATES, JR.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA  15219
Telephone:  412/391-5164
412/471-1033 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Sallie Mae.doc

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Robert Burch ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the class action complaint in this matter (the "action") and authorizes its filing and is willing to serve as a lead or named plaintiff in the action on the basis of the allegations in that complaint or a substantively similar or related complaint or amended complaint to be filed.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transactions in SLM Corporation (SLM) that are the basis of this litigation are listed on the attached schedule.

5.    During the three years prior to the date of this Certificate, Plaintiff has sought to serve as a representative party for a class in a case under the federal securities laws as follows: (list, if any)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _27th_ day of _January_, 2008.

_Robert H Burch_
Plaintiff

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Common stock**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 07/12/2007 | 1,500 | $60.00 |
| 08/07/2007 | 300 | $60.00 |
| 08/10/2007 | 200 | $60.00 |
| 10/19/2007 | 2,000 | $55.00 |

**Option**

| Date Sold | Type of Option | Face Amount | Price |
|---|---|---|---|
| 07/11/2007 | PUT - $60 OCT 07 | 20 | $4.10 |
| 07/17/2007 | PUT - $55 OCT 07 | 20 | $4.30 |