# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| _____ | : |
|  | : |
| In re SLM Corporation Securities Litigation | :     Case No. 08 Civ. 1029 (WHP) |
|  | : |
| _____ | : |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

**GIRARD GIBBS LLP**
Jonathan K. Levine
711 Third Avenue, 20th Floor
New York, NY  10017
Telephone:  (212) 867-1721
Facsimile:  (212) 867-1767
            - and –
Daniel C. Girard
Amanda M. Steiner
601 California Street, Suite 1400
San Francisco, CA  94108
Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846

_Lead Plaintiff's Counsel_

January 29, 2010

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL BACKGROUND........................................................................................... 2

       A.     SLM's Business…………………………………………………………..2

       B.     SLM Secretly Abandons Its Strict Lending Standards……………………3

       C.     SLM Changes Its Forbearance Practices to Conceal Escalating
              Default Rates………………………………………………………………4

       D.     SLM Materially Understates Its Loan Loss Reserves to Show
              Higher Profits…………………………………………………………...5

       E.     The Flowers Transaction…………………………………………………..6

       F.     The Truth Emerges………………………………………………………..7

ARGUMENT ................................................................................................................... 8

    I.     Plaintiffs Allege Actionable False and Misleading Statements ............................ 8

       A.     The Alleged False Statements…………………………………………..8

       B.     Statements Regarding SLM's Loan Loss Reserves………………………8

              1.     Statements About Loan Loss Reserves Are Actionable ................. 8

              2.     Defendants' Argument That They Complied With GAAP Is
                    Both Premature and Incorrect ....................................................... 10

              3.     Plaintiffs' Allegations Are Sufficiently Particularized ................. 12

              4.     No Restatement Is Required ........................................................... 13

       C.     Statements Regarding SLM's Delinquency Rates………………………13

       D.     Statements Regarding Concentration of Credit Risk……………………14

       E.     The Statements Defendants Identify As "Forward-Looking" Are
               Not Protected By the Safe Harbor Provision or Bespeaks Caution
               Doctrine…………………………………………………………………..15

    II.    Plaintiffs Allege A Strong, Cogent and Compelling Inference of Scienter .......... 16

A.     Plaintiffs Sufficiently Allege Facts Giving Rise to a Strong
Inference of Defendants' Conscious Misbehavior or Recklessness........17

     1.     Defendants Were Aware of Facts or Had Access to
Information Contrary to Their Public Statements........................ 17

     2.     Private Loans Were a Core Part of SLM's Business .................... 19

     3.     SLM Failed to Follow Its Own Policies ....................................... 19

     4.     SLM Failed to Maintain Sufficient Internal Controls................... 19

     5.     SLM's GAAP Violations Provide Evidence of Scienter ............. 20

     6.     Lord and Andrews Signed SOX Certifications and
SEC Filings ................................................................................... 20

B.     Plaintiffs Allege Defendants' Motive and Opportunity to
Commit Fraud…………………………………………………………20

     1.     The Flowers Acquisition ................................................................ 21

     2.     Equity Forward Contracts .............................................................. 21

     3.     Lord's Margin Loan ...................................................................... 22

     4.     Lord's Class Period Stock Sales ................................................... 22

C.     Defendants' Proffered Inference Is Not Compelling…………………….23

III.     Plaintiffs' Loss Causation Allegations Satisfy Rule 8 ......................................... 24

CONCLUSION.......................................................................................................... 25

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*
 254 F. Supp. 2d 373 (S.D.N.Y. 2003)…………………………………………………...13

*Atlas v. Accredited Home Lenders Holding Co.*
 556 F. Supp. 2d 1142 (S.D. Cal. 2008)...................................................................... 20, 23

*Caiafa v. Sea Containers Ltd.*
 525 F. Supp. 2d 398 (S.D.N.Y. 2007)…………………………………………………...18

*Caiola v. Citibank, N.A.*
 295 F.3d 312 (2d Cir. 2002)........................................................................................ 10

*City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Group Public Ltd.*
 2009 WL 1456846 (S.D.N.Y. May 20, 2009)…………………………………………...12

*Coronel v. Quanta Capital Holdings Ltd.*
 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009)…………………………………………....12

*Cosmas v. Hassett*
 886 F.2d 8 (2d Cir. 1989) ............................................................................................ 19

*Dura Pharms., Inc. v. Broudo*
 544 U.S. 336 (2005)...................................................................................................... 24

*Emergent Capital Inv. Mgmt, LLC v. Stonepath Group, Inc.*
 343 F.3d 189 (2d Cir. 2003)......................................................................................... 25

*Fadem v. Ford Motor Co.*
 352 F. Supp. 2d 501 (S.D.N.Y. 2005)…………………………………………………...12

*Feiner v. SS & C Techs.*
 11 F. Supp. 2d 204 (D. Conn. 1998) ........................................................................... 13

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*
 270 F.3d 645 (8th Cir. 2001) ........................................................................................ 9

*Ganino v. Citizens Util. Co.*
 228 F.3d 154 (2d Cir. 2000)......................................................................................... 16

*Hall v. The Children's Place Retail Stores, Inc.*
 580 F. Supp. 2d 212 (S.D.N.Y. 2008).......................................................................... 22

*In re Aegon N.V. Sec. Litig.*
    2004 WL 1415973 (S.D.N.Y. June 23, 2004) ................................................................ 18

*In re Alliance Pharm. Corp. Sec. Litig.*
    279 F. Supp. 2d 171 (S.D.N.Y. 2003) ........................................................................ 16

*In re Alstom SA Sec. Litig.*
    406 F. Supp. 2d 433 (S.D.N.Y. 2005) ........................................................................ 20

*In re APAC Teleservice, Inc. Sec. Litig.*
    1999 WL 1052004 (S.D.N.Y. Nov. 19, 1999)………………………………………………..22

*In re AT&T Corp. Sec. Litig.*
    2002 WL 31190863 (D.N.J. Jan. 30, 2002) ................................................................ 22

*In re Atlas Air Worldwide Holdings, Inc.*
    324 F. Supp. 2d 474 (S.D.N.Y. 2004) ............................................................ 17, 18, 20

*In re Bradley Pharm., Inc., Sec. Litig.*
    421 F. Supp. 2d 822 (D.N.J. 2006) ........................................................................... 25

*In re Bristol-Myers Squibb Sec. Litig.*
    312 F. Supp. 2d 549 (S.D.N.Y. 2004) ....................................................................... 18

*In re Cardinal Health Inc. Sec. Litig.*
    426 F. Supp. 2d 688 (S.D. Ohio 2006) ...................................................................... 22

*In re CIT Group, Inc. Sec. Litig.*
    349 F. Supp. 2d 685 (S.D.N.Y. 2004) ....................................................................... 18

*In re Complete Mgmt. Inc. Sec. Litig.*
    153 F. Supp. 2d 314 (S.D.N.Y. 2001)………………………………………………..20

*In re Converium Holding AG Sec. Litig.*
    2007 WL2684069 (S.D.N.Y. Sept. 14, 2007) ............................................................ 13

*In re Countrywide Financial Corp. Derivative Litig.*
    554 F. Supp. 2d 1044 (C.D. Cal. 2008)………………………………………………17

*In re Countrywide Financial Corp. Sec. Litig.*
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) ................................................................ 24, 25

*In re Direct Gen. Corp. Sec. Litig.*
    398 F. Supp. 2d 888 (M.D. Tenn. 2005) ...................................................................... 9

*In re Dynex Cap., Inc. Sec. Litig.*
  2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) ........................................ 9, 17, 19

*In re EVCI Colleges Holding Corp. Sec. Litig.*
  469 F. Supp. 2d 88 (S.D.N.Y. 2006) ................................................. 23

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*
  52 F. Supp. 2d 429 (S.D.N.Y. 2005) ................................................. 9

*In re Giant Interactive Group, Inc. Sec. Litig.*
  643 F. Supp. 2d 562 (S.D.N.Y. 2009) ............................................... 16

*In re Global Crossing, Ltd. Sec. Litig.*
  322 F. Supp. 2d 319 (S.D.N.Y. 2004) ............................................... 10

*In re Hutchinson Tech. Inc. Sec. Litig.*
  502 F. Supp. 2d 884 (D. Minn. 2007) ............................................... 13

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*
  568 F. Supp.2d 349 (S.D.N.Y. 2008) ............................................... 25

*In re MoneyGram Int'l, Inc. Sec. Litig.*
  626 F. Supp. 2d 947 (D. Minn. 2009) ............................................... 23

*In re Moody's Corp. Sec. Litig.*
  612 F. Supp. 2d 397 (S.D.N.Y. 2009) ............................................... 25

*In re New Century*
  588 F. Supp. 2d 1206, 1215 (C.D. Cal. 2008) .................................. 9, 14, 19

*In re Nortel Networks Corp. Sec. Litig.*
  238 F. Supp. 2d 613 (S.D.N.Y. 2003) ............................................... 15

*In re Omnicom Group, Inc. Sec. Litig.*
  2005 WL 735937 (S.D.N.Y. March 28, 2005) .................................... 10

*In re Oxford Health Plans, Inc.*
  187 F.R.D. 133 (S.D.N.Y. 1999) .................................................... 15

*In re Parmalat Sec. Litig.*
  375 F. Supp. 2d 278 (S.D.N.Y. 2005) ............................................... 24

*In re PMA Capital Corp. Sec. Litig.*
  2005 WL 1806503 (E.D. Pa. July 27, 2005) ....................................... 9

*In re RAIT Fin. Trust Sec. Litig.*
    2008 WL 5378164 (E.D. Pa. Dec. 22, 2008)........................................................ 9, 19, 23

*In re Refco, Inc., Sec. Litig.*
    503 F. Supp. 2d 611 (S.D.N.Y. 2007).............................................................. 14

*In re Reliance Sec. Litig.*
    91 F. Supp. 2d 706 (D. Del. 2000)……………………………………………………15

*In re Reliance Sec. Litig.*
    135 F. Supp. 2d 480 (D. Del. 2001)................................................................. 5

*In re Scholastic Corp. Sec. Litig.*
    252 F.3d 63 (2d Cir. 2001).............................................................. 12, 18, 19, 20

*In re Scottish Re Group Sec. Litig.*
    524 F. Supp. 2d 370 (S.D.N.Y. 2007)............................................................. 18

*In re Sprint Corp. Sec. Litig.*
    232 F. Supp. 2d 1193 (D. Kan. 2002)............................................................. 21

*In re Tel-Save Sec. Litig.*
    1999 WL 999427 (E.D. Pa. Oct. 19, 1999)...................................................... 22

*In re Top Tankers, Inc. Sec. Litig.*
    528 F. Supp. 2d 408 (S.D.N.Y. 2007)............................................................. 23

*In re Veeco Instruments, Inc., Sec. Litig.*
    235 F.R.D. 220 (S.D.N.Y. 2006) ................................................................... 19

*In re Vivendi Univ., S.A. Sec. Litig.*
    381 F. Supp. 2d 158 (S.D.N.Y. 2003)......................................................... 16, 21

*In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*
    259 F.R.D. 490 (W.D. Wash. 2009) ............................................................... 9

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*
    513 F.3d 702 (7th Cir. 2008) ....................................................................... 2

*Novak v. Kasaks*
    216 F.3d 300 (2d Cir. 2000)........................................................... 12, 14, 17, 20

*Rothman v. Gregor*
    220 F.3d 81 (2d Cir. 2000).............................................................. 12, 13, 19, 21

*Schnall v. Annuity & Life Re (Holdings), Ltd.*
    2004 WL 367644 (D. Conn. Feb. 22, 2004) ................................................... 15

*SEC v. DCI Telecomms., Inc.*
    122 F. Supp. 2d 495 (S.D.N.Y. 2000) .......................................................... 20

*Shapiro v. UJB Fin. Corp.*
    964 F.2d 272 (3d Cir. 1992) .................................................................. 9, 10

*Shields v. Citytrust Bancorp, Inc.*
    25 F.3d 1124 (2d Cir.1994) ...................................................................... 18

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*
    2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005) ................................................ 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
    551 U.S. 308 (2007) ...................................................................... 16, 19, 23

*60223 Trust v. Goldman Sachs & Co.*
    540 F. Supp. 2d 449 (S.D.N.Y. 2007) .......................................................... 25

**PRELIMINARY STATEMENT**

Defendants SLM Corporation, Albert Lord and Charles Andrews move to dismiss Lead Plaintiff SLM Venture's Second Amended Complaint, arguing that Plaintiffs have not adequately plead actionable false or misleading statements, scienter and loss causation. But the complaint sets forth each statement alleged to be false and misleading, when and where it was made, who made it, and why it was false and misleading at the time it was made. Plaintiffs' allegations present a cogent and compelling case that Defendants knowingly or recklessly misrepresented material facts about SLM's lending practices and profitability.

Defendants primarily challenge the merits of Plaintiffs' allegations. They argue that even though their loan loss reserves were off by $1 billion, the credit losses SLM experienced were the product of mistaken judgment or unforeseeable economic calamities. The problem is that abundant and reliable data available to Defendants at the time they set their reserves showed that their growing portfolio of high-risk loans to students attending "non-traditional" schools would experience higher default rates than a pool of federally-guaranteed loans to students attending four-year colleges—and yet Defendants used the default rates for the low-risk federal loans to set the reserves. Defendants' challenges to Plaintiffs' other allegations of misleading statements and omissions are equally unpersuasive. They argue that Plaintiffs have not alleged their statements in enough detail, or that SLM should be exonerated because it never restated its financials. These arguments, like SLM's reflexive cry of "fraud by hindsight," are contradicted by the complaint, which explains in detail how SLM overstated its income by under-reporting the higher loan losses that would inexorably follow from its decision to lend money to high risk borrowers.

Citing contemporaneous evidence, the statements of confidential witnesses and Defendants' own admissions, Plaintiffs plead in detail how Defendants had access to facts and information contradicting their public statements about core aspects of SLM's business, SLM's failure to follow its own policies, the breakdown in SLM's internal controls, SLM's GAAP

1

violations and the false certifications signed by Lord and Andrews. Plaintiffs also detail how Lord and Andrews were motivated to keep SLM's share price high at all costs by the prospect of consummating the Flowers acquisition and their desire to avoid liability under SLM's equity forward contracts. Plaintiffs also show that Lord's use of his SLM stock to support a margin loan gave him a concrete and personal reason to push the envelope. That Defendants' scheme fell through when the Flowers group backed out of the deal is not evidence that the scheme did not exist. As Judge Posner, writing for the Seventh Circuit, observed, "The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Makor Issues & Rights, Ltd. v. Tellabs Inc*., 513 F.3d 702, 710 (7th Cir. 2008). Plaintiffs' allegations are far more cogent and compelling than Defendants' illogical and convoluted explanations, and the Court should reject Defendants' attack on Plaintiffs' scienter allegations.

As Defendants' arguments directed at Plaintiffs' loss causation allegations are premature and factually unfounded, the Court should deny Defendants' motion in its entirety.

## FACTUAL BACKGROUND

### A.    SLM's Business

SLM is one of the nation's largest providers of student loans. Founded by the government in 1972 to help students pay for college, SLM became a private company starting in 1997. Originally, SLM made federally-sponsored loans to students and parents (through the Federally Funded Education Loan Program, or FFELP). Private lenders like SLM who make FFELP loans receive subsidies from the federal government, which also guarantees a large portion of the loan. If a borrower defaults, the government reimburses the private lender for its losses. ¶¶ 41-42.

FFELP loans are fairly risk-free for lenders, but federal law limits the fees and caps the interest rate that private lenders can charge borrowers. Private education loans can be much more profitable for lenders because they can charge whatever fees and interest rates the market will bear. At the same time, private loans are far riskier because the lender bears all of the costs of

borrower default. Students typically take on private loans if they are attending schools that are ineligible for federally-sponsored loans or have reached their borrowing limit. ¶¶ 42-43.

As SLM transitioned into a private company, it wrote more private loans. ¶ 45. Over time SLM expanded its private loan business, representing to investors that it carefully managed the heightened credit risk of its private loan portfolio with ongoing risk monitoring and review processes. ¶¶ 45-47, 244. By 2006, only 16% of SLM's loans were private but they generated 23% of SLM's core earnings. SLM charged an average interest rate of 11.9% for private loans, compared to an average rate of 6.54% for federally-sponsored loans. ¶ 43.

**B.    SLM Secretly Abandons Its Strict Lending Standards**

In the fall of 2006, proposed legislation threatened to further reduce the profitability of federally-sponsored loans. ¶ 48. In response, SLM management began to seek a buyer for the company. In November 2006, Lord initiated negotiations with a group of private equity investors led by J.C. Flowers & Co. ¶ 52.

With SLM's FFELP lending business on the wane, Defendants sought to increase short-term profits in an effort to negotiate a sale to the Flowers group (or another buyer) at an attractive premium and convince investors that an acquisition on favorable terms was likely. The scheme consisted of writing billions of dollars in private loans to high-risk borrowers, recording increased income from these loans (as a result of increased loan volume and higher rates of interest SLM was entitled to receive on the loans), and underreporting expected losses.

While Defendants continued to represent that all borrowers met strict criteria, SLM changed its policies to lend to borrowers with low FICO scores and poor credit histories. ¶¶ 71-73. FICO scores and credit histories are reasonably accurate measures of the probability of repayment; loans to borrowers with low FICO scores and poor credit histories default at higher rates than loans to borrowers with high FICO scores and established repayment histories.

SLM also told investors that most of its private loans were extended to students who took

3

out federally-sponsored loans, but targeted students who were not eligible for federal loans. Many of these new borrowers were enrolled in career training courses, correspondence schools or proprietary schools run by private, profit-seeking companies (like many tech schools, or the University of Phoenix). Others attended school part-time. ¶¶ 45, 128.

The federal government and student loan industry collect extensive data on default rates for different types of borrowers. These studies uniformly report that students enrolled in career training, correspondence and proprietary schools or who attend school part-time default on their loans at a much higher rate than students who attend four-year non-profit colleges. Among other things, they are far less likely to graduate and, even if they do graduate, they tend to accept jobs that do not pay enough to allow them to repay their loans. ¶¶ 131-35.

Defendants directed employees to make these "non-traditional" loans (as SLM later labeled them) despite the high risk of nonpayment. As SLM's then-CEO put it in early 2007, "If the borrower can create condensation on a mirror, they need to get a loan this year." ¶ 49. SLM dramatically increased the volume of its private loans. Between June 2006 and December 2007, SLM's private loan portfolio more than doubled, growing from $7 billion to $15.8 billion. ¶ 48.

### C.     SLM Changes Its Forbearance Practices to Conceal Escalating Default Rates

SLM's management also implemented new "forbearance" policies that allowed the company to report delinquent loans as "current" and conceal increasing delinquency and default rates. Forbearance consisted of SLM's agreement to allow the borrower to stop making payments of principal and interest on his loan for a specified period of time. The loan continues to accrue interest, which is added to the total amount owed. SLM records the interest as income. ¶¶ 74-95.

Normally, a lender does not grant forbearance unless it increases the likelihood of repayment. Former employees from SLM's collections offices around the country report that they were instructed to stop screening borrowers to ensure that forbearance would increase the likelihood of repayment. Instead, they were told to grant forbearances to any student whose loan

had not reached the maximum of 24 months in forbearance—and even that limitation was often disregarded. ¶¶ 82-95. SLM even paid employees sizeable bonuses based on the dollar amount of loans they moved from delinquency into forbearance. ¶¶ 90-93. These incentives had their intended effect. In 2007, the amount of private loans in forbearance doubled to $2.4 billion. ¶ 80.

### D. SLM Materially Understates Its Loan Loss Reserves to Show Higher Profits

As SLM was writing large volumes of loans to riskier borrowers, and moving as many problem loans as possible into forbearance, SLM was representing to investors that its internal controls and reporting procedures ensured that the company's financial risks were closely monitored and its financial statements were prepared in accordance with generally accepted accounting principles (GAAP). *See, e.g.,* ¶¶ 193, 228, 244, 283. Because SLM was understating its loan loss reserves, however, it was reporting inflated profits by the end of 2006.

In reporting the value of its loan portfolio, GAAP required SLM to recognize only the collectible portion of the loans. SLM should have estimated the volume of loans that would default, then set loan loss reserves sufficient to cover the expected losses. *See In re Reliance Sec. Litig.*, 135 F. Supp. 2d 480, 489 (D. Del. 2001) ("A finance company cannot report the value of a loan portfolio on a balance sheet at a number greater than the estimated collectible portion of the loans. In other words, if a loan portfolio has a face value of $100 million, but is only 75 percent collectible, a finance company may not report the portfolio at more than $75 million.").

Because of the huge volume of loans it makes, SLM does not assess loan collectibility on an individual basis. Instead, SLM estimates the likelihood of default for groups of loans with similar characteristics. GAAP gives companies some flexibility in calculating estimate losses, but they must consider several types of data: loan characteristics, historical loan trends and data, current economic conditions, concentration of borrowers and credit risk, credit review procedures, borrower credit risk, type of school, published student loan default information and trends, charge-offs and recoveries, loan status and the adequacy of internal controls. ¶¶ 108-10.

Defendants ignored available data and did not adjust SLM's reserves to account for the greatly increased risk of default in its non-traditional private loan portfolio. Defendants instead used a default rate that was well below the industry average for federally-sponsored loans, which are far more likely to be repaid than private loans. Industry data showed that SLM's non-traditional private loans were more likely to default than both federally-sponsored loans and private loans to students attending four-year colleges. ¶¶ 106-12, 124-35.

Defendants also calculated the expected default rate using a two-year "loss emergence period" that began immediately after the loan was made. The loss emergence period is the span of time a lender considers in determining the likelihood of default. Typically, a student borrower is not obligated to begin repaying a loan while he or she is still in school. SLM's use of a two-year loss emergence period that included the time period when the student was not in repayment resulted in an artificially low default rate. It also ignored industry data showing that use of a two-year period for student loans materially understates actual default rates and that less risky FFELP loans (which at the time also used a two-year period that started at the time of repayment) had a higher default rate than SLM used for its private loans. ¶¶ 113-23. Nonetheless, Defendants told investors that SLM's reserves were "adequate" and "appropriate." *See, e.g.,* ¶¶ 89, 238.

### E.    The Flowers Transaction

In April 2007 Defendants achieved their goal of negotiating a sale of SLM. The Flowers group agreed to acquire SLM, contingent on the satisfaction of a number of conditions, including conditions tied to SLM's financial performance and outlook. ¶ 53. For Defendants to achieve their objectives, SLM needed to maintain its appearance of profitability. Lord and Andrews were also personally motivated to ensure that the deal closed—they stood to receive cash payments totaling $241.6 million. ¶¶ 61-63. SLM also faced billions of dollars of redemption obligations under outstanding "equity forward contracts," which allowed SLM to raise cash by selling its common stock and agreeing to buy it back at a future date at higher "strike prices."

SLM avoided taking out a loan or issuing debt or equity, but risked liability of approximately $2 billion if the market price of its stock did not reach the strike levels. ¶¶ 64-70.

In July 2007, the Flowers group indicated it was reconsidering the deal, citing proposed legislation as a possible failure of the conditions. ¶ 56. Defendants tried to keep the sale alive by suing the Flowers group and renegotiating, assuring investors that other buyers were ready to step in if the Flowers acquisition did not go through. ¶¶ 56-59. On December 12, 2007, SLM announced that the Flowers group refused to proceed on any terms. ¶¶ 59, 317-18. Two days later, 97% of Lord's SLM shares were sold for $34.6 million to meet a margin call. ¶ 211.

### F.    The Truth Emerges

On a December 19, 2007 investor call, Lord revealed that SLM was increasing its private loan loss reserves. He also acknowledged questions in the market about the credit quality of SLM's private loan portfolio but provided no details. SLM's stock dropped by 21%. ¶¶ 319-25.

On January 3, 2008, SLM disclosed that it would pay approximately $2 billion to settle its equity forward contracts. The next day, SLM announced that, going forward, it would be more selective in making private loans and was implementing stricter underwriting standards. SLM's stock dropped 13% in response to this disclosure. ¶¶ 326-30.

On January 23, 2008, SLM announced its 2007 results, which included a more than 50% reduction in net income from 2006 and a loss of $139 million for the fourth quarter, driven primarily by a $575 million provision for loan losses. That same day, Lord acknowledged that, in violation of its lending policy, SLM had been originating high-risk private loans that were "predictably not collectible." SLM's stock price closed at $18.69 per share. ¶¶ 331-36.

It was not until February 29, 2008 that Defendants separately quantified the high-risk private loans on SLM's financials, labeling them "non-traditional" loans. ¶ 337. Defendants eventually admitted that SLM had written loans to students who were "poor credit risks" attending the "wrong schools" and that by indiscriminately granting forbearances, SLM had

artificially suppressed delinquency rates and only delayed the inevitable defaults of borrowers who should not have qualified for forbearance in the first place. ¶ 342. SLM's provisions for loan losses in 2007 ultimately totaled $1 billion, far exceeding the 56% growth in the portfolio. ¶ 17.

## ARGUMENT

### I.    Plaintiffs Allege Actionable False and Misleading Statements

#### A.    The Alleged False Statements

Plaintiffs allege that during the class period, Defendants made a series of false and misleading statements in (i) conference calls with analysts in January and October 2007; (ii) press releases announcing SLM's results for 2006 and the first three quarters of 2007, and discussing the outlook for 2008; and (iii) SLM's 2006 10-K and 10-Qs for the first three quarters of 2007. ¶¶ 218-318. The false and misleading statements related to SLM's underwriting standards and forbearance practices, SLM's forbearance and delinquency rates, and its private loan business. SLM's financial statements for 2006 and the first three quarters of 2007 were materially misstated as a result of the understatement of SLM's private loan loss reserves, which caused SLM's reported income to be materially overstated. SLM's financial statements were also false and misleading because they misrepresented SLM's forbearance practices and forbearance and delinquency rates, and failed to disclose a concentration of credit risk in high-risk loans, negative trends in SLM's business, and SLM's lack of effective internal controls. *Id.*

Defendants address only some of these allegations in their motion, effectively conceding that Plaintiffs have sufficiently alleged false and misleading statements about SLM's internal controls, SLM's underwriting and forbearance practices, and negative trends and uncertainties in SLM's business. There is no merit to Defendants' challenges to the remaining allegations.

#### B.    Statements Regarding SLM's Loan Loss Reserves

##### 1.    Statements About Loan Loss Reserves Are Actionable

Defendants argue that setting loan loss reserves requires the exercise of judgment and is

inherently forward-looking, rendering their statements about SLM's reserves inactionable. But courts agree that "[t]here is nothing unique about representations and omissions regarding loan loss reserves that removes them from the purview of the antifraud provisions of the federal securities laws." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 (3d Cir. 1992); *see also In re Dynex Cap., Inc. Sec. Litig.*, 2009 WL 3380621, at *10 (S.D.N.Y. Oct. 19, 2009) (denying motion to dismiss statements about the adequacy of lender's loss reserves); *In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 507 (W.D. Wash. 2009) ("Although Allowance provisioning requires some exercise of judgment, allegations of misstatements regarding loan loss reserves are actionable under the Exchange Act"); *In re PMA Capital Corp. Sec. Litig.*, 2005 WL 1806503, at *6 (E.D. Pa. July 27, 2005) (statements about loss reserves are not protected by the bespeaks caution doctrine or the statutory safe harbor provision).

Defendants "simply misstate[] the law, as even accounting principles that require 'judgment' can be abused, gamed or simply misapplied in violation of the securities laws." *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001); *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 465 (S.D.N.Y. 2005) ("Accounting may be an inexact science but … plaintiff has alleged that [defendant's] interpretation of the relevant accounting rule was unreasonable"). Defendants cannot claim that their actions were a matter of judgment because Plaintiffs allege contemporaneous facts showing their interpretation of GAAP was unreasonable. *See, e.g., In re RAIT Fin. Trust Sec. Litig.*, 2008 WL 5378164, at *6-8 (E.D. Pa. Dec. 22, 2008); *In re New Century*, 588 F. Supp. 2d 1206, 1215, 1226-27, 1239 (C.D. Cal. 2008); *Wash. Mut.*, 259 F.R.D. at 507.

Moreover, a company's representations about the adequacy of its loan loss reserves are actionable. *See, e.g., In re Direct Gen. Corp. Sec. Litig.*, 398 F. Supp. 2d 888, 895 (M.D. Tenn. 2005) ("if a defendant affirmatively states that a reserve is 'adequate' or 'solid' even though it knows that the reserves really are not adequate, it may be actionable"); *PMA*, 2005 WL 1806503,

at *6 ("A company cannot characterize loss reserves as adequate or solid when it knows that the reserves are inadequate or unstable"). And once a company chooses to volunteer information about its expectations for the future, its disclosure must be full and fair. *See Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002); *see also Shapiro*, 964 F.2d at 281 ("In our view a reasonable investor would be influenced significantly by knowledge that a bank has knowingly or recklessly hidden its true financial status by deliberately misstating its level of non-performing loans, failing to provide adequate reserves, and indulging its problem loan customers.").

### 2.    Defendants' Argument That They Complied With GAAP Is Both Premature and Incorrect

Defendants argue that they complied with GAAP, asserting that GAAP required SLM to book only loan losses that had already been incurred based on evidence in SLM's models showing that the losses were both probable and reasonably estimable. According to Defendants, under GAAP, SLM was not permitted to increase its reserves based on the risks of future non-performance in the private loan portfolio. Defendants ask the Court to find, as a matter of law at the pleading stage, that GAAP should be interpreted as Defendants suggest, and that Defendants complied with GAAP in determining SLM's loan loss reserves during the class period.

Both of these inquiries are premature, and both will likely be the subject of extensive discovery and expert testimony. *See In re Omnicom Group, Inc. Sec. Litig.*, 2005 WL 735937, at *11 (S.D.N.Y. March 28, 2005) (whether defendant's valuation of stock was permissible under GAAP and what GAAP required "are merely arguments that must await another day"); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 339 (S.D.N.Y. 2004) ("Although the question of whether GAAP has been violated might appear to be a legal determination, the element of what is 'generally accepted' makes this difficult to decide as a matter of law").

Contrary to Defendants' interpretation, SLM was required to book losses inherent in its loan portfolio even if those losses had not yet occurred, and to increase its reserves based on the risks of future non-performance in the private loan portfolio. SLM admitted as much in its class

period SEC filings. *See, e.g.,* ¶ 238 ("We maintain an allowance for loan losses at an amount sufficient to absorb losses inherent in our FFELP and Private Education Loan portfolios at the reporting date based on a projection of estimated probable net credit losses.").

Defendants' interpretation of GAAP is also contradicted by the document they rely upon in their motion, the December 2006 Interagency Policy Statement on the Allowance for Loan and Lease Losses (Hammel Decl., Ex. F).[1] According to the Policy Statement, an appropriate allowance "covers estimated credit losses on individually evaluated loans that are determined to be impaired as well as estimated credit losses inherent in the remainder of the loan and lease portfolio." "Estimated credit losses" are "the current amount of loans that it is probable the institution will be unable to collect." When estimating credit losses, the company should consider historical loss experience, "adjusted for changes in trends, conditions and other relevant factors" that affect loan repayment. Companies should also consider changes in lending practices, underwriting standards, charge-off and collection procedures, the nature and terms of the loans, economic conditions, the volume of past due loans, and the quality of the loan review system at the institution, as well as the existence of concentrations of credit. Even though all of these factors existed at SLM during the class period, Defendants ignored them in determining that the allowance for private loan losses should be significantly less than that for FFELP loans and significantly below all of the statistical data available at the time.[2]

---

[1] Defendants submitted an incomplete copy of the Policy Statement that omits the "Questions and Answers on Accounting for Loan and Lease Losses." Certain of these questions and answers support Plaintiffs' allegations, including No. 3 (loss should be recognized even if it cannot be identified as to a specific loan), No. 11 (substandard loans are those inadequately protected by paying capacity of borrower or collateral pledged, and must be accounted for separately), No. 14 (no fixed period should be used to determine historical loss experience, but the period used should be long enough to capture sufficient loss data), and No. 15 (historical loss experience is a starting point for the analysis, but not sufficient by itself to determine the reserve, which should also consider other factors). A copy is attached as Exhibit 1 to the Levine Declaration.

[2] The Policy Statement also rebuts Defendants' argument about the appropriate loss emergence period to use and whether underwriting standards and forbearance practices needed to be considered in determining the allowance. The Policy Statement makes clear that (1) the two year

### 3.    Plaintiffs' Allegations Are Sufficiently Particularized

Contrary to Defendants' contention, Plaintiffs do plead particularized facts demonstrating that SLM's loan losses reserves fell outside the reasonable range permitted by GAAP. *See* ¶¶ 106-39, 183 (discussing why SLM's reserves were understated by approximately 50% and setting forth particularized facts in existence at the time undermining Defendants' calculation).

Plaintiffs' allegations are further supported by the substantial increase in the reserves at the end of the class period. *See* ¶¶ 181-82. The magnitude of the increase undercuts Defendants' contention that they believed the reserves were adequate. *See Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000). In arguing that their post-class period allowance calculation is irrelevant, Defendants ignore established Second Circuit authority holding that post-class period disclosures can confirm the falsity of earlier statements or actions. *See*, *e.g.*, *Novak v. Kasaks*, 216 F.3d 300, 312-13 (2d Cir. 2000); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).[3]

Defendants incorrectly assert that Plaintiffs have done nothing more than offer numbers "they would have preferred," citing to paragraph 179 of the complaint. This argument ignores the many paragraphs in which Plaintiffs explain how they computed the understatement based on information available during the class period. *See, e.g.*, ¶¶ 113-21, 131-34 (setting forth the information available during the class period showing that reserves were understated); ¶¶ 106-39 (explaining how Defendants calculated the reserves improperly during the class period); ¶¶ 180-

---

loss emergence period Defendants used was improper for the loans SLM was issuing; and (2) Defendants were required to, but did not, consider the slackening of SLM's underwriting standards and forbearance practices in setting the reserve.

[3] Defendants' cases are easily distinguished. *See Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 512 (S.D.N.Y. 2005) (undisputed that no loss occurred during the class period so no inference of falsity could be drawn from a post-class period write-down); *Coronel v. Quanta Capital Holdings Ltd.*, 2009 WL 174656, at *29 (S.D.N.Y. Jan. 26, 2009) (plaintiffs merely noted that "later announcements about reserve losses differed from earlier ones" and did not allege that there was no reasonable basis for class period reserves); *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Group Public Ltd.*, 2009 WL 1456846, at *6-7 (S.D.N.Y. May 20, 2009) (plaintiffs failed to allege when an impairment charge should have been taken, which losses should have triggered the charge, and how the accounting standards should have been applied).

82 (explaining how Plaintiffs computed the understatement based on class period data, and

alleging the reserves were inadequate increased at the end of the class period).[4]

### 4.    No Restatement Is Required

Finally, the fact that SLM's reserves have not been restated "does not indicate, much less

prove, the accuracy of those figures." *Feiner v. SS & C Techs.,* 11 F. Supp. 2d 204, 209 (D.

Conn. 1998); *see also Rothman*, 220 F.3d at 93 (denying motion to dismiss allegations of

accounting deficiencies even though there was no restatement and auditor issued a clean

opinion); *In re Converium Holding AG Sec. Litig*., 2007 WL2684069, at *3 (S.D.N.Y. Sept. 14,

2007) (rejecting argument that even "an unchallenged audit opinion by [the company's auditor]

undercuts Lead Plaintiffs' claim that loss reserves were deficient" because "at this stage of the

litigation, a court may not weigh the evidence that might be presented at trial").

### C.    Statements Regarding SLM's Delinquency Rates

Plaintiffs allege that Defendants materially changed SLM's forbearance practices during

the class period to mask increasing delinquencies and reduce reported delinquency rates. An

increase in delinquencies would have required SLM to increase its loan loss reserves,

undermining Defendants' efforts to inflate SLM's revenues and income. ¶¶ 74-95, 136-56.

Defendants focus on one paragraph of the complaint (¶ 149, which explains how the

manipulation of SLM's forbearance practices violated FASB Statement of Concepts No. 1), in

arguing that "Plaintiffs simply allege that delinquency rates were misstated, but offer no

explanation of how or by what amount." Defendants ignore 41 other paragraphs alleging that

they intentionally manipulated SLM's forbearance practices to lower delinquencies. *See* ¶¶ 74-

95, 136-56. Plaintiffs allege in detail how and why Defendants manipulated SLM's forbearance

---

[4] The complaints in the cases Defendants cite did not include these allegations. *See AIG Global
Sec. Lending Corp. v. Banc of Am. Sec. LLC*, 254 F. Supp. 2d 373, 385 (S.D.N.Y. 2003)
(plaintiffs conceded they were not challenging the accuracy of the numbers); *In re Hutchinson
Tech. Inc. Sec. Litig.*, 502 F. Supp. 2d 884, 894-95 (D. Minn. 2007) (no facts showing the reserve
was inadequate based on experience, that the reserve proved to be inadequate, how defendants
should have calculated the reserve, and how plaintiffs came up with their own numbers).

practices (¶¶ 74-95), the resulting understatement of SLM's delinquency rates (¶¶ 140-46), the impact on SLM's loan loss reserves (¶¶ 136-39), and the specific GAAP provisions violated by these actions (¶¶ 147-56). The allegations are sufficiently particular because they provide Defendants with more than ample notice of the ways in which SLM's forbearance practices and delinquency rates affected SLM's financial condition and reporting. *See*, *e.g.*, *In re Refco, Inc., Sec. Litig.*, 503 F. Supp. 2d 611, 656 (S.D.N.Y. 2007).

Even if Plaintiffs do not specify the precise amount by which SLM's delinquency rates were understated for the purposes of the accounting allegations, Defendants' affirmative misrepresentations about SLM's forbearance practices and delinquency rates are independently actionable. During the class period, Defendants claimed that SLM followed well-established forbearance practices and that borrowers granted forbearance were screened to ensure that forbearance would improve their ability to repay. ¶¶ 74-77. Defendants later admitted that SLM's forbearance practices did not adequately screen borrowers granted forbearance and did not increase the likelihood of repayment, and that the effect of SLM's forbearance practices was to reduce delinquencies only in the short term, because indiscriminate granting of forbearance merely delayed the inevitable delinquency. ¶¶ 78-79. These allegations sufficiently allege falsity with respect to Defendants' disclosures about SLM's forbearance practices and delinquency rates. *See*, *e.g.*, *Novak*, 216 F.3d at 311 (company's public filings materially misleading when the disclosed policy no longer reflected actual practice); *New Century*, 588 F. Supp. 2d at 1225.

### D.    Statements Regarding Concentration of Credit Risk

Plaintiffs allege that Defendants violated GAAP and SEC regulations during the class period by failing to disclose and account for the material concentration of credit risk arising from the billions of dollars of non-traditional loans that SLM originated after relaxing its underwriting standards. ¶¶ 157-62. A concentration of credit risk existed for these loans because they shared similar economic characteristics, would be similarly affected by changes in economic or other

conditions and were, as Defendants later admitted, all "predictably not collectible." ¶ 158.

Defendants nonsensically argue that there could not have been a concentration of credit risk arising from the high-risk private loans during the class period because they did not separately account for them. *See* Def. Mem. at 10. Defendants' own post-class period statements and SEC filings concede the existence of a concentration of credit risk during the class period. *See* ¶¶ 128-29 (explaining why the non-traditional loans represented a concentration of credit risk); ¶ 334 (citing Defendants' admissions that during the class period 15% of SLM's PEL portfolio constituted non-traditional loans and that these loans were "predictably not collectible"); ¶ 337 (quantifying the non-traditional loans held by SLM during the class period).

### E.    The Statements Defendants Identify As "Forward-Looking" Are Not Protected By the Safe Harbor Provision or Bespeaks Caution Doctrine

Taking snippets of statements out of context, Defendants assert that 13 of their statements are protected forward-looking statements. Although the PSLRA provides a limited safe harbor for certain forward-looking statements that are accompanied by meaningful cautionary language, a statement is not protected just because it is phrased in the future tense—particularly if it also states existing or historical conditions or expectations. *See In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003) ("when an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply"). All of the statements Defendants identify as forward looking fall into this category. Most of the statements concern SLM's loan loss reserves, which "are not projections, they are directed to 'the then-present state of the Company's financial condition.'" *Schnall v. Annuity & Life Re (Holdings), Ltd.,* 2004 WL 367644, at *8 (D. Conn. Feb. 22, 2004) (quoting *In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 721 (D.Del. 2000)); *see also In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999) (safe harbor and bespeaks caution do not apply to omissions that undermine the reliability of financial estimates).

The language Defendants cite as "cautionary" is too vague to be meaningful and did not

warn investors of existing facts.[5] *See In re Vivendi Univ., S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 183 (S.D.N.Y. 2003) ("boilerplate warnings will not suffice"); *In re Giant Interactive Group, Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 571 (S.D.N.Y. 2009) ("Defendants cannot, as a matter of law, be absolved of liability pursuant to the 'bespeaks caution' doctrine where they failed to disclose the existence of facts known for many months that would negatively affect [the company's] business but only warned that these facts 'could' negatively affect their business.").

Finally, "[n]either the bespeaks caution doctrine nor the Safe Harbor provision of the PSLRA protects a defendant from liability if a statement was knowingly false when made." *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 192 (S.D.N.Y. 2003) (citation omitted). Plaintiffs allege that Defendants knew their statements were false or misleading when they made them. *See* ¶¶ 227, 233, 239, 241, 243, 282, 288, 292, 297, 301, 313, 318.

## II. Plaintiffs Allege A Strong, Cogent and Compelling Inference of Scienter

A strong inference of scienter "can be established 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000) (citation omitted). A court evaluating allegations of scienter must: (1) accept all factual allegations in the complaint as true; (2) consider the allegations collectively; and (3) entertain only those plausible opposing inferences that can be rationally drawn from the facts alleged. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321-25 (2007). "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even 'the most plausible of competing inferences.'" *Id.* at 324. "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 326.

---

[5] *E.g.*, "Actual results in the future may differ from those discussed here, perhaps materially, based on a variety of factors;" "The Company could also be affected by … incorrect estimates or assumptions by management in connection with the preparation of our consolidated financial statements; … losses from loan defaults; …."

A.    **Plaintiffs Sufficiently Allege Facts Giving Rise to a Strong Inference of Defendants' Conscious Misbehavior or Recklessness**

1.    **Defendants Were Aware of Facts or Had Access to Information Contrary to Their Public Statements**

Plaintiffs allege "defendants' knowledge of facts or access to information contradicting their public statements" and "that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Novak*, 216 F.3d at 308. Plaintiffs cite multiple sources that support the inference that Defendants were aware of or had access to facts that contradicted their public statements, including:

- Statements of former employees. Collections employees who worked at call centers around the country describe SLM's changed policies for granting forbearances, the visits Lord and Andrews made to collections offices and the reports that were regularly prepared and transmitted to top-level executives. ¶¶ 81-95. *See In re Countrywide Financial Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058-59 (C.D. Cal. 2008) ("Plaintiffs' numerous confidential witnesses support a strong inference of a Company-wide culture that, at every level, emphasized increased loan origination volume in derogation of underwriting standards").[6]

- Industry data. Reliable industry data showed that SLM's non-traditional private loans were at substantially greater risk of default than the rate they used to calculate loan loss reserves. ¶¶ 114, 119-21, 132-34. *See Countrywide Deriv.*, 554 F. Supp. 2d at 1062 ("The Individual Defendants, unlike the investing public … were in a position to recognize the significance of [] red flags, and, accordingly, investigate the extent to which underwriting standards had been abandoned").

- Internal data. Defendants received regular reports on numbers of private loans originated, their dollar amounts, and the days the loans were delinquent. During the merger negotiations, Defendants received reports on loans "charged-off" SLM's books that disclosed increased levels of delinquencies. ¶ 188. *Dynex*, 2009 WL 3380621, at *13; *see also In re Atlas Air Worldwide Holdings, Inc.*, 324 F. Supp. 2d 474, 495 (S.D.N.Y. 2004) ("a plaintiff is not required to plead internal reports to demonstrate that contradictory facts were available to the defendants when they made certain statements … where it is alleged the defendants were reckless").

- Corporate admissions. Defendants and other senior SLM executives have admitted, among other things, that SLM was not selective in pursuing new loan business; violated its longstanding policy of only lending to students who were creditworthy; lent too much

---

[6] CW 15 worked at the Fishers, Indiana facility as an Operations Supervisor from October 2003 to April 2007 and then as a Senior Policy Analyst until June 2008. Plaintiffs inadvertently omitted these facts from the Second Amended Complaint.

money to students at schools with low graduation rates who were likely candidates for default; failed to adequately screen borrowers who were granted forbearance; reduced delinquency and default rates only in the short term, merely delaying the inevitable; and that by the end of 2007, 15% of SLM's portfolio consisted of loans to students who were "poor credit risks" attending the "wrong schools." *See* ¶¶ 50, 72-73, 79, 126, 337-49.[7]

Defendants insist that even more information is required, but Plaintiffs are not expected to plead the type of detail that is solely in Defendants' possession and can only come from discovery. *See Scholastic*, 252 F.3d at 72 ("Any information that sheds light on whether class period statements were false or materially misleading is relevant. … We do not require the pleading of detailed evidentiary matter in securities litigation"). Plaintiffs' allegations far exceed those in the cases Defendants cite. *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129-30 (2d Cir.1994) (plaintiff's conclusory legal allegations did not allege that "company's disclosures were inconsistent with current data"); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 569 (S.D.N.Y. 2004) (plaintiff failed to allege any facts showing the defendants knew or should have known that the reserves were inappropriate); *In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at *11 (S.D.N.Y. June 23, 2004) (plaintiff basing claims on post-class period charges and statements, identifying no contemporaneous facts); *In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 691 (S.D.N.Y. 2004) (plaintiff alleged falsity and scienter based only on defendants' increased loss reserves three weeks after IPO).

Because Plaintiffs allege—based on known or readily available facts—that Defendants' representations were false when made, Defendants' fraud-by-hindsight arguments are meritless. *See, e.g., Atlas Air*, 324 F. Supp. 2d at 494-95; *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007) ("This is not a case where plaintiffs are pleading fraud based on changed circumstances that were unforeseen by defendants at the time they made their statements. Rather, plaintiffs have cited contemporaneous circumstances...of which [the

---

[7] This is not a case like *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 414 (S.D.N.Y. 2007), in which the plaintiffs alleged nothing more than a non-defendant's post-class period statement that "the Company's earlier financial statements might have to be restated."

defendants] were aware, and which made their failure to take an earlier valuation allowance tantamount to conscious misbehavior.").

### 2.    Private Loans Were a Core Part of SLM's Business

The private loan portfolio was critical to SLM's business. Plaintiffs allege—and Defendants have admitted—that the private loan sector was "essential," "our economic engine on the loan side of the business," and "now obviously our principal business." ¶¶ 186-87. Knowledge of a product or transaction that is of critical importance to a company may be imputed to the company and to high-level executives like Lord (CEO, Chairman) and Andrews (CFO, CEO). *See, e.g., Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989); *see also Tellabs*, 513 F.3d at 709-11 (it was "hard to credit" defendants' argument that "no member of the Company's senior management who was involved in authorizing or making public statements" knew the falsity of statements regarding demand for the company's major products); *RAIT*, 2008 WL 5378164, at *1, 7, 12-13 (scienter where "most senior" officers misstated "loan loss reserves" implicating company's "core business of lending and monitoring their investments").

### 3.    SLM Failed to Follow Its Own Policies

"There is considerable authority for the proposition that a company's failure to follow an internal policy can form the basis of an inference of recklessness." *Dynex*, 2009 WL 3380621, at *12 (citation omitted); *see also Scholastic*, 252 F.3d at 77 ("defendants' asserted actions contrary to expressed policy and prior practice can form the basis for proof of recklessness"); *Rothman*, 220 F.3d at 91. Plaintiffs allege, and Defendants admit, that during the class period SLM violated its own lending and forbearance policies. ¶¶ 72, 79, 333.

### 4.    SLM Failed to Maintain Sufficient Internal Controls

"[A] failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter." *In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006); *New Century*, 588 F. Supp. 2d at 1230 (allegations that company's underwriting system

19

was driven by volume with internal controls that were "slack rather than searching" support

inference of deliberate recklessness in statements regarding loan quality). Plaintiffs allege, and

SLM has acknowledged, that its internal controls were ineffective. ¶¶ 169-76.

### 5.    SLM's GAAP Violations Provide Evidence of Scienter

"GAAP violations, when coupled with evidence of fraudulent intent" provide evidence of

scienter. *SEC v. DCI Telecomms.*, *Inc.*, 122 F. Supp. 2d 495, 500 (S.D.N.Y. 2000). Plaintiffs

allege that Defendants knowingly or recklessly violated a series of GAAP provisions in an effort

to falsely portray SLM's financial performance. ¶¶ 100-83. The magnitude of the GAAP

violations and the fact that the violations concerned SLM's "principal business" support an

inference of scienter. *See Scholastic*, 252 F.3d at 77 (size of special charges "undermines, at the

pleading stage," defendants' argument that they were unaware of events negatively affecting

financial results); *Atlas Air*, 324 F. Supp. 2d at 489 (size and nature of adjustment "suggests that

this was no mere error caused by the improper application of hyper-technical accounting rules").

### 6.    Lord and Andrews Signed SOX Certifications and SEC Filings

Lord's and Andrews' scienter can also be inferred from the fact that they signed SOX

certifications or other SEC filings containing false and misleading statements. *See In re Alstom*

*SA Sec. Litig.*, 406 F. Supp. 2d 433, 456-57, 461 (S.D.N.Y. 2005); *Teamsters Local 445 Freight*

*Div. Pension Fund v. Bombardier, Inc.*, 2005 WL 2148919, at *12 (S.D.N.Y. Sept. 6, 2005).

### B.    Plaintiffs Allege Defendants' Motive and Opportunity to Commit Fraud

Plaintiffs also provide cogent and compelling allegations of the Defendants' motive and

opportunity to mislead investors. Motive entails "concrete benefits that could be realized by one

or more of the false statements and wrongful nondisclosures alleged." *Novak*, 216 F.3d at 307.

"[T]he artificial inflation of a stock price in order to achieve some more specific goal may satisfy

the pleading requirement." *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F.Supp.2d 314, 328

(S.D.N.Y. 2001).

### 1.    The Flowers Acquisition

Plaintiffs' allegation that Defendants were motivated to fraudulently boost SLM's short-term profits and inflate the stock price to find a private buyer supports an inference of scienter. *See Vivendi*, 381 F. Supp. 2d at 185 ("Scienter may be imputed, as is the case here, to defendants when defendants were motivated to inflate company stock prices as a means to effectuate a specific acquisition that would not otherwise be possible without fraudulently inflating stock prices"); *Rothman*, 220 F.3d at 93-94. Defendants argue that a fixed transaction price eliminated any incentive to inflate the stock price, but the conditions tied to SLM's financial performance gave Defendants an incentive to keep SLM's stock price afloat until the deal closed.

Lord and Andrews were personally motivated by the combined $241.6 million they stood to receive in the transaction. ¶¶ 62-63, 199-201. *See In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1202, 1224 (D. Kan. 2002) (plaintiffs alleged that defendants would receive benefit from merger in form of acceleration and vesting of previously unexercisable stock options representing $600 million in value). Defendants dismiss this anticipated windfall as nothing more than the same benefit that all investors would receive from the transaction. But Plaintiffs allege that a significant portion of the amounts Lord and Andrews stood to receive was based on stock options that were worthless at the time but would be automatically converted into the right to receive $60 per share when the Flowers deal closed, terms not available to shareholders. ¶ 63.

### 2.    Equity Forward Contracts

Plaintiffs also allege that Defendants had motive to overstate SLM's financial results, and thus prop up the stock price, because of the company's equity forward contracts. If the market price of SLM stock fell below certain trigger points, the company had to settle the contracts by paying $2 billion. ¶¶ 203-09. This was not a generic corporate motive like in Defendants' cases. Defendants acknowledge that the equity forward contracts were an unusual financing vehicle. If the price of SLM's stock fell below specified levels, the company faced a $2 billion obligation.

¶ 209. *See In re AT&T Corp. Sec. Litig.*, 2002 WL 31190863, at *3, 26 (D.N.J. Jan. 30, 2002).

### 3.    Lord's Margin Loan

During the class period, Lord used his SLM stock as collateral for an undisclosed margin loan. ¶¶ 216, 217, 322.  Lord's margin arrangements gave him a unique and substantial incentive to keep SLM's stock price high, since a decrease in the stock price would leave him exposed to the lender's demand for additional collateral. *See Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (pledge of shares in personal brokerage account amounted to a 'concrete and personal benefit,' by giving defendant "a financial incentive to conceal the problems at the Company in order to avoid a decline in the stock price that could trigger a margin call or a decrease in available credit in his personal brokerage account"); *In re Tel-Save Sec. Litig.*, 1999 WL 999427, at *6 (E.D. Pa. Oct. 19, 1999) (CEO "had a motive to inflate the stock price because by doing so he was able to secure a $30 million loan").

### 4.    Lord's Class Period Stock Sales

Lord also sold SLM stock three times during the class period, for total gross proceeds of over $70 million. ¶¶ 210-16.[8]

- February 2007 Sale.  Lord sold 400,000 shares mere days before the President released a budget that proposed reducing student lender rate subsidies and increasing lender risk, posing potential harm to SLM's rapidly growing private loan business. ¶¶ 211-12.

- August 2007 Sale.  Lord tendered 1.1 million SLM shares at the then market price of $49.33 to pay the exercise price on 1.65 million options. Lord retained the minimum number of shares required under the terms of the plan. Lord's tender of his SLM shares at current market value, at the same time that SLM was setting inadequate loss reserves and overstating its financial results—is indicative of scienter. The fact that Lord retained shares does not refute an allegation of scienter. ¶ 213. *See In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 731 (S.D. Ohio 2006) (purchase of 40,000 shares by defendant during class period did not undermine scienter since a "trader may [keep some] shares to hedge against the unforeseen or to obscure the insider trading from the SEC").

- December 2007 Sale.  According to Lord, his lender sold 97% of Lord's SLM shares for $34.6 million days to satisfy a margin call on December 14, 2007. A few days later, Lord

---

[8] Scienter may be inferred even though Andrews did not sell stock during the class period. *In re APAC Teleservice, Inc. Sec. Litig.*, 1999 WL 1052004, at *7 (S.D.N.Y. Nov. 19, 1999).

revealed previously undisclosed negative information about SLM's financial condition and business prospects in an investor call, leading to a decline in SLM's stock price. ¶¶ 319-23. Even in the context of margined shares, the auspicious timing of the sale of Lord's shares to cover the margin call raises an inference of scienter. *See In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 88, 100-01 (S.D.N.Y. 2006).

### C.    Defendants' Proffered Inference Is Not Compelling

When Plaintiffs' allegations are accepted as true and assessed "holistically" as required by *Tellabs*, a cogent story of securities fraud is revealed: In an effort to cover up the material failings with SLM's private loan portfolio and buy time to take the company private—collecting over $240 million for themselves in the process—Lord and Andrews loosened underwriting standards, extending loans to student with low credit ratings or who were attending proprietary, for-profit schools, even though they knew these borrowers had low graduation rates and high loan default rates, failed to record adequate loan loss provisions for these loans and manipulated SLM's forbearance practices to cover up increasing delinquencies.

Under *Tellabs,* the court must ask, "would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" 551 U.S. at 326; *see also In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 414-15 (S.D.N.Y. 2007) (tie goes to the plaintiff). The answer is yes. Plaintiffs' inference of scienter is at least as plausible as Defendants' narrative that they were unwitting victims of the economic downturn and federal legislation who either knew nothing about the impairments to SLM's private loan portfolio or were merely overly optimistic in setting SLM's loan loss reserves.

Other courts have rejected a similar narrative in recent cases made by lenders within the context of the recent economic downturn. *See, e.g., In re MoneyGram Int'l, Inc. Sec. Litig.*, 626 F. Supp. 2d 947, 982-83 (D. Minn. 2009) ("plaintiffs' fraud narrative" was "cogent and as plausible as defendants' opposing nonfraudulent narrative" that defendants could not have "presage[d] the nation's worst economic meltdown in decades"); *RAIT,* 2008 WL 5378164, at *13 (inference of scienter "at least as cogent and compelling as any nonculpable inference such as mere negligence"); *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142,

1156-57 (S.D. Cal. 2008) (rejecting "financially sophisticated and experienced" defendants' argument that "they reasonably believed Accredited's reserves to be adequate"); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1173-74, 1186 (C.D. Cal. 2008) (rejecting claim that company's decline was due to an 'unprecedented' external 'liquidity crisis,' rather than defendants' knowingly false "repeated assurances of good practices, quality loan origination, and consistently prudent underwriting guidelines").

**III.     Plaintiffs' Loss Causation Allegations Satisfy Rule 8**

Defendants challenge the merit, not the sufficiency, of Plaintiffs' loss causation allegations. At the pleading stage, Plaintiffs need only satisfy Rule 8 by providing "some indication of the loss and the causal connection that Plaintiffs have in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Plaintiffs have satisfied this standard, alleging that revelations between December 19, 2007 and January 23, 2008 about the quality of SLM's private loan portfolio and its impact on the company's financial condition (which Defendants previously concealed from investors) caused their losses. *See* ¶¶ 319-336.

*Dura* does not require a "mirror image" corrective disclosure and immediate stock drop. A loss may occur when "the relevant truth begins to leak out." 544 U.S. at 342. The truth may emerge—and stock prices may drop—over time. *See, e.g., In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 305 (S.D.N.Y. 2005). This is exactly what Plaintiffs allege. On December 19, 2007, an "agitated, profane" Lord acknowledged on an investor call that SLM was increasing its private loan loss reserves and hinted that defaults were an issue, but his refusal to respond to questions about the credit quality of SLM's private loan portfolio "rattled investors." ¶¶ 319-21. The stock price declined by 21%. ¶ 324. Plaintiffs allege the truth continued to leak on January 3, 2008, with the revelation of the extent to which SLM "continued[d] to focus on higher-margin Private Education Loans."[9] ¶¶ 326-27. The stock price dropped another 13%. ¶ 328.

---

[9] Plaintiffs allege that this disclosure revealed the extent to which SLM *already* relied on private loans as its "economic engine," not that SLM intended to increase that reliance.

On January 23, 2008, Defendants announced a 50% decline in 2007 income and a massive provision for loan losses mostly related to private education loans, and Lord admitted that for the past several years, in violation of its lending policy, SLM had been originating "non-traditional" and high-risk private education loans that were predictably not collectible. ¶¶ 331-34. As Defendants note, the stock price rose slightly that day, but only because "the market had already incorporated that the previously released financial statements could not be relied upon." *In re Bradley Pharm., Inc., Sec. Litig.*, 421 F. Supp. 2d 822, 829 (D.N.J. 2006).

Contrary to Defendants' assertions, Plaintiffs are not required to account for every decline in the stock price prior to the disclosures. *See In re Moody's Corp. Sec. Litig.*, 612 F. Supp. 2d 397, 401 (S.D.N.Y. 2009). A pre-disclosure drop is only relevant when stock loses "almost all" of its value. *Id.* That is not the case here. SLM lost $16.62 per share from $45.47 on January 18, 2007 (the first day of the class period) to $28.85 on December 18, 2007 (the day before the first disclosure), a 37% decline in share value. *See id; In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp.2d 349, 365 (S.D.N.Y. 2008) (78% loss); *60223 Trust v. Goldman Sachs & Co.*, 540 F. Supp. 2d 449, 461 (S.D.N.Y. 2007) (79.76% loss).

And although not all losses in a poor market result from fraud, Defendants are not blameless merely because their actions coincided with an economic downturn. Determining the effect of causes other than those alleged in the complaint is "a matter of proof at trial and not to be decided on a rule 12(b)(6) motion to dismiss." *Emergent Capital Inv. Mgmt, LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003); *Countrywide,* 588 F. Supp. 2d at 1173-74 ("It is not the Court's role to speculate on the causes of the current economic situation. … It will be the fact-finder's job to determine which losses were proximately caused by Countrywide's misrepresentations and which are due to extrinsic or insufficiently linked forces.").

## CONCLUSION

For all the reasons stated above, Defendants' motion should be denied in its entirety.

DATED: January 29, 2010

Respectfully submitted,

**GIRARD GIBBS LLP**

By: _____
Jonathan K. Levine

711 Third Avenue, 20th Floor
New York, NY 10017
Telephone: (212) 867-1721
Facsimile: (212) 867-1767

Daniel C. Girard
Amanda M. Steiner
**GIRARD GIBBS LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

**Lead Plaintiff's Counsel**

Samuel H. Rudman
David A. Rosenfeld
**COUGHLIN STOIA GELLER RUDMAN &
ROBBINS LLP**
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173

**Counsel for Sheet Metal Workers' Local No.
80 Pension Trust Fund**