UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE SLM CORPORATION
SECURITIES LITIGATION

Case No. 08 CV 1029 (WHP)

REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

Peter A. Wald (*pro hac vice*)
Laurie B. Smilan
Jeff G. Hammel
Abid R. Qureshi (*pro hac vice*)
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022
(212) 906-1200

Counsel for Defendants SLM Corporation,
Albert L. Lord and Charles E. Andrews

February 26, 2010

## Table of Contents

**PAGE**

Preliminary Statement ................................................................................................................ 1

Argument .................................................................................................................................... 2

I. PLAINTIFFS HAVE FAILED TO PLEAD PARTICULARIZED FACTS ESTABLISHING FALSITY ................................................................................. 2

II. SLM'S FORWARD-LOOKING STATEMENTS ARE PROTECTED UNDER THE PSLRA SAFE HARBOR ................................................................ 5

III. PLAINTIFFS HAVE FAILED TO PLEAD PARTICULARIZED FACTS ESTABLISHING A STRONG INFERENCE OF SCIENTER ........................... 6

    A. Plaintiffs Have Failed To Plead Circumstantial Evidence Supporting A Strong Inference Of Scienter ........................................................................... 6

    B. Plaintiffs Have Failed To Plead Motive Evidencing A Strong Inference Of Scienter ................................................................................................................ 7

    C. Even Through Their Combined Allegations, Plaintiffs Have Failed To Plead A Strong Inference Of Scienter ............................................................... 8

IV. PLAINTIFFS HAVE FAILED TO PLEAD LOSS CAUSATION ..................... 9

V. DISMISSAL SHOULD BE WITHOUT LEAVE TO AMEND ......................... 10

Conclusion ................................................................................................................................ 10

# Table of Authorities

**CASES**                                                                                                                       **PAGE(S)**

*AIG Global Securities Lending Corp. v. Banc of America Securities LLC*,
    254 F. Supp. 2d 373 (S.D.N.Y 2003).................................................................................3, 5

*Campo v. Sears Holdings Corp.*,
    635 F. Supp. 2d 323 (S.D.N.Y. 2009)......................................................................................7

*City of Brockton Retirement System v. Shaw Group Inc.*,
    540 F. Supp. 2d 464 (S.D.N.Y. 2008)......................................................................................8

*Hall v. The Children's Place Retail Stores, Inc.*,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008)......................................................................................8

*In re Aegon N.V. Securities Litigation*,
    2004 WL 1415973 (S.D.N.Y. 2007).........................................................................................6

*In re APAC Teleservices, Inc. Securities Litigation*,
    1999 WL 1052004 (S.D.N.Y. Nov. 19, 2009)..........................................................................7

*In re Bristol-Myers Squibb Securities Litigation*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004)....................................................................................10

*In re DRDGold Ltd. Securities Litigation*,
    472 F. Supp. 2d 562 (S.D.N.Y. 2007)) -...................................................................................7

*In re Dynex Capital, Inc. Securities Litigation*,
    2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) ..........................................................................6

*In re Novagold Resources Inc. Securities Litigation*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009)......................................................................................7

*In re Omnicom Group, Inc. Securities Litigation*,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008).................................................................................4, 9

*In re PXRE Group, Ltd., Securities Litigation*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009), *aff'd,* 2009 WL 4893719
    (2d Cir. Dec. 21, 2009) ............................................................................................................8

*In re Scholastic Corp. Securities Litigation*,
    252 F.3d 63 (2d Cir. 2001).......................................................................................................5

*In re Tarragon Corp. Securities Litigation*,
    2009 U.S. Dist. LEXIS 60160 (S.D.N.Y. Mar. 27, 2009) ...................................................8

*Kalnit v. Eichler*,
    99 F. Supp. 2d 327 (S.D.N.Y. 2000), *aff'd,* 264 F.3d 131 (2d Cir. 2001) ..........................8

*Lattanzio v. Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007)................................................................................................10

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)...........................................................................................9, 10

*Malin v. XL Capital, Ltd.*,
    312 Fed. Appx. 400 92d Cir. 2009) .....................................................................................8

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)................................................................................................5

*Pittleman v. Impac Mortgage Holdings Inc.*,
    2009 WL 648983 (C.D. Cal Mar. 9, 2009)..........................................................................9

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)..................................................................................................5

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.,*
    75 F.3d 801 (2d Cir. 1996)..................................................................................................2

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994)................................................................................................6

*Steinberg v. Ericsson LM Telephone Co.*,
    2008 WL 5170640 (S.D.N.Y. Dec. 10, 1008) ....................................................................7

*Tellabs, Inc. v. Makor Issues & Rights*,
    551 U.S. 308 (2007).................................................................................................1, 5, 7, 8

**STATUTES**

15 U.S.C. § 78u-4(b)(1) .................................................................................................................3

**Preliminary Statement**

Falsity. Plaintiffs' Complaint (cited as "¶ _") is devoid of the particularized facts necessary to establish that SLM's loan loss allowances were false. Their opposition brief (cited as "Opp. at _") only serves to underscore this fundamental flaw. As courts in this Circuit consistently have held, claims of "false reserve estimates"—without specific facts explaining how, why, and by what amount those estimates were false—must be dismissed. (Defendants' Initial Memorandum of Law (cited as "Br. at _") at 6-9 (citing cases).) In their opposition, plaintiffs actually concede that the model used by SLM to calculate its loan loss allowances was appropriate. (Opp. at 1, 6, 10-11.) Indeed, plaintiffs quibble with only *one* of the model's many variables (default rates), and even then fail to allege particularized facts explaining why a different default rate was required. (Opp. at 12; ¶ 181.) The fact that SLM augmented its allowance for loan losses in the fourth quarter of 2007—based on new, current period information and in the midst of a worldwide economic meltdown that is now well-documented—simply does not establish that earlier period allowances were "false."

Scienter. Similarly, plaintiffs' attempt to plead fraud by hindsight provides no inference of scienter at all—much less, the strong inference of scienter required by the PSLRA and the Supreme Court's *Tellabs* decision. Although plaintiffs barely attempt to defend the adequacy of their confidential witness ("CW") allegations, they pin their "must have known" scienter theories on the speculation and gossip of low-level CWs—none of whom are alleged to have occupied positions supporting an inference that they knew about the reserving decisions that plaintiffs now challenge, or had any insight whatsoever into what the individual defendants thought about those decisions. Indeed, no CW claims to have known any defendant at all.

Loss Causation. Finally, plaintiffs fail to allege facts supporting the claim that their losses were caused by the alleged fraud: they fail to identify a single corrective disclosure—*i.e.*,

1

a disclosure of the "relevant truth"—that subsequently caused a market loss. Indeed, plaintiffs conveniently ignore the uncontroverted, public record facts that (i) SLM's stock price collapsed when the government radically changed the student lending rules and a potential acquirer called off its planned merger as a consequence—well before the end of the class period, and (ii) the end of the class period (late 2007 and early 2008) marked the beginning of the largest credit crisis since the Great Depression, which affected all consumer credit institutions. Plaintiffs' failure to plead facts showing that their alleged losses were caused by disclosure of the alleged fraud—and not by market reaction to well-publicized regulatory changes, the failed Flowers merger, and a global economic collapse—is fatal to their claims. For all of these reasons, plaintiffs' second amended complaint should be dismissed, without further leave to amend.

## Argument

### I. PLAINTIFFS HAVE FAILED TO PLEAD PARTICULARIZED FACTS ESTABLISHING FALSITY

Plaintiffs' allegations of falsity rest on the flawed contention that SLM's 4Q07 increase in its allowance for loan losses "establishes" that earlier period allowances were false. (Opp. at 12 (citing ¶¶ 181-82).) That simply is not the law. (Br. at 7-9 (citing cases)); *see also San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996) (rejecting allegation of false statement based on later disclosure). SLM has never restated its allowances for these earlier periods, and its independent auditors have signed off on the accuracy of its financial statements in every reporting period before and after the recent economic crisis. Plaintiffs have failed to meet their heavy pleading burden to show falsity.

In fact, much of plaintiffs' opposition is devoted to establishing their agreement with defendants. Plaintiffs agree that FAS 5 governs the setting of reserves and requires the analysis of historical data to estimate current period loan losses. (Opp. at 11.) They agree that under FAS 5, SLM was *not allowed* to book reserves on loans in its PEL portfolio unless and until

2

losses on those loans had become "probable and reasonably estimable." (Opp. at 10; Br. at 7.) They also agree that SLM's model for estimating appropriate reserves was consistent with FAS 5. (Opp. at 1, 6, 10-11.)[1] Instead, plaintiffs challenge a single input (default rates), and argue that the variables utilized during the class period were understated. (Opp. at 12.) But plaintiffs provide no particularized facts demonstrating how, why, and by what amount the default rates (and thus the loan loss reserves) were understated. *See AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*, 254 F. Supp. 2d 373, 385 (S.D.N.Y. 2003) (dismissing complaint attempting to allege false loss and delinquency rates but failing to allege facts to show "the amount by which the figures were supposedly under or overstated").

Instead, plaintiffs offer only the illusion of specificity conjured wholly from hindsight: they point to SLM's 4Q07 increase in loan loss allowance as a percentage of the total non-traditional PEL portfolio (from about 6% at the end of 2006 to about 18% at the end of 2007) (¶ 181), and assert that the 4Q07 end-of-period 18% default rate "should have been applied [to the balance in the PEL portfolio] during the Class Period." (¶ 182.) But why is this so? What particularized facts are alleged to support the bald assertion that SLM's 12/31/07 allowance should be "walked back" to the beginning of the class period—when macroeconomic (and borrower) circumstances were materially different? None. Indeed, plaintiffs studiously ignore the financial system meltdown that began to manifest in Q407, which made losses in the non-traditional PEL portfolio "probable" and "reasonably estimable" under FAS 5 at *that point in*

---

[1] In describing FAS 5, plaintiffs mistakenly suggest that defendants have asked this Court to determine, as a matter of law, that SLM's loan loss estimates were consistent with GAAP. (Opp. at 10-11.) To the contrary, because plaintiffs bear the burden of pleading falsity, 15 U.S.C. § 78u-4(b)(1), they must identify particularized facts showing that SLM's calculation of reserves was outside the range of reasonable estimates tolerated by GAAP. (Br. at 6-10.)

3

*time*—and not earlier.[2]

  Plaintiffs' other contentions also lack the particularity necessary to establish falsity:

- Forbearance.  Plaintiffs point to no specific facts supporting their assertions that SLM manipulated forbearance to mask lax underwriting practices and artificially depress default rates (and reserves).  (Opp. at 13-14; ¶¶ 74-95, 136-156.)  Instead, plaintiffs rely on (i) anecdotal statements from low-level, locally-sited collections employees who speculate broadly about imprudently granted forbearance; and (ii) alleged post-class period "admissions."  Both tactics fail.  Anonymous anecdotes about unspecified and unquantified accounts come nowhere close to demonstrating that any corporate-level statement about SLM's reserves or its underwriting or forbearance practices was "false."  (Br. at 9 (citing cases).)  And plaintiffs blatantly mischaracterize (rather than quote) as "admissions" the statements actually made by defendants, which discuss refinements in forbearance practices going forward but do not acknowledge that past practices produced inadequate reserves.  (Opp. at 13-14; ¶ 79.)  *See In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008) (A decision to reverse course . . . does not imply that the earlier business strategy was a subterfuge.").  Reading the actual statements underscores how plaintiffs have mischaracterized them.  (Attached as Exs. V at 5-6, W at 2, X at 5 and Y at 5-6, 11 to Supplemental Declaration of Hammel (cited as "Supp. Dec. Ex. _").)[3]

- <u>Underwriting Standards.</u>  Plaintiffs similarly contend that post-class period refinements to SLM's underwriting standards establish the falsity of earlier statements regarding those standards and SLM's loan loss reserves.  (Opp. at 3, 7; ¶ 342.)  But again, plaintiffs badly mischaracterize the actual statements—Mr. Lord's after-the-fact acknowledgement that it was a "mistake" to make some of the non-traditional loans—trying to convert them into an admission that SLM violated its "clearly defined" underwriting standards.  (¶¶ 234, 340.)  However, such mischaracterizations fall woefully short of particularized facts establishing that earlier statements, or SLM's prior reserves, were materially false at the time.[4]

- <u>Two Year Loss Emergence Period.</u>  Plaintiffs continue to mischaracterize the two year loss emergence period SLM used (and contrary to the complaint, still uses) to estimate default rates, arguing that it is too short a span to predict defaults.  (Opp. at 6; ¶¶ 113-15, 123.)  But as SLM disclosed, the two year loss period is not static:  as categories of loans migrate through different stages of maturity, SLM projects the likelihood of default for each category

---

[2]  Indeed, under the relevant accounting guidance, SLM was *prohibited* from overestimating its loan loss allowance during these prior periods out of concern about future developments; the regulators (and regulatory literature) are very clear that financial statements must reflect only the impact of current period events.  (*See* Br. at Ex. F to Hammel Dec., at 3 n.7, 12; EITF D-80 (Supp. Dec. Ex. U) at 6, Overview, and Q.14.)

[3]  Plaintiffs concede that they fail to "specify the precise amount by which SLM's delinquency rates were understated for the purposes of the accounting allegations."  (Opp. at 14.)

[4]  In one case, the alleged "admission" by defendants is a *triple* hearsay statement attributed to SLM's former CEO by an unnamed manager who supposedly related it to a CW who related it to plaintiffs.  (Opp. at 4 (citing ¶ 49 n.2).)

over a two-year horizon, assigning lower rates of default to categories associated with periods when borrowers are in school. (2006 10-K (Supp. Dec. Ex. Z) at 35; 2007 10-K (Supp. Dec. Ex. AA) at 40; Br. at 9 (citing cases).)[5] Again, none of plaintiffs' rhetoric can mitigate their failure to plead facts establishing the falsity of SLM's statements about the two-year loss emergence period, or SLM's earlier period reserves.

Nor do plaintiffs' cases salvage their pleading failure. In fact, plaintiffs' purported falsity cases actually deal with scienter, and even then pre-date *Tellabs, Inc. v. Makors Issues & Rights*, 551 U.S. 308 (2007). For example, plaintiffs' reliance on *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (Opp. at 12), for the proposition that falsity may be established by pointing to post-class period developments, is inapt on every score. In *Rothman*, the fact that defendant filed a contract suit to recover royalties immediately after the class period was found probative of *scienter* under pre-*Tellabs* standards because the contract case pertained to events occurring during the class period. *Id.*[6] Plaintiffs' cases do not and cannot support the claim that SLM's 4Q07 augmentation of its loan loss allowance—a current period event that related only to Q407—demonstrates the falsity of earlier period allowances. *See AIG Global*, 254 F. Supp. 2d at 385; Br. at 6-10.

## II. SLM'S FORWARD-LOOKING STATEMENTS ARE PROTECTED UNDER THE PSLRA SAFE HARBOR

Plaintiffs acknowledge that many of the challenged statements are forward looking, within the ambit of the PSLRA's safe harbor protections. (Opp. at 15.) However, plaintiffs

---

[5] Plaintiffs also assert that SLM failed to disclose a concentration of credit risk arising from "non-traditional loans." (Opp. at 14-15.) This allegation is part and parcel of plaintiffs' claim that SLM understated default rates and correspondingly, its loan loss allowances. Thus, it fails for the same reasons. (Br. at 10.) Furthermore, SLM expressly disclosed the heightened risks associated with certain components of its PEL portfolio. (2006 10-K (Supp. Dec. Ex. Z) at 21, 57 (increased risks associated with certain "non-standard" loan programs).)

[6] The other pre-*Tellabs* scienter cases cited for falsity fail for the same reason. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (relying on *Rothman* in considering *pre-class* data to show "that declining sales were made known to defendants" during the class period); *Novak v. Kasaks,* 216 F.3d 300 (2d Cir. 2000) (reversing an order dismissing the case on scienter grounds, not falsity).

5

quibble with the adequacy of SLM's cautionary warnings, which clearly state that "[e]vents beyond our control such as a prolonged economic downturn . . . could lead to higher levels of delinquencies and defaults." (2006 10-K (Supp. Dec. Ex. Z) at 21; *see also* Br. at Ex. M to Hammel Dec.) Such warnings consistently have been held sufficient under the PSLRA's Safe Harbor. *See*, *e.g.*, *In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at *12-14 (S.D.N.Y. 2007). In any event, the safe harbor also immunizes forward looking statements where—like here— plaintiffs have failed to plead facts demonstrating defendants' actual knowledge of falsity. (Br. at 21-22; Sec. III.A. *infra*.)

### III. PLAINTIFFS HAVE FAILED TO PLEAD PARTICULARIZED FACTS ESTABLISHING A STRONG INFERENCE OF SCIENTER

#### A. Plaintiffs Have Failed To Plead Circumstantial Evidence Supporting A Strong Inference Of Scienter

Plaintiffs try to allege scienter through a factually unsupported laundry list of accusations that repeatedly have been rejected by the courts of this circuit as insufficient under the PSLRA, including: (i) alleged post-class period, hindsight "admissions" relating to alleged violations of internal policies (Opp. at 19); (ii) alleged "access to information" (*id.* at 17-18); and (iii) alleged lack of internal controls (*id.* at 19-20), the nature and size of alleged GAAP violations (*id.* at 20), and managements' SOX certifications (*id.*). As defendants have shown (Br. at 13-18 (citing cases)), none supports a strong inference of extreme reckless or intentional misconduct.

- No "Fraud by Hindsight." The fact that defendants increased reserves and tightened compliance with internal policies does not give rise to any inference of scienter (even before the PSLRA). *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994).[7]

- No "Must Have Known" Scienter Based on "Access" or "Position." Allegations that senior

---

[7] Plaintiffs' cases finding scienter involve situations where particularized facts were alleged, indicating that defendants gave affirmative directives to violate internal policies; such facts are not alleged here. *See*, *e.g., In re Dynex Capital, Inc. Sec. Litig.*, 2009 WL 3380621, at *12 (S.D.N.Y. Oct. 19, 2009) (finding scienter when "the disregard for underwriting standards was a top-down directive from Dynex management in Virginia").

6

management had access to unspecified information—without particularized allegations specifying the nature of the information known, how it varied from public statements, and what defendants knew about such variance at the time those public statements were made—are insufficient to establish scienter. (Br. at 14 (citing cases).) The CWs cannot fill this enormous pleading gap, particularly when none of them (i) had access to corporate-level information; or (ii) had any interactions with defendants—let alone, interactions sufficient to know that public disclosures by those defendants were knowingly false. (Br. at 16-17.)

- <u>No "Must Have Known" Scienter Based on Nature/Magnitude of Alleged Misstatement.</u>  For similar reasons, after *Tellabs*, courts in this circuit have refused to find scienter on the basis of broad brush "must have known" allegations—because the alleged misstatement affected a "core business," involved significant GAAP violations, resulted from a lack of internal controls,[8] or was improperly certified under SOX. *See*, *e.g.*, *In re Novagold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 303-04 (S.D.N.Y. 2009); *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 336 (S.D.N.Y. 2009). Plaintiffs do not refute these settled authorities.

### B.   Plaintiffs Have Failed To Plead Motive Evidencing A Strong Inference Of Scienter

Plaintiffs also leave unaddressed defendants' cases establishing that allegations regarding Mr. Lord's stock sales (Br. at 20-21) and the desire to avoid equity forward redemption obligations (Br. at 19-20) are insufficient to support a strong inference of scienter as to any defendant. Nor do they attempt to refute defendants' showing (Br. at 20) that Mr. Andrews' lack of stock sales undermines any inference of scienter as to *all* defendants.[9] Instead, plaintiffs

---

[8] To the extent the case law supports any such theory, there must be a showing of extreme recklessness due to a "complete lack" of internal controls, *In re DRDGold Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 574 (S.D.N.Y. 2007)—something that is not alleged (and could not credibly be alleged) here. The one CW who discusses internal controls (¶ 175) at all provides no timeframe for his comments, is too junior to establish any knowledge about corporate-level controls, and only claims weakness in the internal audit department—not a company-wide failure in the area of financial reporting. *Steinberg v. Ericsson LM Tel. Co.*, 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008) (rejecting CWs' statement because they were only "mid-level managers" who would not have any "contacts or communications with Defendants").

[9] The only case plaintiffs cite on this issue—*In re APAC Teleservices, Inc. Sec. Litig.*, 1999 WL 1052004, at *7 (S.D.N.Y. Nov. 19, 1999)—does nothing to support their position. This pre-*Tellabs* decision held that *whether* one defendant sold stock was a "[f]actual question[] . . . [and] should not be addressed on a motion to dismiss." *Id.* Here, the absence of any stock sales by Mr. Andrews is uncontroverted.

7

attempt to show motive based on defendants' potential merger compensation and the fact that Mr. Lord had a margin loan (as opposed to a forced margin sale, in order to satisfy that loan).

Even before *Tellabs*, this Court recognized that "the desire to realize personal benefits as a result of a merger can be imputed to any corporate officer, [and thus] such motive cannot legally give rise to a 'strong inference'" of scienter. *Kalnit v. Eichler,* 99 F. Supp. 2d 327, 340 (S.D.N.Y. 2000), *aff'd,* 264 F.3d 131 (2d Cir. 2001). Additionally, neither a margin loan nor forced margin sales evidence motive. *In re Tarragon Corp. Sec. Litig.*, 2009 U.S. Dist. LEXIS 60160, at *38-39 (S.D.N.Y. Mar. 27, 2009) ("One defendant's sale of shares in the final 48 hours of class period, made in order to satisfy margin calls, does not raise a 'strong inference' of scienter."). Of course, Mr. Lord's forced margin sale provides no evidence of motive whatsoever as to SLM or Mr. Andrews. Plaintiffs' cases do not hold differently. *See e.g., Hall v. The Children's Place Retail Stores, Inc*., 580 F. Supp. 2d 212, 223, 233 (S.D.N.Y. 2008) (finding scienter only because the defendant affirmatively "violated the Company's internal control policies by pledging shares of his common stock as collateral for margin loans").

### C.   Even Through Their Combined Allegations, Plaintiffs Have Failed To Plead A Strong Inference Of Scienter

Ultimately, plaintiffs' kitchen sink approach simply fails to create the strong inference of scienter required by statute. Even when considered cumulatively, plaintiffs' allegations do not suffice: "zero plus zero" still equals zero. *City of Brockton Ret. Sys. v. Shaw Group Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008); *Malin v. XL Capital, Ltd.,* 312 Fed. Appx. 400, 402 (2d Cir. 2009) ("having concluded that none of plaintiffs' allegations showed even a weak inference of scienter, there is no logical way … that the combined effect of the allegations would form a *strong* inference of scienter") (emphasis in original). The far more "compelling and cogent" inference under *Tellabs* is that defendants were among the first victims of the global financial

8

market collapse, which began in the second half of 2007. *In re PXRE Group, Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 548 (S.D.N.Y. 2009) ("the more compelling inference … is that Defendants, in an unprecedented and uncertain situation, simply lacked" the ability to forecast unprecedented events), *aff'd,* 2009 WL 4893719 (2d Cir. Dec. 21, 2009); *see also Pittleman v. Impac Mortg. Holdings, Inc.*, 2009 WL 648983, at *4 (C.D. Cal. Mar. 9, 2009).

## IV.   PLAINTIFFS HAVE FAILED TO PLEAD LOSS CAUSATION

To plead loss causation, plaintiffs must plead facts showing that "the market reacted negatively" to a corrective disclosure, which exposed the alleged misstatement. *See, e.g., Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005). Plaintiffs concede that they suffered no loss as a result of the January 23, 2008 announcements, because "the stock price rose … that day." (Opp. at 25.) This lack of a negative market reaction is "fatal under Second Circuit precedent." *Lentell*, 396 F.3d at 175.

The other so-called corrective disclosures, on December 19 (a conference call) and January 3 (an 8-K filing and press release), did not reveal the falsity of any prior statement. "[W]here a disclosure does not reveal the falsity of the alleged misstatements, it does not qualify as 'corrective.'" *Omnicom,* 541 F. Supp. 2d at 552. Plaintiffs' only answer is that the refusal of SLM's newly appointed CEO, Mr. Lord (as of Dec. 14), to answer questions concerning the PEL portfolio on the December 19 conference call somehow exposes the alleged "fraud," and that SLM's revelation of the number of PEL loans it had extended (a previously disclosed historical fact, *see* 2006 10-K (Supp. Dec. Ex. Z) at 13-14) somehow reveals the "falsity" of its reserves. (Opp. at 24-25.) But the failure to provide new information and the re-publication of previously disclosed facts are obviously not "corrective" of anything said before. *Omnicom*, 541 F. Supp. 2d at 550, 552; *see also Lentell*, 396 F.3d at 177. Furthermore, plaintiffs' allegations fail to provide any basis for ascribing some "rough proportion" of the stock price decline attributable to

9

the alleged misstatements—rather than massive and undeniable market and industry factors such as the failed Flowers merger and the late 2007 economic collapse—as Second Circuit authority expressly requires them to do.  *See Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007); *Lentell*, 396 F.3d at 177.

## V.     DISMISSAL SHOULD BE WITHOUT LEAVE TO AMEND

This litigation was first filed in January 2008.  For over two years, two different lead plaintiffs and three different law firms have investigated and filed two separate amended complaints.  Defendants' October 19, 2009 pre-motion letter described the flaws in the current complaint, yet plaintiffs elected to stand on that complaint.  Plaintiffs have no right to a third bite at the apple and have offered no reason to believe that they could produce a viable pleading.  Dismissal should be without leave to amend.  *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 554, 570 (S.D.N.Y. 2004) (dismissing with prejudice first amended complaint where plaintiffs did not amend following pre-motion letter).

### Conclusion

For the foregoing reasons, defendants' motion to dismiss should be granted, without leave to amend.

Dated: February 26, 2010  
New York, New York

Respectfully submitted,

LATHAM & WATKINS LLP

By:   /s/  Jeff G. Hammel  
        Jeff G. Hammel

Peter A. Wald (*pro hac vice*)  
Laurie B. Smilan  
Jeff G. Hammel  
Abid R. Qureshi (*pro hac vice*)  
885 Third Avenue  
New York, New York 10022  
(212) 906-1200

Counsel for Defendants SLM Corporation, Albert L. Lord and Charles E. Andrews

10