USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/24/2010

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                    :

In re:  SLM CORPORATION       :
        SECURITIES LITIGATION

                    :

                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Master File No.
08 Civ. 1029 (WHP)

MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

             Lead Plaintiff SLM Venture brings this putative securities class action lawsuit

against SLM Corporation ("Sallie Mae" or the "Company") and two of its officers, Albert Lord

("Lord") and Charles Andrews ("Andrews").  Between January 18, 2007 and January 23, 2008

(the "Class Period"), Plaintiff alleges that Defendants made misleading statements about Sallie

Mae's earnings, underwriting guidelines, and loan forbearance practices in violation of Sections

10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  15 U.S.C. §§

78j(b), 78t(a).  Defendants move to dismiss the Second Amended Class Action Complaint (the

"Complaint") pursuant to Fed. R. Civ. P. 12(b)(6).  For the following reasons, Defendants'

motion is granted in part and denied in part.

             As a preliminary matter, the Complaint needs some realignment.  By

Memorandum and Order dated April 1, 2009, this Court displaced Westchester Capital

Management Inc., an investment advisor, as lead plaintiff and appointed SLM Venture in its

place.  In re SLM Corp. Sec. Litig., 258 F.R.D. 112, 116-17 (S.D.N.Y. 2009).  At that time, this

Court also rejected SLM Venture's application to appoint Coughlin Stoia Geller Rudman &

Robbins, LLP[1] as "liaison counsel." In re SLM, 258 F.R.D. at 117 n.3.  Coughlin Stoia represented another entity vying for appointment as lead plaintiff—the Sheet Metal Workers' Local No. 80 Pension Trust Fund ("Sheet Metal Workers").  For reasons this Court cannot fathom, the Complaint nevertheless alleges claims on behalf of "Lead Plaintiff SLM Venture and additional plaintiff Sheet Metal Workers" and lists Coughlin Stoia as a counsel on the Complaint. (Second Amended Class Action Complaint dated Sept. 3, 2009 ("Compl." ¶ 26.) That is a clear violation of this Court's prior order.  See In re SLM, 258 F.R.D. at 117 n.3. Accordingly, all references in the Complaint to the Sheet Metal Workers are stricken.

BACKGROUND

The Complaint is a behemoth—373 paragraphs sprawling over 129 pages.  For the purposes of this motion, its labyrinthine allegations are accepted as true.

I.  The Parties

SLM Venture is a joint venture established by several families for the purpose of investing in Sallie Mae common stock.  It seeks to represent a class of all purchasers of Sallie Mae common stock during the Class Period. (Compl. ¶ 25; Declaration of Sam Stoodeh dated Feb. 29, 2009 ¶¶ 3-4.)  SLM Venture purchased Sallie Mae common stock on the New York Stock Exchange during the Class Period. (Compl. ¶¶ 25-26.)

Sallie Mae is a Delaware corporation and one of the nation's leading providers of student loans.  It offers federally-guaranteed student loans through the Federal Family Education Loan Program ("FFELP") and private education loans ("PELs" or "Private Loans") that are not

---

[1] On March 31, 2010, Coughlin Stoia changed its name to Robbins Geller Rudman & Dowd LLP. (Docket No. 113.)

guaranteed by the federal government. (Compl. ¶¶ 27, 41.) Founded in 1972, Sallie Mae was a government-sponsored enterprise until it privatized on December 29, 2004. (Compl. ¶ 27.) Its shares trade on the New York Stock Exchange. (Compl. ¶ 27.)

Lord is Sallie Mae's Chief Executive Officer ("CEO") and Vice Chairman of its Board of Directors. Before becoming CEO in December 2007, he held a number of senior executive positions within the company, including an earlier turn as CEO from 1997 until mid-2005. (Compl. ¶ 28.) For most of 2007, Lord was an outside director of Sallie Mae. (Compl. ¶ 28.)

Andrews was Sallie Mae's Chief Financial Officer ("CFO") from January 2006 until May 2007, when he was named CEO. (Compl. ¶ 29.) Andrews served as CEO from May 2007 until December 2007, when he was named President of Sallie Mae. (Compl. ¶ 29.) Andrews resigned from Sallie Mae on September 30, 2008.

II. Defendants' Purported Efforts to Inflate Sallie Mae Stock

Plaintiff alleges that Defendants misled the market about Sallie Mae's financial performance for the purpose of inflating the Company's share price. Specifically, Plaintiff avers that Sallie Mae lowered its borrowing criteria to increase its portfolio of private loans, hid defaults by changing its forbearance policy, and inflated profits through inadequate loan loss reserves. Defendants reported those inflated profits in a series of public statements in SEC filings, press releases, and related analyst conference calls from January to November 2007.

A. Lending Standards

Plaintiff's allegations focus on Sallie Mae's portfolio of Private Loans. Gradually, Sallie Mae increased its Private Loan exposure by offering PELs directly to "Non-Traditional Students"—individuals enrolled in career training courses or for-profit institutions of

3

higher education. (Compl. ¶ 45.) These Private Loans are riskier than FFELP loans because they are not guaranteed by the federal government. (Compl. ¶¶ 42-43, 45.)

However, Private Loans offer greater opportunity for profit because, unlike FFELP loans, their interest rates are not capped by federal regulations. (Compl. ¶¶ 42-44.) For example, in 2006, the difference between income earned on an FFELP loan and the interest paid on the debt to fund the loan was an average of 1.26%. (Compl. ¶ 42.) That same year, Sallie Mae earned an average profit of 5.13% on PELs. (Compl. ¶ 43.)

Plaintiff alleges that Sallie Mae loosened its underwriting practices and extended Private Loans to students who were "not creditworthy" in order to increase its market share of potentially lucrative Private Loans. (Compl. ¶¶ 48, 71-73.) In particular, Plaintiff contends that Sallie Mae "significantly reduce[d] the credit score that a borrower needed to obtain a loan" and issued more loans to students who were attending schools with low graduation rates. (Compl. ¶¶ 72-73.)

Plaintiff alleges that Sallie Mae concealed this sea change in underwriting practices by affirmatively representing in its Securities and Exchange Commission (" SEC") filings that the "additional risk" of PELs was managed "through industry-tested loan underwriting standards." (Compl. ¶¶ 232, 257.) For example, Sallie Mae's 2006 10-K, which was signed by both Andrews and Lord, stated: "Since we bear the full credit risk for Private Education Loans, they are underwritten and priced according to credit risk based upon standardized consumer credit scoring criteria." (Compl. ¶ 234; Declaration of Jeff G. Hammel dated Dec. 11, 2009 ("Hammel Decl.") Ex. E: SLM Corporation Form 2006 10-K ("2006 10-K").) Sallie Mae reiterated that assurance in its Form 10-Q report filed on May 10, 2007. (Compl. ¶¶ 257-58.) Moreover, Andrews and Lord made similar representations during analyst

conference calls on January 18 and October 11, 2007.  (Compl. ¶¶ 226, 296.)  Defendants did not disclose any modifications of Sallie Mae's underwriting standards during the Class Period.  (Compl. ¶ 72.)

     B.  Loan Loss Reserves & Reported Earnings

     Plaintiff also alleges that Defendants understated loan loss allowances for PELs in violation of Generally Accepted Accounting Principles ("GAAP") and SEC regulations.  (Compl. ¶¶ 106-12.)  Loan loss allowances are used to calculate the present value of a loan portfolio by accounting for the percentage of loans that will ultimately be deemed uncollectible and charged off.  GAAP and SEC regulations require Sallie Mae to establish an allowance for loan losses based on, inter alia, loan characteristics, historical loan trends, current economic conditions, concentration of borrowers, credit review, borrower credit risk, type of school, published student loan default information and trends, charge-offs, and recoveries.  (Compl. ¶ 110.)

     The Complaint includes statements by two confidential witnesses ("CWs") concerning the availability of data used to calculate loan loss reserves.[2]  (Compl. ¶ 188.)  CW 13 states that Lord and Andrews received monthly reports listing the "raw number of loans, their dollar amounts, and the number of days the loans were past due," as well as ad hoc reports on loans charged off Sallie Mae's books.  (Compl. ¶ 188.)  In addition to those monthly reports, CW 15 states that Defendants requested risk analysis reports showing delinquency trends and historical borrower default information more than once a month beginning in September 2007.  (Compl. ¶ 188.)

---

[2]  The first, CW 13, is alleged to have reported to a Sallie Mae Senior Vice President.  (Compl. ¶ 99.)  The second, CW 15, is not described by position or duties in the Complaint and cannot be characterized by the Court.

Sallie Mae's 2006 10-K described the Company's method for calculating loan loss reserves as follows:

> We maintain an allowance for loan losses at an amount sufficient to absorb losses inherent in our FFELP and Private Education Loan portfolios at the reporting date based on a projection of estimated probable net credit losses. We analyze those portfolios to determine the effects that the various stages of delinquency have on borrower default behavior and ultimate charge-off. We estimate the allowance for loan losses and losses on accrued interest income for our managed loan portfolio using a migration analysis of delinquent and current accounts. A migration analysis is a technique used to estimate the likelihood that a loan receivable may progress through the various delinquency stages and ultimately charge-off, and is a widely used reserving methodology in the consumer finance industry. We also use the migration analysis to estimate the amount of uncollectible accrued interest on [PELs] and write off that amount against current period interest income.
>
> When calculating the allowance for loan losses on [PEL] [l]oan loss, we divide the portfolio into categories of similar risk characteristics based on loan program type, loan status . . . , underwriting criteria, existence or absence of a co-borrower, and aging. We then apply default and collection rate projections to each category. . . . Management believes that the allowance for loan losses is appropriate to cover probable losses in the student loan portfolio.

(Compl. ¶¶ 194, 196, 238.)  Plaintiff contends that this description materially misstated the adequacy of the loan loss reserves because Sallie Mae did not account for increased defaults in its non-traditional Private Loan portfolio.  (Compl. ¶¶ 106-12, 124-35.)

Additionally, Plaintiff contends that Defendants improperly applied the two-year "loss emergence period." (Compl. ¶¶ 113-15.)  A loss emergence period is the time during which defaults are measured when calculating an appropriate allowance for loan losses.  (Compl. ¶ 113.)  By measuring two years from issuance of the loan, rather than from when a borrower became obligated to make payments, Sallie Mae counted as a performing interval the time during

6

which a borrower could not default because no payments were due.  Not surprisingly, Plaintiff contends that this depressed delinquency rates.  (Compl. ¶¶ 113-15.)

Plaintiff further alleges that the miscalculated loan loss reserves allowed Defendants to overstate Sallie Mae's earnings.  Thus, Plaintiff argues that Defendants made false or misleading statements each time Sallie Mae publicly announced its earnings during the Class Period.  In addition to the 2006 10-K signed by both Lord and Andrews, Plaintiff identifies Sallie Mae's January 18, 2007 8-K; April 24, 2007 8-K; May 10, 2007 10-Q; August 7, 2007 10-Q; and November 9, 2007 10-Q and accompanying Sarbanes Oxley ("SOX") certifications during the Class Period, all signed by Andrews.  (Compl. ¶¶ 194, 218, 223-30, 250-56, 268-94, 304.)

C.  Forbearance Standards

Based largely on the testimony of former low- and mid-level employees from Sallie Mae's collection offices,[3] Plaintiff contends that Sallie Mae changed its forbearance policy to hide PEL defaults.  (Compl. ¶¶ 74-95.)  Forbearance allowed a borrower to delay payments for a period of time while interest accrued and permitted Sallie Mae to characterize the loan as "current."  (Compl. ¶ 74.)  Consequently, by shifting delinquent loans into forbearance, Sallie Mae avoided accounting for them as delinquent or in default.  (Compl. ¶¶ 74-76.)  Plaintiff alleges that Sallie Mae authorized forbearances for PELs indiscriminately and in contravention of its policy that forbearance increase the likelihood the loan could be collected.  (Compl. ¶¶ 74-95, 238.)

_____

[3]  CWs 2 through 12 were employees at Sallie Mae call centers.  (Compl. ¶¶ 85-92, 99.)  Only two CWs are alleged to have worked at headquarters—CW 1 was an "Education Loan Product Analyst" from 2005 until May 2007 and a Senior Market Analyst from May 2007 to June 2008.  (Compl. ¶ 49 n.2).

III. Motives to Inflate Sallie Mae's Share Price

        Plaintiff alleges that several factors incentivized Defendants to show continued growth and favorable financial trends during the Class Period. (Compl. ¶ 51.)

   A. Equity Forward Contracts

        Before the Class Period, Sallie Mae entered into equity forward contracts[4] for the purpose of raising money without borrowing or issuing debt. (Compl. ¶¶ 64-67.) Under those contracts, Sallie Mae sold its shares at a set price and agreed to repurchase them later at a higher "strike price." (Compl. ¶ 64.) Thus, Sallie Mae assumed the risk that its share price would be below the strike price when the time came to settle the equity forward contracts. (Compl. ¶¶ 64-65.) The equity forward contracts also provided that, if the Company's share price fell below specified "trigger prices," Sallie Mae would be required to repurchase the shares immediately at the strike price. (Compl. ¶¶ 66-67.) These risks, including the specter of paying $2 billion earlier than anticipated, placed enormous pressure on Sallie Mae to keep its share price "as high as possible." (Compl. ¶ 67.) By the end of the Class Period, the Complaint alleges that Defendants "lost their bet on [Sallie Mae's] share value" because it hit the trigger price. (Compl. ¶ 68.)

   B. The J.C. Flowers Transaction

        In November 2006, Sallie Mae commenced merger negotiations with J.C. Flowers & Co. (Compl. ¶¶ 48, 52.) Sallie Mae signed a plan of merger on April 15, 2007 (the "Plan of Merger") with a Flowers-led consortium including Bank of America and JP Morgan Chase (the "Flowers Group"). Under the Plan of Merger, the Flowers Group would acquire all of Sallie

---

[4] An equity forward contract is a cash contract, similar to a futures contract, by which two parties agree to the exchange of equity shares to be delivered by the seller to the buyer at some future date certain. See Encyclopedia of Banking and Finance 494 (10th ed. 1994).

Mae's shares for $60 per share, a 50% premium over the then-prevailing trading price. (Compl. ¶¶ 52-54.) The Plan of Merger provided that Lord and Andrews would also receive cash payments for the difference between the $60 share price and the value of their stock options— a king's ransom totaling $225 million for Lord and $16.6 million for Andrews. (Compl. ¶¶ 62-63.)

The Plan of Merger conditioned the acquisition on Sallie Mae's continued satisfactory performance. (Compl. ¶ 55.) Plaintiff alleges that Defendants had "an incentive to ensure that the merger conditions tied to the Company's financial performance were fulfilled and to foster the Flowers [G]roup's belief the Company was worth buying at $60 per share of common stock." (Compl. ¶ 55.)

In July 2007, the Flowers Group informed Sallie Mae that legislation limiting the interest rate on federally-guaranteed student loans could doom the merger. (Compl. ¶ 56.) Sallie Mae announced that it "strongly disagree[d]" with the Flowers Group and that the legislation, even if enacted, would not constitute a material adverse change under the Plan of Merger. (Compl. ¶ 57.)

On October 8, 2007, Sallie Mae filed suit in Delaware Chancery Court seeking to compel the merger. (Compl. ¶ 58.) And on December 12, 2007, Sallie Mae announced that the Flowers Group had refused to consummate the merger. (Compl. ¶ 59.) Finally, on January 28, 2008—less than a week after the end of the Class Period—Sallie Mae dismissed its lawsuit against the Flowers Group in exchange for financing commitments. (Compl. ¶ 60.)

C. Lord's Stock Sales

Plaintiff alleges that Lord sold Sallie Mae stock at three points during the Class Period in "unusual amounts" and "at suspicious times." (Compl. ¶¶ 210-17.) The first took

9

place in February 2007 when Lord sold 400,000 shares of Sallie Mae stock for an average price of $45.80 per share days before the White House publicly released a budget proposal cutting student lender rate subsidies and increasing lender risk. (Compl. ¶ 211.) Plaintiff claims that Lord knew of the proposal and understood it would adversely affect profitability of FFELP loans and make PELs critical to Sallie Mae's success. (Compl. ¶¶ 211-12.)

Then, in August 2007, Lord exercised options that were about to expire in order to purchase 1,663,448 Sallie Mae shares for between $18.33 and $26.62 per share. Simultaneously, Lord tendered 1,139,510 of those shares back to Sallie Mae at their fair market value of $49.33 per share to pay the exercise price and associated taxes. (Compl. ¶ 213.) Lord retained the remaining 523,938 shares, the minimum allowed under Sallie Mae's rules. (Compl. ¶ 213.) Plaintiff avers that Lord chose to sell as many shares as he could—rather than fund the options exercise with a loan—because he knew that the Flowers Group would not continue with the planned merger in view of the significant reductions in FFELP guarantees and concomitant increase in lender risk. (Compl. ¶ 215.)

Finally, on December 14, 2007, two days after Sallie Mae's announcement that the Flowers Group refused to proceed with the merger, Lord sold 1,265,401 Sallie Mae shares at $27.36 per share, purportedly to satisfy a margin call. (Compl. ¶¶ 216-17.) That sale liquidated 97% of Lord's Sallie Mae holdings. (Compl. ¶ 216.)

Plaintiff does not allege that Andrews engaged in any suspicious stock sales. According to Defendants, Andrews increased his Sallie Mae holdings during the Class Period. (See Hammel Decl. Ex. K: C.E. Andrews SEC Form 4 dated Jan. 26, 2007.)

IV.  The Purported Corrective Disclosures

   Plaintiff alleges that Defendants' fraud was revealed in a series of corrective disclosures starting on December 19, 2007.  (Compl. ¶¶ 319-25.)  During an analyst call that day, Lord announced that Sallie Mae was increasing its Private Loan loss reserves but declined to answer any specific questions about the credit quality of Sallie Mae's PEL portfolio in a manner the Wall Street Journal described as "agitated and profane."  (Compl. ¶¶ 217, 320, 325.)  At that time, Lord also defended his sale of 1.2 million Sallie Mae shares the prior week by asserting that his "bank sold [him] out."  (Compl. ¶ 322.)  The market responded by pummeling Sallie Mae's shares, which fell 19% that day to close at $22.89 per share.  (Compl. ¶ 324.)

   On January 3, 2008, Sallie Mae filed a Form 8-K and press release reporting that the College Cost Reduction and Access Act of 2007 would likely reduce or eliminate profitability on new FFELP loan originations.  (Compl. ¶ 326.)  As a countermeasure, Sallie Mae announced it would focus on its PEL portfolio, be "more selective in pursuing origination activity," and "continu[e] the more stringent underwriting standards that are necessary in this market."  (Compl. ¶ 326.)  That day, the market punished Sallie Mae's share price with a 13% plunge from $19.16 to $16.67.  (Compl. ¶ 328.)

   Finally, on January 23, 2008, Sallie Mae announced its financial results for 2007.  (Compl. ¶ 331.)  Those results included a loss of $139 million for the fourth quarter of 2007, "massive" provisions for loan losses of $750 million on a "core earnings" basis, compared to $88 million for the fourth quarter of 2006, and a decline of more than 50% in net income from 2006.  (Compl. ¶ 331.)  During a conference call later that day, Lord conceded:

> Sallie Mae has lent too much money to students who have gone to schools without very good graduation records.  Such students at such schools are virtually singly responsible for 60% of the '07 credit losses.  Our methodology in creating loan loss provisions

tended to look backwards because that's the information that we had. . . . The company has stopped making loans that were predictably not collectible.

(Compl. ¶ 333.)  Between December 19 and January 23, Sallie Mae's shares fell 35%.  (Compl. ¶¶ 336, 354.)

Following the Class Period, Lord made several public statements which Plaintiff characterizes as admissions.  In a June 5, 2008 interview with the <u>Wall Street Journal</u>, Lord acknowledged that issuing Private Loans to non-traditional borrowers was "obviously a mistake and I'm not going to step away from responsibility because I was either chairman or CEO when those loans were made.  We got a little too confident in our view that credit scores are of limited meaning for undergraduates.  Maybe as early as 2004, we started lending with less selectivity." (Compl. ¶ 340.)  During a September 10, 2008 analyst call, Lord conceded: "We shouldn't have non-traditional borrowers, but we do.  In fact about 15% of our portfolio [is] what we call non-traditional borrowers. . . .  The fact is we put 15% on . . . our book . . . over the '04 to '07 period basically because we got a little sloppy and began to, I think, engage in some wishful thinking in our underwriting practices.  We very much stopped doing that."  (Compl. ¶ 342.)

DISCUSSION

I. <u>Legal Standard</u>

In reviewing a motion to dismiss, this Court accepts all facts alleged in the complaint as true and construes all reasonable inferences in plaintiff's favor.  <u>ECA Local 134 IBEW Joint Pension Trust Fund of Chicago v. JP Morgan Chase Co.</u>, 553 F.3d 187, 196 (2d Cir. 2009); <u>Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.</u>, 531 F.3d 190, 194 (2d Cir. 2008).  Nonetheless, "a complaint must contain sufficient factual matter, accepted as

true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citation omitted). To survive a motion to dismiss, a court must find that the claim is more than mere suspicion, but rather rests on "factual allegations sufficient to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 555). If a plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." Twombly, 550 U.S. at 570.

"Determining whether a complaint states a plausible claim for relief will . . . be a context specific task that requires the reviewing court to draw on its judicial experience and common sense." South Cherry St. LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009) (internal quotations omitted). A court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted); see also Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991).

## II. Section 10(b) & Rule 10b-5 Claim

To state a claim for misrepresentation under Section 10(b) and Rule 10b-5, a plaintiff must allege that each defendant "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the

plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." ATSI Commc'ns, 493 F.3d at 105 (citing Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005)); see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 318, 321 (2007).  A securities fraud complaint must further comply with the heightened pleading standard of Fed. R. Civ. P. 9(b), which requires that "the circumstances constituting fraud . . . be stated with particularity."  See Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000).  Thus, "[a] plaintiff cannot base securities fraud claims on speculation and conclusory allegations." Kalnit v. Eicher, 264 F.3d 131, 142 (2d Cir. 2001).

Defendants argue that the Complaint should be dismissed because Plaintiff has not adequately alleged the existence of any false statements, scienter, and loss causation.

A.  False Statements

Plaintiff alleges that, during the Class Period, Defendants understated Sallie Mae's PEL loss reserves and overstated its income in 2006 and 2007 SEC filings, press releases, and analyst calls.  According to Plaintiff, the loan loss reserves were not calculated pursuant to GAAP or SEC regulations.

Defendants argue that Plaintiff has not pled particularized facts establishing the falsity of the loan loss reserves.  However, Defendants concede that Plaintiff is primarily challenging the accuracy of Sallie Mae's reported default rates, a metric that is integral to calculating loan loss reserves under GAAP.  Underscoring the basis of Plaintiff's allegations in fact, the Complaint cites contemporaneous data from sources including the Department of Education showing significantly higher default rates than those reported by Sallie Mae.

Plaintiff also alleges that Defendants violated GAAP by resorting to lax underwriting standards and aggressive loan forbearance practices.[5] Given the error in the default rate metric and its impact on Sallie Mae's other financial reports, such allegations are sufficient to plead falsity.

At the pleading stage, this Court cannot conclude that Sallie Mae calculated loan loss reserves in accordance with GAAP. "GAAP is not the lucid or encyclopedic set of pre-existing rules that [it might be perceived] to be. Far from a single-source accounting rulebook, GAAP encompasses the conventions, rules, and procedures that define accepted accounting practice at a particular point in time." Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 101 (1995). Thus, "although the question of whether GAAP has been violated might appear to be a legal determination, the element of what is 'generally accepted' makes this difficult to decide as a matter of law." In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 339 (S.D.N.Y. 2004); see also In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 656-57 (S.D.N.Y. 2007) ("At the motion to dismiss stage, the plaintiffs' assertion that certain [GAAP] practices were not generally accepted must be taken as true." (quotations omitted)).

Defendants' argument that certain challenged statements are forward-looking and protected under the Private Securities Litigation Reform Act ("PSLRA") safe harbor provision is also unavailing. "Under the PSLRA, a safe harbor exists for forward-looking statements if they are identified as forward-looking and are accompanied by meaningful cautionary language . . . or the plaintiff fails to prove that the statements were made with actual knowledge of their falsity."

---

[5] While Plaintiff's principal allegations regarding Sallie Mae's forbearance policies rely, in large measure, on eleven confidential witnesses ("CWs"). CWs 2-12, employees at Sallie Mae call centers, are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Novak, 216 F.2d at 300. The CWs were positioned, albeit at low levels, to have knowledge of how Sallie Mae implemented its forbearance policy.

In re Aegon N.V. Sec. Litig., No. 03 Civ. 0603 (RWS), 2004 WL 1415973, at *11 (S.D.N.Y. June 23, 2004). But Defendants' argument fails for two reasons. First, while the statements regarding loan loss reserves necessarily include forward-looking projections about future defaults, "[s]tatements regarding loss reserves are not projections [if] they are directed to 'the then-present state of the Company's financial condition.'" Schnall v. Annuity & Life Re (Holdings), Ltd., No. 02 Civ. 2133 (JGG), 2004 WL 367644, at *8 (D. Conn. Feb. 22, 2004); see also In re Reliance Sec. Litig., 91 F. Supp. 2d 706, 721 (D. Del. 2000). "[I]t is well recognized that even when an allegedly false statement has both a forward looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply." In re Nortel Networks Corp. Sec. Litig., 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003).

Moreover, "[n]either the bespeaks caution doctrine nor the [s]afe [h]arbor provision of the PSLRA protects a defendant from liability if a statement was knowingly false when made." In re Alliance Pharm. Corp. Sec. Litig., 279 F. Supp. 2d 171, 192 (S.D.N.Y. 2003). Plaintiff alleges that Defendants knew the statements regarding loan loss reserves were false when made, and thus neither the bespeaks caution doctrine nor the PSLRA safe harbor provision apply here. See In re Prudential Sec. Inc. Ltd. P'ships Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (Pollack, J.) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

Accordingly, the Complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949.

B. Scienter

A well-pled scienter allegation "state[s] with particularity facts giving rise to a strong inference" that the defendants had "a mental state embracing [the] intent to deceive, manipulate, or defraud." Tellabs, 551 U.S. at 319; see also South Cherry, 573 F.3d at 108; Teamsters, 531 F.3d at 194. "[T]he scienter element can be satisfied by a strong showing of reckless disregard for the truth." South Cherry, 573 F.3d at 109 (citations omitted). A reckless disregard for the truth means "conscious recklessness—i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence." South Cherry, 573 F.3d at 109 (citing Novak, 216 F.3d at 312) (emphasis in original). Like any allegation of recklessness in tort, the plaintiff need identify only conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." South Cherry, 573 F.3d at 109 (quotation marks omitted); Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, 694 F. Supp. 2d 287, 297 (S.D.N.Y. 2010).

Moreover, scienter cannot be assessed "in a vacuum[;] the inquiry is inherently comparative[.]" Tellabs, 551 U.S. at 324. A court "must consider plausible nonculpable explanations for the defendant's conduct." Tellabs, 551 U.S. at 324; ATSI Comm'cns, 493 F.3d at 99. In comparing competing explanations, the "complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324; South Cherry, 573 F.3d at 111.

"The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b)

17

by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." In re Ambac Fin. Grp., Inc. Sec. Litig., 693 F. Supp. 2d. 241, 264 (S.D.N.Y. 2010) (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)).  Plaintiff contends that it has sufficiently alleged scienter under both prongs.

           i. Motive & Opportunity

        Because Lord and Andrews held "the highest positions of power and authority within the company," it is not disputed that Defendants had the opportunity to commit fraud. San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 813 (2d Cir. 1996); see also In re Ambac, 693 F. Supp. 2d at 265.

        Whether Defendants possessed a motive to commit fraud is a more difficult question.  "Sufficient motive allegations must entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." Kalnit, 264 F.3d at 139 (internal citation omitted).  "It is not sufficient to allege goals that are 'possessed by virtually all corporate insiders,' such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability or the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation." South Cherry, 573 F.3d at 109 (citing Novak, 216 F.3d at 308); see also Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995) ("Plaintiffs' allegation that defendants were motivated to defraud the public because an inflated stock price would increase their compensation is without merit.  If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.").  However, "artificial inflation of a stock price in order to achieve some more specific goal may satisfy the pleading requirement." See In re Complete Mgmt. Inc. Sec. Litig., 153 F.

Supp. 2d 314, 328 (S.D.N.Y. 2001) (finding allegation of recognition of "phony receivables" in context of acquisition sufficiently concrete to find motive) (citing In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 270 (2d Cir. 1993)).

The analysis of a defendant's motive is "extremely contextual." In re Complete Mgmt., 153 F. Supp. 2d at 328. To prevail, a plaintiff must allege that individual defendants stood to benefit from the artificial inflation of share prices at the expense of shareholders. See In re Complete Mgmt., 153 F. Supp. 2d at 328 (citing In re Time Warner, 9 F.3d at 270). The Complaint advances three reasons why Defendants were motivated to inflate Sallie Mae's share price—the Flowers Acquisition, Lord's stock sales during the Class Period, and the equity forward contracts. Considered together, these allegations are sufficiently concrete to give rise to an inference that Lord possessed the intent to defraud shareholders. This applies equally to Sallie Mae because "a corporate defendant's scienter is necessarily derived from its employees . . . [and] courts have readily attributed the scienter of management-level employees to corporate defendants." In re Marsh & Mclennan Cos., Inc. Sec. Litig., 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) (internal citations omitted).

Plaintiff's motive and opportunity allegations regarding the Flowers Group merger transcend a generic corporate desire to negotiate favorable terms. The Complaint alleges a "concrete and personal benefit" for Lord. See Kalnit, 264 F.3d at 139. Under the proposed merger, Lord would receive "a cash payment in the amount of approximately $225 million" and could exercise stock options "tied to exercise prices above the market price of SLM stock at that time." (Compl. ¶¶ 200-01.) Moreover, to keep the merger prospects viable, Lord had an incentive to avoid the possibility that Sallie Mae's share price would fall below the trigger price in its equity forward contracts. If that occurred, Sallie Mae would have been required to

19

repurchase approximately $2 billion in shares, an event that would have torpedoed the merger and Lord's payout.

Apart from the possibility of reaping a windfall payout, Lord made "unusual" stock sales in February, August, and December 2007. This type of trading in the context of an acquisition contributes to an inference of scienter. See Rothman, 220 F.3d at 93 (citing In re Time Warner, 9 F.3d at 269); Burstyn v. Worldwide Xceed Grp., Inc., No. 01 Civ. 1125 (GEL), 2002 WL 31191741, at *5 (S.D.N.Y. Sept. 30, 2002) (finding "specific goal . . . to acquire companies" sufficient motive to support strong inference of scienter"); In re Complete Mgmt. Sec. Litig., 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001) (finding motive and opportunity based in part on motive to inflate stock price to effectuate acquisitions). Whether insider trading activity can be characterized as "unusual" depends on "the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74-75 (2d Cir. 2001). A large sale does not necessarily give rise to an inference of scienter. See Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995) (stock sale by officer that amounted to less than 11% of holdings not "unusual"); Rothman, 220 F.3d at 94 (stock sale by officers of less than 10% of their holdings not "unusual"). However, a sale amounting to a large percentage of an individual's holdings may be sufficient. In re Scholastic, 252 F.3d at 74-75 (sale of 80% of individual defendant's holdings sufficient to establish motive and opportunity). Lord's trades—culminating in the December liquidation of 97% of his Sallie Mae holdings—are unusual for a corporate officer by any measure.[6]

---

[6] Moreover, to the extent that Lord offers explanations for his stock sales—he contends that the August sales were necessary to pay the exercise price of expiring options and associated taxes, and that the December sale was necessary to satisfy a margin call—those facts remain in dispute.

The number of corporate insiders who sold shares is also relevant. See, e.g., In re Scholastic Corp., 252 F.3d at 75. In some instances, courts have held that an inference of motive and opportunity is undermined when only one of several individual defendants engaged in unusual trading activity. See, e.g., San Leandro, 75 F.3d at 814 (claim of scienter undermined when only one of five individual defendants sold stock); Acito, 47 F.3d at 54 (scienter not pled based on sales by one of four individual defendants). Here, there are only two individual defendants—one who dumped nearly all of his shares during the Class Period and one who did not. While the absence of sales by Andrews undermines the claim of scienter against him, that does not exculpate Sallie Mae or Lord. In re Scholastic Corp., 252 F.3d at 75 (sales by other non-defendant officers did not change culpability of sole individual defendant).

Accordingly, Plaintiff has alleged motive and opportunity with respect to Sallie Mae and Lord. However, because Plaintiff does not allege that Andrews engaged in any unusual trading activity, Plaintiff has failed to adequately allege motive and opportunity with respect to him.

ii. Conscious Misbehavior or Recklessness

Because Andrews did not engage in unusual trading activity during the Class Period, he can only be liable if his statements were reckless. A strong inference of recklessness arises when a defendant (1) engages in deliberate illegal behavior, (2) knew or should have known that he was misrepresenting material facts, or (3) failed to check information he had a duty to monitor. Novak, 216 F.3d at 308-09; see also Teamsters, 531 F.3d at 194. In this context, recklessness is not "merely enhanced negligence." In re JP Morgan Chase Sec. Litig.,

---

"Although defendants contest [trading] information, whether plaintiff[] can prove [its] allegations is not to be resolved on a Rule 12(b)(6) motion." In re Scholastic Corp., 252 F.3d at 75.

363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005). Rather, it is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." In re JP Morgan Chase, 363 F. Supp. 2d at 624-25; see SEC v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998); Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996). An allegation "that a defendant merely 'ought to have known' is not sufficient to allege recklessness." Hart v. Internet Wire, Inc., 145 F. Supp. 2d 360, 368 (S.D.N.Y. 2001).

   Plaintiff does not identify any contemporaneous internal document showing that the loan loss reserves were improperly calculated or that Andrews made a statement without foundation. While CWs 13 and 15 assert that Defendants received reports on loan origination and delinquencies, the Complaint fails to describe their contents or whether they differed from Andrews's Class Period statements regarding delinquencies or loan loss reserves. Without those details, a "broad reference to raw data" is insufficient to establish scienter. Teamsters, 531 F.3d at 196; see also Plumbers, 694 F. Supp. 2d at 299; Steinberg v. Ericsson LM Tel. Co., No. 07 Civ. 9615 (RPP), 2008 WL 5170640, at *13-14 (S.D.N.Y. Dec. 10, 2008). Similarly, none of the CWs claim knowledge of how the loan loss reserves were calculated. Aside from CW 13, none had access to the aggregated data used to determine loan loss reserves. See In re Elan Corp. Sec. Litig., 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) ("Plaintiffs do not allege any facts indicating that [the CW] was in a position to have knowledge regarding communications with [the Company's] senior management or the conclusions reached by . . . management upon receipt of this information.").

   Accordingly, Plaintiff's claim against Andrews is dismissed.

C. Loss Causation

Loss causation is a necessary element of a 10b-5 claim. Dura Pharms., Inc. v.

Broudo, 544 U.S. 336, 346-47 (2005). The burden of establishing loss causation rests on the

plaintiff. 15 U.S.C. § 78u-4(b)(4). Loss causation can be established by showing that the market

reacted negatively to a corrective disclosure that "reveal[s] . . . the falsity of prior

recommendations." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 175 (2d Cir. 2005).

At the pleading stage, loss causation allegations need only be set forth in a "short

and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8.

"Ordinary pleading rules are not meant to impose a great burden upon a plaintiff. . . . But it

should not prove burdensome for a plaintiff who has suffered an economic loss to provide a

defendant with some indication of the loss and the causal connection that the plaintiff has in

mind." Dura, 544 U.S. at 347.

"Dura does not require that a corrective disclosure take a particular form or be of

a particular quality. . . . It is the exposure of the falsity of the fraudulent representation that is the

critical component of loss causation." In re Omnicom Grp., Inc. Sec. Litig., 541 F. Supp. 2d

546, 551 (S.D.N.Y. 2008) (internal citations and quotation marks omitted), aff'd, 597 F.3d 501

(2d Cir. 2010).

Plaintiff contends that it has adequately pled loss causation because Sallie Mae

stock declined when the truth "leak[ed] out" in late 2007 and early 2008. In particular, Plaintiff

alleges that Sallie Mae stock dropped 21% on December 19, 2007 after Lord acknowledged that

Sallie Mae was increasing its Private Loan loss reserves but refused to answer questions about

the credit quality of Sallie Mae's PEL portfolio. Plaintiff also notes that Sallie Mae's share price

dropped 13% on January 3, 2008 after Sallie Mae's announcement that it would "be more

selective in pursuing origination activity" and "continue to focus on generally higher-margin Private Education Loans." These share price declines are sufficient for the modest showing required under Rule 8.

## III. Section 20(a) Claim

In order to establish a prima facie case of liability under section 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation. In re PXRE Grp., 600 F. Supp. 2d 510, 548 (S.D.N.Y. 2009) (citing Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998)). "Since culpable participation is an element, the PSLRA's heightened pleading requirements apply and plaintiffs must plead with particularity giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaged in fraudulent conduct." In re Global Crossing, 322 F. Supp. 2d at 349.

Lord was an officer and Chief Executive Officer of Sallie Mae during the Class Period, and was responsible for many of the allegedly fraudulent statements throughout the Class Period. Because Plaintiff has alleged a primary violation, Defendants' motion to dismiss the Section 20(a) claim against Lord is denied.

As discussed in Section II.B, Plaintiff has not pled facts sufficient to give rise to a strong inference that Andrews acted with scienter. Accordingly, Defendants' motion to dismiss the Section 20(a) claims against Andrews is granted.

24

CONCLUSION

For the foregoing reasons, Defendants SLM Corporation's and Albert Lord's

motion to dismiss the Second Amended Class Action Complaint is denied.  Defendant Charles

Andrews' motion to dismiss the Complaint is granted.  All references in the Complaint to the

Sheet Metal Workers Local No. 80 Pension Trust Fund are stricken.  The Clerk of Court is

directed to terminate Charles Andrews as a Defendant in this action.

Dated: September 24, 2010
       New York, New York

                              SO ORDERED:


                              _____
                              WILLIAM H. PAULEY III
                              U.S.D.J.

*Counsel of Record:*

Jonathan K. Levine, Esq.
Girard Gibbs LLP
601 California Street, Suite 1400
San Francisco, CA 94108
*Counsel for Lead Plaintiff SLM Venture*

Jeff G. Hammel, Esq.
Latham and Watkins
885 Third Avenue
New York, NY 10022
*Counsel for Defendants*