```
                                          USDC SDNY
                                          DOCUMENT
                                          ELECTRONICALLY FILED
UNITED STATES DISTRICT COURT              DOC #: _____
SOUTHERN DISTRICT OF NEW YORK             DATE FILED: 1/24/12
-------------------------------X
                               :          Master File No.
In re: SLM CORPORATION                    08 Civ. 1029 (WHP)
       SECURITIES LITIGATION   :
                                          MEMORANDUM & ORDER
-------------------------------X
```

WILLIAM H. PAULEY III, District Judge:

        Lead Plaintiff SLM Ventures moves to certify a class consisting of all persons or entities who bought or otherwise acquired SLM Corporation ("Sallie Mae") common shares between January 18, 2007, and January 23, 2008 (the "class period"), and who possessed any of those shares over one or more of the dates of December 19, 2007, January 3, 2008, and January 23, 2008. For the following reasons, SLM Ventures' motion to certify a class is granted.

## BACKGROUND

        The claims in this action are described at length in this Court's prior Memorandum & Order, dated September 24, 2010. See In re SLM Corp. Sec. Litg., 740 F. Supp. 2d 542 (S.D.N.Y. 2010). The allegations are briefly summarized here to provide context for the class certification motion.

### I. Sallie Mae and the Alleged Misstatements

        Sallie Mae is the leading provider of student loans in the United States. It offers both federally guaranteed student loans and private education loans ("PELs"). Because PELs are not guaranteed by the government, they carry higher risk. However, they offer Sallie Mae greater potential profit, because the government does not set PEL fees and interest rates. (See Second Amended Complaint, dated Sept. 3, 2009 ("SAC") ¶¶ 41-43.) During 2006, only sixteen

percent of Sallie Mae's loans were private, yet they generated twenty-three percent of Sallie Mae's core earnings. (SAC ¶ 43.)

In 2006, Sallie Mae's management decided to expand the company's PEL business. (SAC ¶¶ 47-48.) Between June 2006 and December 2007, Sallie Mae's PEL portfolio more than doubled, growing from $7 billion to $15.8 billion. (SAC ¶48.) At the time, Sallie Mae publicly stated that it had applied strict underwriting standards to all PEL borrowers. However, SLM Ventures alleges that Sallie Mae actually relaxed its underwriting standards and loaned billions of dollars to borrowers with low credit scores and other high risk borrowers who attended part-time, correspondence, or for-profit schools. (SAC ¶¶ 71-73, 128.)

SLM Ventures also alleges that Sallie Mae implemented a policy to move as many problem loans as possible into forbearance so that it could suppress the true number of private loans that were delinquent or in default. (SAC ¶¶ 74-95.) Generally Accepted Accounting Principles ("GAAP") and Securities and Exchange Commission ("SEC") regulations required Sallie Mae to calculate and report the present value of its PEL portfolio by establishing loan loss reserves that accounted for uncollectible loans. SLM Ventures alleges that Sallie Mae failed to adjust its reserves to account for the increased risk of private loan defaults due to Sallie Mae's relaxed underwriting standards and forbearance policy. (SAC ¶¶ 131-35.) As a result, SLM Ventures alleges that, beginning on January 18, 2007, and continuing throughout the proposed class period, Sallie Mae materially understated its loan loss reserves and overstated its profitability. (SAC ¶¶ 177-81.)

According to SLM Ventures, Sallie Mae increased its PEL portfolio and hid the riskiness of those loans in order to boost short-term profits, attract a buyer for the company at a high premium, and convince investors that such a deal would be consummated. (SAC ¶¶ 61-63,

197-202.) In April 2007, Sallie Mae and its then-Chairman of the Board, Albert L. Lord ("Lord"), negotiated to sell the company to a group of private equity investors (the "Flowers Transaction"). The strike price was set at $60 per share, and was contingent on Sallie Mae's financial performance and outlook. (SAC ¶¶ 52-55.) If the proposed merger closed, Lord would receive a cash payment totaling $225 million representing the value of his stock options. (SAC ¶¶ 61-63.)

While the Flowers Transaction was pending, Sallie Mae faced billions of dollars of redemption obligations for outstanding equity forward contracts. Under those contracts, Sallie Mae raised cash by selling common stock and agreeing to buy the stock back at the higher strike price. However, if the Flowers Transaction was not consummated, Sallie Mae would be required to pay approximately $2 billion to settle the equity forward contracts. (SAC ¶¶ 64-67.) On October 8, 2007, citing the recent passage of the College Cost Reduction and Access Act of 2007 ("CCRAA") as a material adverse effect on Sallie Mae's financial performance and outlook, the private equity group backed out of the Flowers Transaction. On December 12, 2007, Sallie Mae abandoned the deal. (Affidavit of Christopher James, dated May 26, 2011 ("James Aff.") ¶ 18.)

SLM Ventures alleges that on December 19, 2007, Sallie Mae began to disclose the risks inherent in its PEL business. During an investor call, Lord revealed that Sallie Mae was increasing its PEL loss reserves but refused to answer questions about the credit worthiness of Sallie Mae's loan portfolio. According to media reports, Lord was "agitated" and "profane" during the call. Following the call, Sallie Mae's stock dropped by twenty-one percent. (SAC ¶¶ 319-25.)

On January 3, 2008, Sallie Mae issued a press release and filed a Form 8-K disclosing that the CCRAA would reduce or eliminate profitability on new federally backed

loans. Sallie Mae confirmed that it would be required to pay approximately $2 billion to settle its equity forward contracts. After those disclosures, the price of Sallie Mae's stock dropped by thirteen percent. (SAC ¶¶ 326-28.)

On January 23, 2008, Sallie Mae announced its 2007 financial results, including a fifty percent decline in net income from 2006, a fourth quarter loss of $139 million, and provisions for loan losses totaling $750 million. On a conference call later that day, Lord acknowledged that Sallie Mae had originated high-risk private loans that were not collectible and that Sallie Mae had stopped issuing such loans. (SAC ¶¶ 331-36.)

II. SLM Ventures and the Representative Class

On April 1, 2009, this Court granted SLM Ventures' motion for relief from a prior Memorandum & Order appointing Westchester Capital Management as lead plaintiff, and appointed SLM Ventures as new lead plaintiff. See In re SLM Corp. Sec. Litig., 258 F.R.D. 112, 114 (S.D.N.Y. 2009). SLM Ventures is a partnership created for the purpose of investing in Sallie Mae stock. It alleges that it suffered losses of approximately $2.9 million from investments in Sallie Mae common stock. During the class period, SLM Ventures purchased 611,639 Sallie Mae common shares on the New York Stock Exchange and sold 585,849 shares, for a net purchase of 25,790 shares. SLM Ventures' net expenditure was $3.4 million. (See Declaration of Christina C. Sharp, dated Apr. 8, 2011 ("Sharp Decl") Ex. 1 (Lead Plaintiff's Supplemental Certification Pursuant to the Federal Securities Laws and Rule 26(e)).)

SLM Ventures seeks to certify a class of all persons or entities who bought or otherwise acquired Sallie Mae common shares between January 18, 2007, and January 23, 2008, and who possessed any of those shares over one or more of the dates of December 19, 2007,

January 3, 2008, and January 23, 2008.[1] The proposed class excludes Defendants, members of Lord's family, any entity in which Lord has a controlling interest, any entity that is a parent or subsidiary of, or which is controlled by either Defendant, and the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendants.

## DISCUSSION

### I. Legal Standard

To be certified, a class must satisfy the four prerequisites of Rule 23(a) (numerosity, commonality, typicality and adequacy) and the two requirements of Rule 23(b)(3) (predominance and superiority). See In re Salomon Analyst Metromedia Litig., 544 F.3d 474, 478 (2d Cir. 2008). A plaintiff moving for class certification must establish each of the Rule 23 requirements by a preponderance of the evidence. See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 202 (2d Cir. 2008). The court should "assess all of the relevant evidence admitted at the class certification stage," Bombardier, 546 F.3d at 202, and "[f]requently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011).

"[C]laims alleging violations of Sections 10(b) and 20(a) of the Exchange Act are especially amenable to class certification." Katz v. Image Innovations Holdings, Inc., No. 06 Civ. 3707 (JGK), 2010 WL 2926196, at *3 (S.D.N.Y. July 22, 2010) (citing Amchem Products v. Windsor, 521 U.S. 591, 625 (1997)). In addition, "[b]ecause of the usefulness of class actions in addressing allegations of securities fraud, the class certification requirements are to be

---

[1] SLM Ventures amended its class definition in response to Defendants' argument that the original class definition improperly included "in-and-out" traders. This Court finds that SLM Ventures' amended definition adequately addresses Defendants' argument.

- 5 -

construed liberally." Darquea v. Jarden Corp., No. 06 Civ. 722 (CLB), 2008 WL 622811, at *4 (S.D.N.Y. Mar. 6, 2008); see also Fogarazzo v. Lehman Bros., Inc., 263 F.R.D. 90, 96 (S.D.N.Y. 2009).

Because SLM Ventures has met its burden and Defendants do not challenge the numerosity, commonality, and superiority requirements, this Court finds that the proposed class satisfies those requirements. Defendants' opposition to class certification hinges on two arguments: (1) common issues do not predominate and (2) SLM Ventures is not a typical or adequate lead plaintiff.

II. Predominance—Materiality of the Alleged Misrepresentations and Omissions

The predominance requirement for class certification "tests whether a proposed class is sufficiently cohesive to warrant adjudication by representation." Salomon Analyst, 544 F.3d at 480 (internal quotations omitted). In determining whether common questions predominate over individual questions, courts focus on whether the issue of liability will be common to members of the class. See In re Vecco Instruments, Inc. Sec. Litig., 235 F.R.D. 220, 240 (S.D.N.Y. 2005). SLM Ventures alleges that Defendants are liable under sections 10(b) and 20(a) of the Securities Exchange Act of 1934. To recover under section 10(b), all class members must show "(1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation." Matrixx Initiatives, Inc. v. Siracusano, 131 S.Ct. 1309, 1317 (2011); see also Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341 (2005). To establish Lord's liability under section 20(a) for Sallie Mae's alleged 10(b) violation, SLM Ventures must show that Lord was "in some meaningful sense a culpable participant of the fraud[.]" S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996).

Defendants focus on SLM Ventures' purported failure to meet the requirements for the separate reliance presumptions described in Basic Inc. v. Levinson, 485 U.S. 224 (1988) (the "fraud on the market"), and Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972) (the "failure to disclose"). In Basic, the Supreme Court dispensed with the requirement that an investor prove awareness of a particular misstatement where there was a "fraud on the market." Basic, 485 U.S. at 245-47; see also Hevesi v. Citigroup Inc., 366 F.3d 70, 77 (2d Cir. 2004). A fraud on the market occurs and investor reliance on misrepresentations is presumed "where a defendant has (1) publicly made (2) a material misrepresentation (3) about stock traded on an impersonal, well developed (i.e., efficient) market[.]" Salomon Analyst, 544 F.3d at 481. In Affiliated Ute the Supreme Court presumed reliance when a defendant failed to disclose material information that it was obliged to share. See Affiliated Ute, 406 U.S. at 153-54. Defendants concede that the proposed class satisfies all of the elements for both presumptions except materiality.

Defendants contend that SLM Ventures cannot demonstrate materiality without proffering an expert report (1) showing how Sallie Mae's stock price reacted to corrective disclosures and (2) accounting for potentially confounding information. But that is not SLM Ventures' burden on class certification. The Second Circuit squarely rejected this argument, stating that it "is a misreading of Basic" to argue that there is a "burden on plaintiffs to prove that the alleged misrepresentations 'moved the market,' i.e., had a measurable effect on the stock price." Salomon Analyst, 544 F.3d at 482. By adopting the "total mix" standard of materiality, the Basic Court "fram[ed] the question of materiality in terms of how the information would be viewed by a reasonable investor, rather than in terms of actual impact on market price." Salomon Analyst, 544 F.3d at 482; see also In re Sadia, S.A. Sec. Litig., 269 F.R.D. 298, 313

(S.D.N.Y. 2010) ("[Materiality] depends on an assessment of all the relevant circumstances in a particular case . . .[and] . . . is influenced by considerations of fairness, probability, and common sense.").

SLM Ventures' expert, Professor Gregg A. Jarrell, conducted an event study as part of his analysis of market efficiency. (Affidavit of Gregg A. Jarrell, dated Apr. 6, 2011 ("Jarrell Aff.") ¶¶ 19-40.) But Professor Jarrell does not offer an opinion about the economic materiality of the alleged misrepresentations and omissions. As Professor Jarrell explained, evaluating potentially confounding information on the disclosure dates, and determining whether it was material, is tantamount to a loss causation analysis. (See Affidavit of Jonathan K. Levine, dated July 1, 2011 ("Levine Aff."), Ex. 1 at 53:13-19.) See also In re Omnicom Grp. Inc. Sec. Litig., 541 F. Supp. 2d 546, 553 (S.D.N.Y. 2008), aff'd, 597 F.3d 501 (2d Cir. 2010). And the Supreme Court has held that plaintiffs need not prove loss causation to obtain class certification. See Erica P. John Fund, Inc. v. Halliburton Co., 131 S. Ct. 2179, 2184-87 (2011).

Defendants' wooden insistence that Professor Jarrell must conduct a price impact analysis confuses "economic materiality" with the meaning of materiality under the securities laws. Even Defendants' expert buttressed this distinction by explaining that "materiality" has a specific meaning for economists, who use scientific methods to determine whether a misrepresentation or omission "impact[ed] the stock price in a significant fashion." (Levine Aff. Ex. 2 (James) at 24:8-25:22.) A legal assessment of materiality is different—it is not determined by a single factor such as price impact, but must take into account all the relevant circumstances in a particular case. See Matrixx, 131 S.Ct. at 1317. As the Second Circuit has explained, the "[fraud on the market] presumption was not justified by scientific certainty, but by

considerations of fairness, probability, judicial economy, congressional policy, and common sense." Salomon Analyst, 544 F.3d at 483.

While not required at the class certification stage, evidence of a stock price movement following corrective disclosures may be a relevant factor in the legal assessment of materiality. See, e.g., Berks Cnty. Emp. Retirement Fund v. First Am. Corp., 734 F. Supp. 2d 533, 540 n.40 (S.D.N.Y. 2010). Professor Jarrell's event study shows that Sallie Mae's stock price declined by a significant amount, 31.9% (over and above market volatility), on the corrective disclosures. (Jarrell Aff. ¶¶ 57-67, Apx. A at 87, 96, 103.) Defendants and their expert do not dispute that conclusion, but argue that Professor Jarrell failed to account for confounding information and failed to conduct a proper price impact study. However, SLM Ventures need not "submit evidence that misstatements and omissions artificially inflated the price of [the stock] at the time they were made or throughout the class period" because "[s]uch a requirement would unfairly and unnecessarily heighten plaintiffs' burden at this stage." Sadia, 269 F.R.D. at 313-14 (quoting Salomon Analyst, 544 F.3d at 482). Defendants' reliance on In re Moody's Corp. Sec. Litig. and Berks is misplaced. In those cases, there was no evidence of a statistically significant movement in the stock price on any of the dates of the alleged misrepresentations and omissions or the dates of corrective disclosures. In re Moody's Corp. Sec. Litig., 274 F.R.D. 480, 489-90 (S.D.N.Y. 2011); Berks, 734 F. Supp. 2d at 540-41.

Courts evaluate materiality holistically. See Matrixx, 131 S.Ct. at 1317; see also Salomon Analyst, 544 F.3d at 482. Thus, even without Professor Jarrell's event study, this Court would find that Sallie Mae's misstatements and omissions were material. In Salomon Analyst, for example, the Second Circuit held that the district court did not abuse its discretion in finding

that plaintiffs invoked the presumption by showing "defendants themselves publicly emphasized the importance" of the subject of the misrepresentations. 544 F.3d at 485.

SLM Ventures offers similar evidence of Defendants' public statements emphasizing the importance of Sallie Mae's PEL business. Defendants attempt to distinguish Salomon Analyst by arguing that their representations were not about a "vital" aspect of their business, but the Defendants' own words undermine this argument. During the class period, Defendants publicly characterized the company's PEL business as "essential," "our economic engine on the loan side of the business," and "now obviously our principal business." (SAC ¶¶ 186-87; Sharp Decl. Exs. 3 at 3, 4 at 4.) Although PELs accounted for only 16% of Sallie Mae's total managed loan portfolio in 2006, they generated 23% of the company's core earnings. (SAC ¶ 43.) Sallie Mae's PEL portfolio more than doubled between June 2006 and December 2007 and Defendants later disclosed that, by the end of 2007, 15% of Sallie Mae's PEL portfolio consisted of loans to students who were "poor credit risks" attending the "wrong schools." (SAC ¶ 73; Levine Aff. Ex. 7.) Analysts reported on the profitability, projected growth, and potential credit risks of Sallie Mae's PEL business in dozens of reports and news articles following each class period earnings announcement. (Levine Aff. Exs. 10-13; Jarrell Aff. Apx. A at 4-5, 34-35, 50-51, 72-73.)

Other courts have concluded that the types of misrepresentations and omissions SLM Ventures alleges—about the company's core business revenue and improper accounting practices, as well as underwriting practices, loan loss reserves and internal risk controls—are material to a reasonable investor. See, e.g., Employees' Retirement Sys. of the Gov't. of the Virgin Islands v. J.P. Morgan Chase & Co., No. 09 Civ. 3701 (JGK), 2011 WL 1796426, at *11 (S.D.N.Y. May 10, 2011) ("Allegations of widespread abandonment of underwriting and

appraisal guidelines can hardly be held immaterial as a matter of law."); Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 181 (S.D.N.Y. 2010) ("[M]aterial misrepresentations include those concern[ing] a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.") (internal quotation omitted); Alstom, 253 F.R.D. at 279 (a €150 million earnings overstatement was material); Atlas v. Accredited Home Lenders Holding Co., 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) (a mortgage lender's manipulation of reserves, leading to an overstatement of income of millions of dollars, and underwriting practices were material); In re New Century, 588 F. Supp. 2d 1206, 1225 (C.D. Cal. 2008) (statements about loan quality and strict underwriting standards were material misrepresentations); In re PMA Capital Corp. Sec. Litig., 2005 WL 1806503, at *6 (E.D. Pa. 2005) (finding material statements that loss reserves were adequate). Defendants are correct that not all statements about Sallie Mae's PEL business, underwriting policy, loan loss reserves, or financial results are per se material. But the fact that Defendants misrepresented and omitted information about Sallie Mae's "principal business" and that information impacted the profitability of the PEL business and the company as a whole, militates in favor of finding materiality.

Courts in this circuit also consider the SEC's guidance on quantitative and qualitative considerations that are relevant to materiality, as summarized in SEC Staff Accounting Bulletin No. 99 ("SAB No. 99"), 64 Fed. Reg. 45150 (1999). See ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009) ("While SAB No. 99 does not change the standard of materiality, we consider the factors it sets forth in determining whether the misstatement significantly altered the 'total mix' of information available to investors."). The SAB No. 99 factors not already considered by this Court are (1)

"[w]hether the misstatement masks a change in earnings or other trends" (Defendants' representations about Sallie Mae's underwriting standards, forbearance practices, and adequacy of the PEL loss reserves, SAC ¶¶ 71-99); (2) "[w]hether the misstatement affects the registrant's compliance with regulatory requirements" (Defendants' understatement of PEL loss reserves and overstatement of the company's income due to noncompliance with GAAP and SEC accounting rules, SAC ¶¶ 100-183); and (3) "[w]hether the misstatement has the effect of increasing management's compensation" (Lord stood to collect $225 million if the Flowers Transaction closed, SAC ¶ 63). 64 Fed. Reg. 45152.

Lord's personal involvement in the misrepresentations and omissions is another relevant factor. (SAC ¶¶ 230, 295, 317.) Not every statement Lord certifies will be material to a reasonable investor, but his endorsement of them contributes to their materiality. See In re Monster Worldwide, Inc. Sec. Litig., 251 F.R.D. 132, 138 (S.D.N.Y. 2008); see also United States v. Ferguson, 545 F. Supp. 2d 238, 240-41 (D. Conn. 2008) (holding that evidence of management's involvement with misrepresentations about loss reserves was relevant to materiality and admissible at trial so long as the misrepresentations themselves were not immaterial as a matter of law).

At bottom, materiality cannot be determined by analyzing each relevant fact in isolation, as Defendants suggest. See Matrixx, 131 S.Ct. at 1317. Indeed, the Supreme Court counsels a common-sense and holistic approach. Viewed through Matrixx, SLM Ventures has demonstrated the materiality of Sallie Mae's misstatements on this motion.

III. Defendants Have Not Rebutted the Presumptions of Reliance

Relying on the report of their expert, Professor Christopher James, Defendants attempt to rebut the presumptions of reliance in two ways. First, Defendants argue that because

Professor Jarrell did not remove potentially confounding information from the three corrective disclosures in his event study, these disclosures cannot be used to show economic materiality. But this is simply loss causation by another name. And SLM Venture is not required to jump that hurdle at class certification. See, e.g., Halliburton, 131 S. Ct. at 2184-87.

Second, Defendants argue that the Flowers Transaction strike price affected Sallie Mae's common stock price more than information about Sallie Mae's financial condition and results. Given the $60 strike price, contemplated by the Flowers Transaction, Defendants maintain that the alleged misrepresentations and omissions about Sallie Mae's PEL business would have been immaterial to a reasonable investor. However, Defendants' argument does not address the allegations that Sallie Mae's stock price was artificially inflated beginning in January 2007, three months before the announcement of the Flowers Transaction. Moreover, Professor James did not consider whether the transaction would have occurred at all, or at a lower price, if certain facts had been disclosed. (See Jarrell Rebuttal Aff. ¶¶ 20-23.) In other words, Professor James assumed that had the information contained in the corrective disclosures been revealed earlier, it would not have triggered the "material adverse change" clause in the transaction agreement, changed the $60 strike price, or otherwise interfered with the closing. In addition, Professor Jarrell identified a statistically significant movement in Sallie Mae's stock price following a July 17, 2007, Form 8-K press release. (See Jarrell Aff. Apx. A at 4, 50, 82.) Considering the allegations in this case and evidence that Sallie Mae's stock price fluctuated on news of its financial condition, Professor James' assumptions make little sense. (See Jarrell Rebuttal Aff. ¶¶ 24-29.)

Defendants bear the burden of rebutting the presumption of reliance by showing there was no price impact. See Salomon Analyst, 544 F.3d at 483. Because Defendants have

failed to proffer persuasive evidence supporting their arguments, they have not met their burden on this motion.

IV. Typicality and Adequacy of SLM Ventures

SLM Ventures has demonstrated that it is a typical and adequate class representative. It has acted as lead plaintiff for more than two years, supervised counsel, produced more than 40,000 pages of documents, provided extensive depositions, and otherwise fulfilled its obligations as a class representative. (See Declaration of Sam Sotoodeh, dated Apr. 7, 2011("Sotoodeh Decl.") ¶¶ 4-5; see also Levine Aff. ¶ 2.)

Defendants argue that SLM Ventures is atypical and inadequate. To buttress that argument, Defendants point to SLM Ventures' amended certification, its options trading, and inconsistent descriptions of its status and structure. "[I]n the context of complex securities litigation, attacks on the adequacy of the class representative based on the representative's ignorance or credibility are rarely appropriate." Koppel v. 4987 Corp., 191 F.R.D. 360, 369 (S.D.N.Y. 2000) (citation omitted). "[A]ny allegations concerning the representative's adequacy must be relevant to the claims in the litigation, such that the problems could become the focus of cross-examination and unique defenses at trial, to the detriment of the class." In re NYSE Specialists Sec. Litig., 240 F.R.D. 128, 144 (S.D.N.Y. 2007) (citation omitted). The cases Defendants cite involve dishonesty or blatant inconsistencies that were directly relevant to the plaintiffs' claims. Here, by contrast, Defendants' criticisms of SLM Ventures do not relate to its claims or threaten to become the focus of the litigation.

Homing in on SLM Ventures' amended lead plaintiff certification, Defendants claim that SLM Ventures misrepresented its trading in Sallie Mae common stock. However, SLM Ventures' corrections to the certification do not impact any aspect of this litigation or

prejudice Defendants. While such discrepancies are disturbing, they do not rise to a level requiring disqualification of SLM Ventures as lead plaintiff. Cf. In re Smith Barney Transfer Agent Litig., --- F.Supp.2d ----, No. 05 Civ. 7583 (WHP), 2011 WL 4430857, at *4 (S.D.N.Y. Sept. 22, 2011).

Courts routinely reject criticisms based on errors in certifications, particularly where there is no evidence of bad faith or intent to deceive the court or the parties. See, e.g., In re IPO Sec. Litig., 227 F.R.D. 65, 98 (S.D.N.Y. 2004). Defendants argue that NYSE Specialists supports their claim that an error in a certification warrants removal of a lead plaintiff. But in NYSE Specialists, the lead plaintiff was not a real party in interest because it had not purchased any shares in the relevant securities. NYSE Specialists, 240 F.R.D. at 138; accord Smith Barney, 2011 WL 4430857, at *1. That kind of "epic failure" is not present here. Smith Barney, 2001 WL 4430857, at *1.

In addition, Defendants argue that SLM Ventures overstates its losses because the amended certification includes transactions that reflect intra-day trading and the performance of options contracts. But under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the certification must include "all of the transactions of the plaintiff in the security that is the subject of the complaint," which in SLM Ventures' case includes common stock transactions resulting from intra-day and options trading. 15 U.S.C.§ 78u-4(a)(2)(A)(iv). Defendants also point out that SLM Ventures owns fewer shares of common stock than previously reported. However, the reduced losses do not impact SLM Ventures' status as lead plaintiff since its losses of approximately $2.9 million are still greater than the $524,143 in losses claimed by the movant with the next greatest loss. (ECF No. 21 at 1; ECF No. 132 at 5; ECF No. 133-1.)

In another vein, Defendants contend that SLM Ventures' credibility is damaged because it "told the Court it did not hedge with SLM options." This argument misinterprets the record. In early 2009, SLM Ventures explained that it was organized for the purpose of investing in "SLM securities," but also traded in "non-SLM securities" to mitigate its losses. (Levine Aff. Ex.15 at ¶ 7.) The term "SLM securities" included both Sallie Mae common stock and Sallie Mae options. See 15 U.S.C. § 78c(a)(10) ("The term 'security' means any note, stock, . . . any put, call, straddle, option or privilege on any security [.]"). By "non-SLM securities," SLM Ventures meant securities that have no relationship to Sallie Mae. (ECF No. 86 at 5.)

Seizing on the reference to "non-SLM securities," Sallie Mae and Westchester Capital (the prior lead plaintiff) argued that investments in non-SLM securities reflected a "hedging/arbitrage strategy" that may differentiate SLM Ventures from other class members. (Levine Aff. Ex. 16 at 2; ECF No. 81 at 3-4.) In the only reference to options in the briefs on the renewed motion for lead plaintiff, Westchester Capital incorrectly stated that "options on SLM securities would fall into the category of non-SLM securities." (ECF No. 81 at 4.) But, this Court previously rejected the argument that Westchester Capital's own arbitrage trading strategy rendered it atypical. See Burch v. SLM Corp., No. 08 Civ. 1029 (WHP), 2008 WL 2945348, at *5 (S.D.N.Y. July 23, 2008). That reasoning applies with equal power to SLM Ventures' loss mitigation or trading strategies. Moreover, in earlier briefing, SLM Ventures clarified that "non-SLM securities" meant just that—securities unrelated to Sallie Mae. SLM Ventures said nothing about options trading. (ECF No. 86 at 5-6.)

Based on that extensive briefing, this Court concluded in its decision appointing SLM Ventures as lead plaintiff that "'non-SLM securities' does not refer to options" and that SLM Ventures' investments "in securities unrelated to SLM do not raise questions about its

ability to serve as lead plaintiff." SLM Corp., 258 F.R.D. at 117. Both statements are accurate, as is the Court's finding that SLM Ventures' "injuries stem from the alleged overvaluations of SLM stock resulting from Defendants' allegedly materially false and misleading statements and omissions." SLM Corp., 258 F.R.D. at 117.

SLM Ventures was not required under the PSLRA to disclose its options trading. See 15 U.S.C. § 78u-4(a)(2)(A)(iv). Thus, nondisclosure of its options trading raises no questions about SLM Ventures' credibility. See, e.g., In re Oxford Health Plans Inc. Sec. Litig., 199 F.R.D. 119, 124 (S.D.N.Y. 2001) (court was not misled where named plaintiffs did not disclose options trades because they were not subject of the complaint); In re Sepracor Inc., 233 F.R.D. 52, 54 (D. Mass. 2005) (rejecting attack based on nondisclosure of hedging transactions).

Defendants' contention that SLM Ventures' options trading renders it atypical is also without merit. Investors who traded in both options and common stock have repeatedly been found to be typical and adequate representatives of common stock purchasers. See, e.g., Oxford Health Plans, 199 F.R.D. at 123-24; In re Priceline.com Inc., 236 F.R.D. 89, 98-99 (D. Conn. 2006).

Defendants accuse SLM Ventures of being "evasive" and "vague" about its structure and status. These allegations are unsupported by the record and are irrelevant to the issues in this case. After Sallie Mae raised questions about SLM Ventures' structure more than two years ago, this Court directed SLM Ventures to file a declaration detailing its partnership structure. In response to that directive, one of SLM Ventures' partners and principal investors, Sam Sotoodeh, stated that SLM Ventures is a joint venture structured as a partnership under California law and detailed, inter alia, its management structure. (Levine Aff., Ex. 15.) In January 2011, SLM Ventures produced its federal tax returns, which identify each partner and

include the name of the partnership (which is "SLM Ventures," although its partners refer to it interchangeably as "SLM Venture" or "SLM Ventures"). (See Levine Aff. ¶¶ 2-3, Exs. 17 & 18.) Defendants' remaining arguments relating to SLM Ventures' structure or status are without merit.

Finally, Defendants contend that Sotoodeh made statements purportedly attributing SLM Ventures' losses to mismanagement and factors other than fraud. This Court previously rejected a virtually identical argument aimed at Westchester Capital. See Burch, 2008 WL 2945348, at *5. In January 2008, Westchester Capital's president wrote that Lord made a "major strategic blunder" with the Flowers Transaction and attributed Sallie Mae's deteriorating performance to "higher funding costs tied to the worsening credit crisis." See Burch, 2008 WL 2945348, at *2. This Court concluded that these statements were "not inconsistent" with the claims in this case. See Burch, 2008 WL 2945348, at *5. The same is true for Sotoodeh's statements about Lord "screw[ing] up the [Flowers] deal" and Sallie Mae's "disastrous [equity] forward contracts," "changed . . . management," and "funding plan." That Sotoodeh requested a valuation of Sallie Mae after the first corrective disclosure likewise has no bearing on SLM Ventures' adequacy as lead plaintiff.

Putative class members The Merger Fund and Sheet Metal Workers' Local No. 80 Pension Trust Fund ("SMW 80") apply independently for leave to file motions for relief from this Court's order appointing SLM Ventures as lead plaintiff. Because those applications rest on Sallie Mae's arguments concerning SLM Ventures' typicality and adequacy, which this Court rejects, they too are denied.

CONCLUSION

For the foregoing reasons, lead plaintiff SLM Ventures' motion to certify a class consisting of all persons or entities who bought or otherwise acquired SLM Corporation common shares between January 18, 2007, and January 23, 2008, and who possessed any of those shares over one or more of the dates of December 19, 2007, January 3, 2008, and January 23, 2008, is granted.

Dated: January 24, 2012
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record:*

Daniel C. Girard, Esq.
Jonathan K. Levine, Esq.
Girard Gibbs LLP
601 California Street, Suite 1400
San Francisco, CA 94108
*Counsel for Lead Plaintiff SLM Venture*

Peter A. Wald, Esq.
Christopher R. Harris, Esq.
Latham & Watkins, LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
*Counsel for Defendants*