**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re SLM Corporation Securities Litigation | :<br>:<br>:    Case No. 08 Civ. 1029 (WHP)<br>:<br>: |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF SLM VENTURES'**
**MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

**GIRARD GIBBS LLP**
Jonathan K. Levine
711 Third Avenue, 20th Floor
New York, NY  10017
Telephone:  (212) 867-1721
Facsimile:  (212) 867-1767

- and –

Daniel C. Girard
Amanda M. Steiner
Christina C. Sharp
601 California Street, Suite 1400
San Francisco, CA  94108
Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846

*Lead Plaintiff's Counsel*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................. 2

    A.    Brief Overview of the Allegations ......................................................... 2

    B.    Procedural History ............................................................................... 4

        1.    Lead Plaintiff ........................................................................ 4

        2.    Investigation, Second Amended Complaint and Motion
                to Dismiss........................................................................... 4

        3.    Discovery ............................................................................. 5

        4.    Class Certification................................................................ 6

        5.    Experts and Consultants....................................................... 7

        6.    Settlement Negotiations ....................................................... 8

        7.    The Proposed Settlement ..................................................... 8

        8.    Preliminary Settlement Approval ......................................... 9

FINAL APPROVAL IS WARRANTED ................................................................ 9

    A.    The Legal Standard for Final Approval ................................................. 9

    B.    The *Grinnell* Factors Support Final Approval ..................................... 10

        1.    The Complexity, Expense and Likely Duration of the Litigation ........... 10

        2.    The Reaction of the Class to the Settlement .............................. 11

        3.    The Stage of the Proceedings and the Amount of Discovery
                Completed ........................................................................... 11

        4.    The Risks of Establishing Liability and Damages.................................. 12

        5.    The Risks of Maintaining the Class Action Through Trial...................... 14

6.  The Ability of Defendants to Withstand a Greater
    Settlement ................................................................................................. 14

7.  The Range of Reasonableness of the Settlement *Fund* in Light
    of the Best Possible Recovery and the Attendant Risks of
    Litigation ................................................................................................ 14

CONCLUSION ........................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases**

*City of Detroit v. Grinnell Corp.*
495 F.2d 448 (2d Cir. 1974).............................................................................. 9

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*
502 F.3d 91 (2d Cir. 2007).............................................................................. 13

*D'Amato v. Deutsche Bank*
236 F.3d 78 (2d Cir. 2001).............................................................................. 14

*Fait v. Regions Fin. Corp.*
655 F.3d 105 (2d Cir. 2011)............................................................................ 12

*Gortat v. Capala Bros., Inc.*
2012 WL 1116495 (E.D.N.Y. Apr. 3, 2012) .................................................. 13

*Hall v. Children's Place Retail Stores, Inc.*
669 F. Supp. 2d 399 (S.D.N.Y. 2009)............................................................. 15

*Hicks v. Stanley*
2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005 ................................................... 11

*In re Alloy, Inc. Sec. Litig.*
2004 WL 2750089 (S.D.N.Y. Dec. 2, 2004) ................................................... 10

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*
2006 WL 903236 (S.D.N.Y. Apr. 6, 2006)......................................... 11, 12, 13

*In re Bristol-Myers Squibb Sec. Litig.*
361 F. Supp. 2d 229 (S.D.N.Y. 2005)............................................................. 13

*In re Elan Sec. Litig.*
385 F. Supp. 2d 363 (S.D.N.Y. 2005 .............................................................. 13

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*
2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)............................................ passim

*In re Gilat Satellite Networks, Ltd.*
2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007................................................... 11

*In re Global Crossing Secs. & ERISA Litig.*
225 F.R.D. 436 (S.D.N.Y. 2004) ............................................................... 12, 13

*In re Initial Public Offering Sec. Litig.*
  671 F. Supp. 2d 467 (S.D.N.Y. 2009)............................................................ 15

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*
  2007 WL 4526593 (S.D.N.Y. Dec. 20, 2007) .............................................. 15

*In re Merrill Lynch Research Reports Sec. Litig.*
  2007 WL 313474 (S.D.N.Y. Feb. 1, 2007)................................................... 14

*In re Nortel Networks Sec. Litig.*
  2006 WL 3802198 (S.D.N.Y. Dec. 26, 2006) .............................................. 15

*In re Omnicom Group, Inc.*
  541 F. Supp. 2d 546 (S.D.N.Y. 2008)........................................................... 13

*In re Omnicom Group, Inc.*
  597 F.3d 501 (2d Cir. 2010).......................................................................... 13

*In re Paine Webber Ltd. P'ships Litig.*
  147 F.3d 132 (2d Cir. 1998)............................................................................ 9

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.*
  163 F.R.D. 200 (S.D.N.Y. 1995) .................................................................. 11

*In re Sumitomo Copper Litig.*
  189 F.R.D. 274 (S.D.N.Y. 1999) .................................................................. 12

*In re Warner Chilcott Ltd. Sec. Litig.*
  2008 WL 5110904 (S.D.N.Y. Nov. 20, 2008).......................................... 1, 9, 12

*In re Wayfarin Sodium Antitrust Litig.*
  391 F.3d 516 (3d Cir. 2004).......................................................................... 14

*Newman v. Stein*
  464 F.2d 689 (2d Cir. 1972).......................................................................... 14

*Oppenlander v. Standard Oil Co.*
  64 F.R.D. 597, 624 (D. Colo. 1974) ............................................................ 11

*W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*
  549 F.3d 100 (2d Cir. 2008)............................................................................ 4

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*
  396 F.3d 96 (2d Cir. 2005).............................................................................. 9

**Rules**

Fed. R. Civ. Proc. 23 ...................................................................................................... 1, 10, 13, 14

## INTRODUCTION

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure and the Court's preliminary class action settlement approval order, Lead Plaintiff SLM Ventures moves for final approval of a proposed $35 million settlement that would resolve this litigation in its entirety. As detailed in plaintiff's preliminary settlement approval motion papers, the proposed settlement, negotiated with the assistance of one of the most experienced mediators in the country, was entered into after the Court had issued its order certifying the class for liability purposes, plaintiff's counsel had reviewed over 1.7 million pages of documents, and fact discovery was nearing completion.  The settlement is the product of hard-fought negotiations between experienced counsel and parties who were thoroughly familiar with the strengths and weaknesses of the case.

On April 18, 2012, the Court granted plaintiff's motion for preliminary approval of the proposed settlement, appointed A.B. Data, Ltd. as Claims Administrator and directed that notice of the proposed settlement be provided to the class.  *See* Dkt. No. 169.  The parties and the Claims Administrator have complied with the Court's preliminary approval order.  Plaintiff now seeks final settlement approval in accordance with Rule 23(e) of the Federal Rules of Civil Procedure.

The Court has previously acknowledged the policy considerations favoring settlement of complex class action cases.  *See In re Warner Chilcott Ltd. Sec. Litig.*, No. 06 Civ. 11515 (WHP), 2008 WL 5110904, at *1 (S.D.N.Y. Nov. 20, 2008).   The managing partner of SLM Ventures participated in the litigation and the mediation process, and fully supports the proposed settlement.  The settlement bears all the hallmarks of an arms' length bargain.  Because the settlement is fair, reasonable and adequate and satisfies the requirements of Rule 23(e), the Court should grant plaintiff's motion for final approval.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.      Brief Overview of the Allegations**[1]

SLM Corporation is the parent company of the largest provider of student loans in the country (collectively, these entities are referred to as "Sallie Mae").  Mr. Albert Lord is SLM Corporation's CEO and Vice Chairman of its Board of Directors.

During the Class Period, Sallie Mae offered both federally-guaranteed student loans through the Federal Family Education Loan Program ("FFELP") and private education loans ("PELs") that were not guaranteed by the federal government.  This case arose out of SLM Corporation's financial reporting practices for its PELs.  These loans offered Sallie Mae the potential for more profit than FFELP loans because the fees and interest rates paid by borrowers were not set by the government.  They were allegedly far riskier, however, because Sallie Mae bore all of the costs of borrower default.

In the fall of 2006, plaintiff alleges that Sallie Mae's management responded to proposed federal legislation that threatened to reduce the profitability of the company's FFELP business by sharply expanding the PEL business and seeking a buyer for the company.  Although defendants said publicly that all PEL borrowers met strict underwriting criteria, plaintiff believes Sallie Mae had actually relaxed its standards and accumulated a large, but undisclosed, portfolio of subprime student loans.  Between June 2006 and December 2007, Sallie Mae's PEL portfolio allegedly more than doubled, growing from $7 billion to $15.8 billion.  Plaintiff further alleges that Sallie Mae also implemented new "forbearance" policies.  Plaintiff contends these policies allowed the company to report delinquent loans as "current" and conceal alleged increasing delinquency and default rates arising from the subprime loans in the PEL portfolio.

Plaintiff alleges that information available to defendants showed that the subprime loans in the PEL portfolio would become delinquent and then default at higher rates than other loans in the portfolio.  To comply with GAAP and SEC regulations, plaintiff contends that Sallie Mae

---

[1]      This overview summarizes the allegations of the Second Amended Class Action Complaint (the "Complaint"), filed in September 2009.  Dkt. No. 96.

was required to increase Sallie Mae's loan loss reserves to account for the increase in the probable and reasonably estimable losses in the PEL portfolio.  Plaintiff contends Sallie Mae's loan loss reserves were understated by hundreds of millions of dollars during each quarter of the Class Period.   Based on these allegations of material understatements in Sallie Mae's loan loss reserves, plaintiff alleges that defendants were also materially overstating Sallie Mae's profitability by the end of 2006 and throughout the Class Period.

Plaintiff further alleges that defendants were seeking to inflate Salle Mae's short-term profits while management attempted to negotiate a sale of the company at an attractive premium and convince investors that an acquisition on favorable terms was likely.  Plaintiff contends that, by November 2006, Mr. Lord had initiated negotiations with a group of private equity investors. Plaintiff alleges that by April 2007 a deal was in place that was contingent on the satisfaction of a number of conditions, including conditions tied to Sallie Mae's financial performance and outlook.  According to plaintiff, Mr. Lord stood to receive a cash payment of $225 million if the sale went through and Sallie Mae faced redemption obligations under outstanding "equity forward contracts," which allowed Sallie Mae to raise cash by selling its common stock and agreeing to buy it back at a future date at higher "strike prices."  Plaintiff alleges that Sallie Mae avoided taking out a loan or issuing debt or equity, but risked liability of approximately $2 billion if the market price of its stock did not reach the strike levels.

Plaintiff claims the truth began to emerge on December 19, 2007 when Mr. Lord revealed on an investor conference call that Sallie Mae was increasing its loan loss reserves associated with the PEL portfolio but declined to answer any specific questions about the credit quality of the portfolio.  After the call, Sallie Mae's common stock price dropped by 21%.  About two weeks later, Sallie Mae allegedly announced it would focus on its PEL portfolio, be "more selective in pursuing origination activity," and "continu[e] the more stringent underwriting standards that are necessary in this market."  After this disclosure, the price of Sallie Mae common stock dropped by 13%.  On January 23, 2008, Sallie Mae announced its 2007 financial results, which among other items included a loss of $139 million for the fourth quarter and a

decline of more than 50% in net income from 2006, as well as a $750 million provision for loan losses on a "core earnings" basis.  The price of Sallie Mae common stock dropped by 1.7% after the January 23 disclosure.

Defendants assert that they made no actionable misstatements or omissions, that their accounting procedures complied with GAAP, and that SLM Ventures cannot prove scienter, loss causation or damages.

## B.    Procedural History

### 1.    Lead Plaintiff

In March 2008, SLM Ventures and two other movants sought appointment as lead plaintiff.  Dkt. Nos. 11, 15, 20.  The Court appointed investment advisor Westchester Capital Management as lead plaintiff in July 2008 because it had the largest financial interest in the relief sought by the proposed class.  Dkt. No. 62.  In December 2008, the Second Circuit issued *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008), which held that an investment advisor lacks Article III standing to assert claims under the federal securities laws on behalf of funds for which it merely serves as manager.  In light of *W.R. Huff*, SLM Ventures requested reconsideration of the Court's lead plaintiff order.  The three original lead plaintiff movants filed a series of briefs addressing the impact of *W.R. Huff* on the Court's appointment of Westchester Capital and the appropriate replacement lead plaintiff.

The Court ultimately determined that Westchester Capital did not have Article III standing under *W.R. Huff* and appointed SLM Ventures, the movant with the next largest financial interest in the relief sought by the proposed class, as lead plaintiff on April 1, 2009.  Dkt. No. 88.  Westchester Capital filed a petition for writ of mandamus with the Second Circuit, which was denied in October 2009 following full briefing by the parties.  Dkt. No. 98.

### 2.    Investigation, Second Amended Complaint and Motion to Dismiss

While the appeal was pending, SLM Ventures and its counsel continued their investigation of the facts and the law and prepared a detailed amended complaint.  SLM Ventures retained investigators to locate and interview potential witnesses and retained an

accounting expert to analyze Sallie Mae's financial statements and MD&A disclosures.  SLM

Ventures ultimately filed its complaint in September 2009.  *See* Declaration of Jonathan K.

Levine in Support of Lead Plaintiff SLM Ventures' Motions for Final Approval of Class Action

Settlement and Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Levine

Decl."), ¶ 5.

Defendants moved to dismiss in December 2009, arguing that the complaint failed to

establish that the defendants' statements were false, failed adequately to allege that any of the

defendants acted with scienter, and failed adequately to plead that the corrective disclosures

identified in the Complaint caused the losses alleged.  Dkt. Nos. 103-105.  Following full

briefing and oral argument, the Court dismissed the claims against defendant Charles Andrews

and denied the motion in its entirety as to defendants Sallie Mae and Mr. Lord.  Dkt. No. 114.

### 3.     Discovery

Following the case management conference, the parties served initial document requests

in November and December 2010.  SLM Ventures, an investment partnership, produced more

than 40,000 pages of documents in response to defendants' requests.  Defendants deposed the

managing partner of SLM Ventures (Sam Sotoodeh) twice, once in his personal capacity and

then as a Rule 30(b)(6) representative of SLM Ventures.  Two other investors in SLM Ventures

(Mark Moshayedi and Wolfgang Reinicke) also were deposed by defendants and these

individuals also produced responsive documents.  *See* Levine Decl., ¶ 7.

Plaintiff also served document requests on defendants.  Plaintiff took issue with

defendants' responses, and the parties negotiated for several months to narrow the range of

issues in dispute.  During this time, defendants amended their responses to plaintiff's document

requests three times.  Defendants eventually served an 824 page privilege log.  Plaintiff objected

to various aspects of defendants' privilege log, and after further protracted negotiations,

defendants served an amended log and produced certain documents previously withheld as

privileged.  Defendants amended their privilege log three more times at plaintiff's insistence and

produced thousands of additional pages of documents.  Defendants served a "supplemental"

privilege log, which was also subsequently amended.  *See* id*.*, ¶ 8.

Plaintiff took an early Rule 30(b)(6) deposition of defendants' information technology expert and a later Rule 30(b)(6) deposition directed at certain of Sallie Mae's accounting practices and identification of relevant witnesses.  *Id.*  SLM Ventures also served subpoenas on non-parties Pricewaterhouse Coopers (Sallie Mae's independent auditor) and J.C. Flowers & Co. (the key player in the group of private equity investors that had agreed to acquire Sallie Mae in 2007) and had extensive negotiations with both non-parties over compliance with the subpoenas. *See id*., ¶¶ 9-10.

Defendants, PwC and J.C. Flowers ultimately produced more than 1.7 million pages of documents in response to plaintiff's document requests and subpoenas.  To prepare for depositions, lead counsel assembled an in-house team of attorneys and paralegals who reviewed and analyzed the productions, which included hundreds of thousands of emails, Excel spreadsheets containing accounting data, presentations relating to the PEL business and draft SEC filings.  SLM Ventures' accounting expert reviewed and analyzed PwC's audit and quarterly review workpapers and many of the complex financial and accounting documents contained in Sallie Mae's production.  Plaintiff's  expert on damages reviewed and analyzed documents in the production relating to Sallie Mae's public disclosures and communications with securities analysts.  *See id*., ¶ 11.

SLM Ventures served three additional sets of document requests in December 2011 and January 2012, and obtained a court order directing defendants to produce emails from four additional custodians and for an additional nine-month time period in 2006.  *See id*., ¶ 12.  After reviewing the relevant documents, lead counsel deposed nine senior current and former executives of Sallie Mae who participated in the PEL business and the accounting practices at issue in the Complaint.  Lead counsel also appeared at the depositions of four of the confidential witnesses cited in the Complaint who defendants had subpoenaed for deposition.  *See id*., ¶ 13.

**4.     Class Certification**

SLM Ventures moved for class certification in April 2011.  Plaintiff relied on a

comprehensive affidavit from Gregg Jarrell, a professor of economics and finance at the University of Rochester's William E. Simon Graduate School of Business Administration.  Dkt. Nos. 131-135.  His affidavit, based upon a review of numerous case documents, addressed market efficiency and a methodology for examining loss causation on a class-wide basis. Professor Jarrell produced more than 18,000 pages of documents he relied upon in preparing his affidavit, was deposed twice by defendants, and also submitted a rebuttal affidavit to address the arguments raised by defendants' class certification expert, Professor Christopher James.  Lead counsel also reviewed the documents produced by Professor James and completed his deposition.  *See* Levine Decl., ¶ 15.

While the class certification motion was pending, and seizing on arguments made by defendants in their opposition to class certification, both of the other former lead plaintiff movants filed letters with the Court requesting a pre-motion conference to discuss their intention to again seek appointment as lead plaintiff.  Dkt. Nos. 149-150.  On January 24, 2012, the Court rejected the requests to reconsider the appointment of lead plaintiff and granted SLM Ventures' motion for class certification.  Dkt. No. 160.

### 5.    Experts and Consultants

Because of the complex accounting and financial reporting allegations in the case and the loss causation and damage defenses raised by defendants in their motion to dismiss and in opposition to class certification, SLM Ventures relied throughout the litigation on various experts and consultants.  In addition to preparing two affidavits and being deposed twice in connection with class certification, Professor Jarrell, supported by consulting firm Forensic Economics, had begun preparing his expert report by the time the Court's order certifying the class had issued.  SLM Ventures' accounting expert, retained at the commencement of the litigation, assisted lead counsel in its pre-filing investigation, drafting the Complaint and discovery requests, and negotiating with defendants and non-parties concerning the accounting documents to be produced.  He also reviewed relevant accounting and financial documents, helped lead counsel prepare for many of the depositions, and had begun work on an expert report

at the time settlement was reached.  SLM Ventures also consulted with an expert on loan loss reserves, who was preparing to begin work on another expert report if the case did not settle. *See* Levine Decl., ¶ 17.

### 6.      Settlement Negotiations

In December 2011 and January 2012, following the close of class certification briefing but before the Court's certification order, the parties and counsel participated in two formal, day-long mediation sessions in New York before the Honorable Daniel Weinstein (Ret.).  Prior to the first mediation session, the parties submitted comprehensive confidential mediation statements to Judge Weinstein.  Representatives of defendants' insurance carriers also attended both mediation sessions.  While progress was made during these mediation sessions, the parties were unable to reach a resolution and the litigation continued during this period.  *See* Declaration of the Hon. Daniel H. Weinstein in Support of Motion for Preliminary Approval of Class Action Settlement ("Weinstein Decl."), Dkt. No. 167, ¶¶ 4-5.

In between the two mediation sessions and following the second session, Judge Weinstein continued to negotiate with the parties and defendants' insurers to see if the case could be resolved.  After the Court granted SLM Ventures' motion for class certification, and as the fact discovery cut-off date approached, the negotiations accelerated and the parties ultimately were able to reach a settlement in principle in early February 2012.  *See* Weinstein Decl., ¶ 6.

### 7.      The Proposed Settlement

The proposed Settlement[2] now before the Court provides for a recovery for the class certified in the Court's January 24, 2012 order of $35 million in cash, in exchange for the dismissal of all claims that were or could have been asserted against defendants in the action.  If the Settlement is approved and becomes final, defendants have no right to the return, recovery or reversion of any portion of the Settlement Fund.

---

[2]      Capitalized terms in this memorandum are defined in the Settlement Agreement.  *See* Dkt. No. 166, Ex. 1.

8.      **Preliminary Settlement Approval**

On April 18, 2012, the Court granted preliminary approval of the Settlement, approved

the appointment of A.B. Data, Ltd. as Claims Administrator, directed the provision of notice of

the Settlement to class members and set a briefing and hearing schedule regarding final approval

of the Settlement.  *See* Dkt. No. 169.  In accordance with the Court's order, settlement notices

and proof of claim forms were mailed to class members beginning on May 3, 2012 and a

summary of the settlement notice was published in the national edition of *Investor's Business

Daily* on May 10, 2012.  *See* Affidavit of Christina Peters-Stasiewicz, ¶¶ 9-11, 17.

In accordance with the terms of the Settlement, the $35 million Settlement Fund was

placed in an escrow account on May 18, 2012.  *See* Levine Decl., ¶ 20.

## FINAL APPROVAL IS WARRANTED

**A.      The Legal Standard for Final Approval**

"The settlement of complex class action litigation is favored by the Courts."  *In re

Warner Chilcott*, 2008 WL 5110904, at *1 (citing *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396

F.3d 96, 116 (2d Cir. 2005)); *see also In re Paine Webber Ltd. P'ships Litig.*, 147 F.3d 132, 138

(2d Cir. 1998) (there is a "strong judicial policy in favor of settlements, particularly in the class

action context").

The Second Circuit has identified nine factors that district courts must consider in

determining whether to approve a class action settlement:

> (1) the complexity, expense and likely duration of the litigation, (2) the
> reaction of the class to the settlement, (3) the stage of the proceedings and
> the amount of discovery completed, (4) the risks of establishing liability, (5)
> the risks of establishing damages, (6) the risks of maintaining the class
> action through the trial, (7) the ability of the defendants to withstand a
> greater judgment, (8) the range of reasonableness of the settlement fund in
> light of the best possible recovery, (9) the range of reasonableness of the
> settlement fund to a possible recovery in light of all the attendant risks of
> litigation.

*In re Warner Chilcott*, 2008 WL 5110904, at *1 (quoting *City of Detroit v. Grinnell Corp.*, 495

F.2d 448, 462 (2d Cir. 1974)).

B.       The *Grinnell* Factors Support Final Approval

The proposed Settlement warrants final approval under Rule 23(e) and the *Grinnell* factors.

1.       The Complexity, Expense and Likely Duration of the Litigation

SLM Ventures has been litigating this case for four years, and has thus far defeated defendants' motion to dismiss and succeeded in obtaining class certification. The parties also engaged in hard fought discovery resulting in several litigated discovery disputes, many hours of negotiations, numerous depositions and the production and detailed review of more than 1.7 million pages of documents. Should litigation continue, there is every reason to expect that it would be equally contentious. At the time the parties reached the Settlement, defendants were preparing to make a supplemental production of documents in response to the Court's discovery ruling, and there was a possibility that the pre-trial schedule would be extended. SLM Ventures had twelve additional days of depositions scheduled and numerous experts on both sides were gearing up for the expert discovery phase of the litigation and the anticipated motions for summary judgment.

If the case did not settle, the parties faced the expense and delay of completing fact and expert discovery, additional motion practice, trial and potential appeals. *See, e.g.*, *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 (CM) (PED), 2010 WL 4537550, at *15 (S.D.N.Y. Nov. 8, 2010) ("Although Plaintiffs have conducted significant fact discovery, the costs and duration of completing fact discovery, conducting expert discovery, additional motion practice, trial preparation, the trial itself, post-trial motions, and any appeals would be substantial."); *In re Alloy, Inc. Sec. Litig.*, No. 03 Civ. 1597 (WHP), 2004 WL 2750089, at *2 (S.D.N.Y. Dec. 2, 2004) (approving settlement in complex securities fraud case where issues "were likely to be litigated aggressively, at substantial expense to all parties").

Continued litigation would not only be extremely expensive, it would delay any recovery to class members. Because of "the lengthy, costly, and uncertain course of further litigation, the settlement provides a significant and expeditious route to recovery for the Class," and "it may be

preferable 'to take the bird in the hand instead of the prospective flock in the bush.'" *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 163 F.R.D. 200, 210 (S.D.N.Y. 1995) (quoting *Oppenlander v. Standard Oil Co.*, 64 F.R.D. 597, 624 (D. Colo. 1974)); *see also In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, No. MDL 1500, 02 Civ. 5575 (SWK), 2006 WL 903236, at *8 (S.D.N.Y. Apr. 6, 2006) (because of their "notorious complexity," securities class actions often settle to "circumvent[] the difficulty and uncertainty inherent in long, costly trials") (citations omitted); *In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510, 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007) ("Securities class actions are generally complex and expensive to prosecute.").

### 2. The Reaction of the Class to the Settlement

As detailed above, notice of the Settlement was mailed to members of the class beginning on May 3, 2012 and published on May 10, 2012. *See* Peters-Stasiewicz Aff., ¶¶ 9-11, 17. Pursuant to the Court's preliminary approval order, class members have until June 29, 2012 to object to or exclude themselves from the Settlement. *See* Dkt. No. 169. Plaintiff will respond to any comments or objections by class members in its reply brief regarding final approval of the Settlement.

### 3. The Stage of the Proceedings and the Amount of Discovery Completed

The Settlement was reached after considerable discovery of SLM Venture's claims and defendants' defenses. *See Hicks v. Stanley*, No. 01 Civ. 10071 (RJH), 2005 WL 2757792, at *6 (S.D.N.Y. Oct. 24, 2005) ("Fairness is also indicated by the fact that the settlement was reached after thorough discovery, including substantial document review and the depositions of ten Morgan Stanley witnesses."). The parties took 19 depositions, and engaged in extensive expert discovery in connection with class certification. Lead counsel have reviewed and analyzed nearly 2 million pages of documents produced by defendants and relevant non-parties. Plaintiff was subjected to thorough discovery as well. Because of the completion of a significant portion of discovery and the advanced stage of the litigation, the parties are well-informed about "the strengths and weaknesses of their respective cases" and have "adequate information about their

claims." *In re Warner Chilcott*, 2008 WL 5110904, at *2 (quoting *In re Global Crossing Secs. & ERISA Litig.*, 225 F.R.D. 436, 458 (S.D.N.Y. 2004)).  This factor therefore weighs in favor of final approval of the proposed settlement.

  **4.**  **The Risks of Establishing Liability and Damages**

  The risks presented by securities litigation generally, and this case in particular, weigh in favor of final approval.  Courts, including courts within this district, "have long recognized that [securities] litigation is notably difficult and notoriously uncertain."  *In re Flag Telecom*, 2010 WL 4537550, at *15 (quoting *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999)).  In the course of this litigation, defendants have asserted many of the typical defenses to securities allegations—that the statements plaintiff challenges were not false or misleading and that plaintiff cannot prove scienter, loss causation, or damages.  "Defendants could be expected to gather additional evidence for each of these defenses and to assert them in a motion for summary judgment and/or at trial and, if necessary, on appeal."  *Id.* (finding that several "issues present significant hurdles to plaintiffs' ability to prove defendants' liability, including difficulties in establishing defendants' 'actual knowledge' of falsity, dueling interpretations of established accounting standards, and proving that defendants' reliance on the advice of two accounting firms was unreasonable"); *see also In re AOL Time Warner*, 2006 WL 903236, at *11 ("The difficulty of establishing liability is a common risk of securities litigation.").

  This case also poses hurdles not present in many other securities cases because it involves complex allegations of accounting fraud involving the setting of loan loss reserves.  *See In re Warner Chilcott*, 2008 WL 5110904, at *2 ("The claims in this case were complex, which *ipso facto* gives rise to uncertainty.").  Citing *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011), defendants can be expected to argue that in order to prevail on the accounting fraud allegations  at the heart of the case, plaintiff would need to prove not only that Sallie Mae's judgmental loan loss reserves were objectively false, but also that they were disbelieved by defendants at the time the reserves were publicly reported.

  Defendants have also taken every opportunity to point out that:  (i) the financial

statements challenged in the Complaint have never been restated; (ii) PwC to this day stands by those financial statements, which it either audited or reviewed on a quarterly basis during the Class Period; (iii) other than the allegations in the litigation, there have been no other accusations or assertions of accounting fraud by defendants by any other person or entity; and (iv) the SEC never undertook to investigate, much less take formal action against defendants based on the facts alleged in the case.  *See, e.g.*, *In re Bristol-Myers Squibb Sec. Litig.*, 361 F. Supp. 2d 229, 234 (S.D.N.Y. 2005) (noting that cases involving a company's restatement of its financials "fall[] along the low end of the continuum of risk"); *In re Elan Sec. Litig.*, 385 F. Supp. 2d 363, 375 (S.D.N.Y. 2005) (finding low risk where the SEC had commenced a parallel proceeding).

While plaintiff believes that the evidence gathered in discovery supports the claims asserted in the Complaint, if the parties proceeded through summary judgment, plaintiff faced the risk that the Court might accept some or all of defendants' defenses to liability, including their contention that plaintiff could not prove loss causation.  *See, e.g.*, *In re Omnicom Group, Inc.*, 541 F. Supp. 2d 546, 551-54 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010). Defendants were also certain to vigorously contest damages at trial.  *See In re AOL Time Warner*, 2006 WL 903236, at *9 (noting that "the legal requirements for recovery under the securities laws present considerable challenges, particularly with respect to loss causation and the calculation of damages").  "Even in a less challenging case, '[c]alculation of damages is a complicated and uncertain process, typically involving conflicting expert opinion about the difference between the purchase price and the stock's "true" value absent the alleged fraud.'"  *In re Flag Telecom*, 2010 WL 4537550, at *18 (quoting *Global Crossing*, 225 F.R.D. at 459).

**5.      The Risks of Maintaining the Class Action Through Trial**

There is always a risk that the Court could find a reason to decertify the class, an option it has up until judgment under Rule 23(c)(1)(C), or that the Court would grant defendants' inevitable motion for summary judgment.  *See, e.g.*, *Gortat v. Capala Bros., Inc.*, No. 07 CIV. 3629 ILG SMG, 2012 WL 1116495, at *2 (E.D.N.Y. Apr. 3, 2012) (quoting *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 n. 9 (2d Cir. 2007): a district court

that has certified a class under Rule 23 "can always alter, or indeed revoke, class certification at any time before final judgment is entered should a change in circumstances" render a class action no longer appropriate).

> **6.** **The Ability of Defendants to Withstand a Greater Settlement**

Sallie Mae's ability to withstand a greater settlement is not at issue.  This factor, however, is generally not determinative.  *See In re Wayfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538 (3d Cir. 2004); *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d Cir. 2001) (finding no abuse of discretion in the district court's finding that "the defendants' ability to withstand a higher judgment weighed against the settlement," but that "this factor, standing alone, does not suggest that the settlement is unfair").

> **7.** **The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risks of Litigation**

"In analyzing these last two factors, the issue for the Court is not whether the Settlement represents the 'best possible recovery,' but how the Settlement relates to the strengths and weaknesses of the case." *In re Flag Telecom*, 2010 WL 4537550, at *20.  "[I]n any case, there is a range of reasonableness with respect to a settlement." *Id.* (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).  This range of reasonableness "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman*, 464 F.2d at 693.

The proposed Settlement will provide class members with a $35 million cash recovery, which represents approximately 6.5% of plaintiff's estimate of the maximum damages attributable to the alleged wrongdoing that might be recovered at trial.  This result is well within the range of reasonableness. *See, e.g.*, *In re Merrill Lynch Research Reports Sec. Litig.,* Nos. 02 MDL 1484(JFK), et al., 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (finding that 6.25% of estimated damages was "at the higher end of the range of reasonableness of recovery in class action securities litigations").

The settlement compares favorably with recent settlements in other securities class action

cases.  In recent years, courts in this District have routinely approved settlements in securities class action cases that range from 2% to 10% of estimated damages.  *See, e.g.*, *In re Initial Public Offering Sec. Litig.,* 671 F. Supp. 2d 467, 483 (S.D.N.Y. 2009) (2.0% of estimated recovery); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,* No. 02 Civ. 5097(JFK), 2007 WL 4526593, at *11 (S.D.N.Y. Dec. 20, 2007) (2.15-4.07% of estimated recovery); *Hall v. Children's Place Retail Stores, Inc.*, 669 F. Supp. 2d 399, 402 (S.D.N.Y. 2009) (5.0-12.0% of estimated recovery); *In re Nortel Networks Sec. Litig.*, No. 01 CIV. 1855 (RMB), 2006 WL 3802198, at *6 (S.D.N.Y. Dec. 26, 2006) (10.0% of estimated recovery).

Securities class action settlements in 2011 averaged $21 million.  About 80% of cases filed after the PSLRA was enacted in 1995 have settled for less than $25 million, with more than half settling for less than $10 million.  And the median percentage of estimated damages recovered in 2011 settlements was 2.1%.  *See* Ellen M. Ryan & Laura E. Simmons*,* Securities Class Action Settlements: 2011 Review and Analysis (Cornerstone Research 2012);[3] *see also In re Flag Telecom*, 2010 WL 4537550, at *20 (citing Cornerstone Research's analysis of other settlements as "objective data" of the settlement's reasonableness).  By any of these measures, given the expense, likely duration and risks of continued litigation, the proposed Settlement is within the range of reasonableness and merits final approval.  Both Judge Weinstein and lead plaintiff concur in this conclusion.  *See* Weinstein Decl., ¶¶ 7-8, and Declaration of Sam Sootodeh in Support of Lead Plaintiff SLM Ventures' Motions for Final Approval of Class Action Settlement and for Award of Attorneys' Fees and Reimbursement of Litigation Expenses, ¶ 5.

## CONCLUSION

For all of the foregoing reasons, SLM Ventures respectfully requests that the Court grant final approval to the proposed settlement and enter the Order of Final Judgment submitted herewith.

---

[3]      Available at http://www.cornerstone.com/securities_settlements_2011/.

DATED:  May 18, 2012                         Respectfully submitted,

**GIRARD GIBBS LLP**

By:   /s/*Jonathan K. Levine*
         Jonathan K. Levine

Jonathan K. Levine
711 Third Avenue, 20th Floor
New York, NY  10017
Telephone:  (212) 867-1721
Facsimile:  (212) 867-1767

Daniel C. Girard
Amanda M. Steiner
Christina C. Sharp
**GIRARD GIBBS LLP**
601 California Street, Suite 1400
San Francisco, CA  94108
Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846

**Lead Plaintiff's Counsel**

## CERTIFICATE OF SERVICE

I, Jonathan K. Levine, hereby certify that on May 18, 2012, I caused the following

document(s) to be filed electronically with the United States District Court for the Southern

District of New York through the Court's mandated ECF service:

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF SLM VENTURES'
MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

Counsel of record are required by the Court to be registered e-filers, and as such are

automatically e-served with a copy of the document(s) upon confirmation of e-filing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of May, 2012 at San Francisco, California.


/s/ Jonathan K. Levine
Jonathan K. Levine